Gregory S. Gilbert (6310)
Jon T. Pearson (10182)
Elody C. Tignor (15663)
HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
702.669.4600
702.669.4650 fax
gsgilbert@hollandhart.com
jtpearson@hollandhart.com
ectignor@hollandhart.com

*Counsel for Defendant/Counterclaim Plaintiff
Consulting by AR, LLC*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Ignite Spirits, Inc., a Wyoming corporation,<br><br>Plaintiff,<br><br>v.<br><br>Consulting by AR, LLC, a Florida limited liability company; Does I through X, inclusive; and Roe Business Entities I through X, inclusive,<br><br>Defendants.<br><br>———————————<br><br>Consulting by AR, LLC,<br><br>Counterclaim Plaintiff,<br><br>v.<br><br>Ignite Spirits, Inc. (f/k/a Ignite Beverages, Inc.); Ignite International Ltd.; and Ignite International Brands, Ltd.,<br><br>Counterclaim Defendants. | Case No. 2:21-cv-01590-JCM-EJY<br><br>**CONSULTING BY AR, LLC'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**<br><br>**Public [Redacted] Version as Filed on September 7, 2021** |

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

1

**ANSWER**

Defendant Consulting by AR, LLC ("Company") answers the Complaint of plaintiff Ignite Spirits, Inc. ("Ignite Spirits") as follows. The numbered paragraphs below correspond to the numbered paragraphs in the Complaint. If not specifically admitted, the Company denies all allegations in Ignite Spirits' Complaint.

**PARTIES**

1. The Company admits that Ignite Spirits is a Wyoming corporation. The Company lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 1 and thus denies them.

2. The Company admits the allegations in paragraph 2.

3. The Company lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 and thus denies them. The Company states that Ignite Spirits' pleading of fictitious defendants was not based on a reasonable, good-faith belief that unknown defendants should or could be added to Ignite Spirits' declaratory judgment action.

**JURISDICTION AND VENUE**

4. Paragraph 4 contains characterizations, legal arguments, and conclusions of law to which no response is required. If a response is required, the Company admits that before removal, the Eighth Judicial District Court, Clark County, Nevada had subject-matter jurisdiction over this action. The Company denies the remaining allegations in paragraph 4.

5. Paragraph 5 contains characterizations, legal arguments, and conclusions of law to which no response is required. If a response is required, the Company admits that before removal, venue was appropriate in the Eighth Judicial District Court, Clark County, Nevada.

**GENERAL ALLEGATIONS**

6. The Company incorporates its answers to paragraphs 1 through 5 above as if fully set forth here.

7. Paragraph 7 contains characterizations, legal arguments, and conclusions of law relating to the contents of a written document to which no response is required. The Company states that on March 11, 2021, the Company, Ignite Spirits, and Ignite International Brands, Ltd.

2

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

("Ignite Brands") entered into a Letter Agreement. The Company denies the remaining allegations in paragraph 7.

8.      Paragraph 8 contains characterizations, legal arguments, and conclusions of law relating to the contents of a written document to which no response is required. The Company refers to the Letter Agreement for its contents, and refers to its Counterclaims for a more detailed and accurate summary of the facts, including the conduct by Ignite Spirits, Ignite Brands, and others relating to the Company successfully obtaining a valuable strategic marketing and promotional partnership for Ignite with Resorts World Las Vegas, LLC.

9.      The Company denies the allegations in paragraph 9.

10.     The Company denies the allegations in paragraph 10.

11.     Paragraph 11 contains characterizations, legal arguments, and conclusions of law to which no response is required. If a response is required, the Company denies the allegations in paragraph 11.

12.     Paragraph 12 contains characterizations, legal arguments, and conclusions of law to which no response is required. If a response is required, the Company denies the allegations in paragraph 12.

13.     The Company denies the allegations in paragraph 13.

14.     The Company denies the allegations in paragraph 14.

15.     The Company denies the allegations in paragraph 15.

16.     The Company denies the allegations in paragraph 16.

17.     The Company denies the allegations in paragraph 17.

18.     Answering paragraph 18, the Company admits that it retained counsel, and states that its counsel served a demand letter. The Company denies the remaining allegations in paragraph 18.

19.     Answering paragraph 19, the Company states that Ignite Spirits seeks a declaratory judgment. The Company denies the remaining allegations in paragraph 19.

20.     Answering paragraph 20, the Company states that Ignite Spirits seeks a declaratory judgment. The Company denies the remaining allegations in paragraph 20.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

3

21.     Answering paragraph 21, the Company states that Ignite Spirits seeks a declaratory judgment. The Company denies the remaining allegations in paragraph 21.

22.     The Company lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 and thus denies them.

### FIRST CLAIM FOR RELIEF

### (DECLARATORY RELIEF)

23.     The Company incorporates its answers to paragraphs 1 through 22 above as if fully set forth here.

24.     The Company denies the allegations in paragraph 24.

25.     Answering paragraph 25, the Company states that Ignite Spirits seeks a declaratory judgment. The Company denies the remaining allegations in paragraph 25.

26.     Answering paragraph 26, the Company states that Ignite Spirits seeks a declaratory judgment. The Company denies the remaining allegations in paragraph 26.

27.     Answering paragraph 27, the Company states that Ignite Spirits seeks a declaratory judgment. The Company denies the remaining allegations in paragraph 27.

28.     The Company denies the allegations in paragraph 28.

29.     The Company denies the allegations in paragraph 29.

### RESPONSE TO THE PRAYER FOR RELIEF

The "Wherefore" paragraphs numbered 1 through 3 in the Complaint state Ignite Spirits' Prayer for Relief, to which no answer is required. If an answer is required, the Company denies the allegations in the Prayer for Relief, and denies that Ignite Spirits is entitled to any relief.

### AFFIRMATIVE AND OTHER DEFENSES

The Company asserts the following defenses. Ignite Spirits' request for declaratory relief is barred in whole or in part for the reasons set forth in the Counterclaims below, and the defenses set forth below incorporate the factual allegations of the Counterclaims by reference. In asserting these defenses, the Company does not assume the burden of proof on any issue as to which applicable law places the burden of proof on Ignite Spirits. The Company reserves the right to assert additional defenses, as warranted by facts learned through investigation and discovery, and

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

4

reserves the right to amend its answer to assert such additional defenses, as allowed under Rule 15 of the Nevada Rules of Civil Procedure.

1.      Ignite Spirits' Complaint fails to state a claim upon which relief can be granted.

2.      The request for declaratory relief set forth in Ignite Spirits' Complaint is barred by the doctrines of waiver, acquiescence, and estoppel.

3.      On information and belief, the damages, if any, that were allegedly sustained by Ignite Spirits because of the acts complained of in the Complaint were caused in whole or in part or were contributed to through the acts, omissions, negligence, or intentional misconduct of Ignite Spirits, its respective agents, predecessors, or related entities.

4.      Ignite Spirits' request for declaratory relief is barred by the doctrine of equitable and promissory estoppel.

5.      Because of Ignite Spirits' own careless, negligent, or other wrongful conduct, Ignite Spirits is barred from recovering anything from the Company by the equitable doctrine of unclean hands.

6.      Ignite Spirits' request for declaratory relief is barred because the Company substantially performed its respective contractual duties and obligations under the Letter Agreement and later modified by Ignite Spirits, its representatives, and related entities.

7.      If the Company failed to perform any contractual duty or obligation, the Company's failure was justified.

8.      Ignite Spirits is barred from claiming or recovering any relief because Ignite Spirits and its agents and related entities excused the Company from performing certain duties and obligations set forth in the Letter Agreement.

9.      Ignite Spirits' Complaint is barred because the relief sought frustrates the purpose of the parties' agreements, including the Letter Agreement—i.e., the Letter Agreement and any modifications made to the Letter Agreement by Ignite Spirits' or any other Ignite-related party's conduct after signing the Letter Agreement.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

5

10.    Ignite Spirits' request for declaratory relief is barred, in whole or in part, because any recovery would result in unjust enrichment to Ignite Spirits and certain related parties, including Ignite International Brands, Ltd. and Ignite International, Ltd.

11.    Ignite Spirits failed to join required party, Ignite Brands.

12.    Ignite Spirits has no right to interest, attorneys' fees, or costs in connection with this lawsuit.

13.    Ignite Spirits' request for declaratory relief is barred based on the Letter Agreement at issue in the Complaint due to Ignite Spirits' own statements, modifications, inactions, or other conduct ratifying the Letter Agreement.

14.    In accordance with Rule 11 of the Federal Rules of Civil Procedure, at the time of the filing of this Answer, all possible affirmative defenses may not have been alleged inasmuch as sufficient facts and other relevant information may not have been available after reasonable inquiry, and therefore the Company reserves its right to amend this Answer to allege additional affirmative defenses if subsequent investigation warrants the same.

[Counterclaims on Next Page]

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

6

# COUNTERCLAIMS

Counterclaim plaintiff Consulting by AR, LLC ("Company") brings these Counterclaims against counterclaim defendants Ignite Spirits, Inc. (f/k/a Ignite Beverages, Inc. ("Ignite Spirits")), Ignite International, Ltd. ("Ignite International"), and Ignite International Brands, Ltd. ("Ignite Brands," and with Ignite Spirits and Ignite International, "Ignite" or "Counterclaim Defendants") and alleges as follows. Counts 1, 2, 3 are against Ignite Spirits and Ignite Brands, Count 4 is against Ignite Brands, and Count 5 is against Counterclaim Defendants.

## COUNTERCLAIM PARTIES AND RELEVANT NON-PARTIES

### A.   Counterclaim Parties

1.     Counterclaim plaintiff Company is a Florida limited-liability company. Alan Richardson is the Company's sole member and manager. Richardson permanently resides in Miami-Dade County, Florida.

2.     Counterclaim defendant Ignite Spirits is a for-profit Wyoming corporation headquartered in Los Angeles County, California.

3.     Counterclaim defendant Ignite International is a for-profit Wyoming corporation headquartered in Los Angeles County, California.

4.     Counterclaim defendant Ignite Brands is a for-profit publicly traded British Columbia corporation headquartered in Vaughan, Ontario. Ignite Brands' common shares trade on the Canadian Securities Exchange under the ticker "BILZ," and on the OTCQX market under the ticker "BILZF." Ignite Spirits and Ignite International are wholly-owned subsidiaries of Ignite Brands.

### B.   Relevant Non-Parties

5.     Dan Bilzerian is the founder, CEO, and chairman of the board of directors of Ignite Brands. Dan Bilzerian is also a member of the board of directors of Ignite International. Dan Bilzerian touts himself as being an internationally recognized and respected social media celebrity who has amassed over 40 million followers across prominent social media platforms.

6.     John Schaefer is the President of Ignite Spirits and Ignite International, and is a member of the board of directors of Ignite Spirits. Schaefer is also the President and COO of Ignite

7

Brands.

7.    Paul Bilzerian is Dan Bilzerian's father, and is known as a former corporate takeover specialist. He is most well-known, though, for his prolonged legal battle with the U.S. Securities & Exchange Commission over profits made during his tenure as a corporate raider. In 2019, Paul Bilzerian renounced his American citizenship in protest of what he purports has been "a long and disappointing experience in the federal judicial system that has been consistently unjust and shown little regard for the law or the truth." Despite Paul Bilzerian's rich history, he actively participated and led the negotiations on behalf of Ignite, including events that precipitated the filing of this lawsuit.

8.    David Bell is the co-founder and managing director of Lean Staffing Solutions, Inc., a for-profit Florida corporation. Bell is a close associate of Paul Bilzerian's. Dan Bilzerian's brother, Adam Bilzerian, is a member of the board of directors of Bell's company, Lean Staffing Solutions. Bell was apparently "used" by Ignite to be a consultant in matters relating to the subject transactions described below.

9.    Resorts World Las Vegas, LLC ("Resorts World") is a casino and resort located on the Las Vegas Strip. Resorts World opened on June 24, 2021. It is the first new resort to be completed on the Las Vegas Strip since the Cosmopolitan, which opened in 2010. At a cost of about $4.3 billion, Resorts World is the most expensive resort property ever developed in Las Vegas. It includes a 117,000-square-foot casino and a 59-story tower housing three Hilton brand hotels: the Las Vegas Hilton at Resorts World; Conrad Las Vegas at Resorts World; and Crockfords Las Vegas. Resorts World's west tower features a state-of-the-art 100,000-square-foot exterior LED screen used for digital advertising for various brands and events associated with Resorts World. It is the largest exterior LED building display in the United States, and it can be seen down Las Vegas Boulevard, as well as north bound traffic along the I-15 Freeway.

## JURISDICTION AND VENUE

10.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332, because there is complete diversity of citizenship between the Company and Counterclaim Defendants, and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000. This

8

Court also has supplemental jurisdiction over these Counterclaims under 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Counterclaim Defendants because they have transacted and continue to transact business in the District of Nevada, the subject agreements are governed by Nevada law, and Ignite Spirits and Ignite Brands contractually agreed to submit to the jurisdiction of the state and federal courts sitting in Nevada.

12.     Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims in these Counterclaims occurred in this District and, as discussed above, because Counterclaim Defendants are subject to the Court's personal jurisdiction in this District.

**FACTUAL ALLEGATIONS**

**A.     Richardson Offers to Broker a Strategic Marketing and Promotional Partnership for Ignite with Resorts World**

13.     Ignite is a global consumer-packaged goods company, operating in the premium product segment of the market. Its product categories include nicotine and synthetic vape products, performance drinks named ZRO, spirits featuring vodka, and apparel.

14.     Dan Bilzerian claims to be personally involved with the selection and sourcing of every Ignite product that goes to market, and believes that with the backing of his social media followers, he provides "Ignite with a unique edge in an increasingly saturated and heavily regulated competitive landscape." Despite Dan Bilzerian's public persona with millions of social media followers, Ignite lacked any significant presence on the Las Vegas Strip, and had little, if any, presence in the resort and casino industry generally.

15.     Given this lack of presence, in or about January 2021, the Company's managing member, Richardson, approached Dan Bilzerian—someone he has known for over 15 years— offering to broker a strategic marketing and promotional partnership for Ignite with Resorts World. Based on the publicity surrounding the long-awaited opening of Resorts World, Richardson thought that Ignite and Resorts World could be a natural fit: Resorts World would benefit from Dan Bilzerian's social media follower-network, and Ignite would immediately obtain exposure and recognition for being linked to a new multi-billion-dollar resort on the Las Vegas Strip. Dan

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Bilzerian was extremely interested and introduced Richardson to Bell so that they could continue to discuss Richardson's proposal.

**B.     The Letter Agreement between the Company, Ignite Spirits, and Ignite Brands**

16.     On March 11, 2021, and after negotiations between Richardson, Bell, Dan Bilzerian, and Paul Bilzerian, the Company entered into a Letter Agreement with Ignite Spirits and Ignite Brands. Richardson signed the Letter Agreement on behalf of the Company. Schaefer signed as "President," which Richardson understood was on behalf of Ignite Spirits and Ignite Brands. In fact, Ignite Brands is a party, beneficiary, and obligor under the Letter Agreement as evidenced by, among other things, the Letter Agreement, the exhibits to the Letter Agreement, and the Stock Option Plan for Ignite Brands that was provided by Paul Holden, General Counsel for Ignite, to the Company's counsel. After signing the Letter Agreement, Paul Bilzerian offered his "sincere" wish to the Company's counsel that the Letter Agreement "leads to great success for Alan [Richardson], Ignite, and Resorts World."

17.     The Letter Agreement provides that the Company has a right to receive compensation, including, among other things, shares of Ignite Brands' █████████ stock valued at CA$█████, if a definitive agreement with Resorts World is signed by July 1, 2021.[1] Although the Letter Agreement provides that the definitive agreement with Resorts World must be signed by July 1, the Letter Agreement lacks a time-of-the-essence provision. In fact, the July 1 date was simply a target date that was loosely tied to the various celebrations planned for the Resorts World's grand opening and related events. The parties never had discussions about the significance of that specific date.

18.     The definitive agreement with Resorts World was to contain substantially all terms set forth in Exhibit A to the Letter Agreement. Below are the terms set forth in Exhibit A to the Letter Agreement that were used by the Company to negotiate a strategic marketing and promotional partnership for Ignite with Resorts World.

---

[1] "CA$" refers to the Canadian dollar.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134



**OOH LED Exposure**

**Product Integration**

**Hospitality Bank**

**Partner Exclusivity**

**Social Media Integration**

**Appearances**

**Term**

**Poker Room**

**C.    Ignite Modified or Waived Terms of the Letter Agreement by Insisting that Richardson Obtain Even More Favorable Terms for Them**

19.    Right after signing the Letter Agreement, Richardson began brokering the strategic marketing and promotional partnership for Ignite with Resorts World. His discussions with Resorts World centered on the terms sought by Ignite in Exhibit A to the Letter Agreement. Within weeks, Richardson secured an outline proposal from Resorts World. Resorts World's outline proposal was meant to facilitate a letter of intent between Ignite and Resorts World that would then be used to

finalize a definitive agreement between the parties.

20.   Richardson provided Resorts World's outline proposal to Ignite's representatives, including Bell, Dan Bilzerian, and Paul Bilzerian. After reviewing Resorts World's outline proposal, Paul Bilzerian immediately demanded that Richardson obtain even more favorable terms than originally sought by Ignite. Paul Bilzerian identified seven so-called issues with Resorts World's outline proposal, and threatened to adjust the Company's compensation if *his* demands were not met.

Dear Alan,

Thank you for getting us the Outline from Resorts World. I have attached the original signed agreement with you; the Resorts World Outline; and a comparison of the two, highlighting the disparities. We probably need to figure out if we can move Resorts World and, if not, what adjustment we should make to your compensation. We will now need to present this to Ignite's Board of Directors, which consists of five outside directors plus Dan. Let us schedule a call later this week to discuss it further.

A summary of the changes are:



HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

21.     Dan Bilzerian later told Richardson that "if u [sic] can get me some money and get rid of the exclusive then I think [the deal] can work[.]" He emphasized that Richardson was to "bring [him] the sweetheart deal that is worth ███████████ of stock," and "[n]ot some slave ass contract for a slot in the mini bar." By "slave ass contract," Dan Bilzerian was referring to his personal obligations that would be required under the deal, which were obligations originally sought and agreed to by Ignite and Dan Bilzerian in the Letter Agreement.

22.     Although the Company's compensation was never modified, and the Company had been negotiating a strategic marketing and promotional partnership based on the terms identified in Exhibit A to the Letter Agreement, Richardson successfully negotiated the more favorable terms sought by Ignite, Paul Bilzerian, and Dan Bilzerian, including modifying ██ ███████████████████████████████████████████████████ ██████████ █████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████—something that the Company was not responsible for delivering under the Letter Agreement but obtained by Richardson because of his desire for Ignite to be successful. His Company, after all, was going to be a stockholder of Ignite Brands.

23.     Based on his efforts, Richardson obtained a draft letter of intent from Resorts World that included these and other more favorable terms for Ignite. On April 22, 2021, Paul Bilzerian provided a revised draft of the letter of intent that Ignite was willing to sign. Paul Bilzerian asked Richardson to "let us [i.e., Ignite] know if you believe this is acceptable to Resorts World[.]" Hours later, Paul Bilzerian asked Richardson "not to communicate with [him] any further, written or oral[,]" and indicated that "the only person who is authorized by Ignite to discuss Resorts World and Ignite with [Richardson] is David Bell." Because Bell is no more than Paul Bilzerian's "yes-man," Paul Bilzerian did not follow his own directive as he continued to discuss the deal with Richardson.

24.     When a modified Letter of Intent was presented and because of the inconsistent messages sent by Paul Bilzerian, the Company's counsel emphasized that Resorts World would not review the modified letter of intent unless it was "signed by Ignite," and there was confirmation

that Dan Bilzerian approved portions of the letter of intent that required his personal services.

Dear Paul [Holden]:

I am counsel to Alan Richardson and Consulting by AR, LLC. . . . We have previously traded a few emails, but the bulk of the conversations regarding the LOI have been between Alan and Paul or Dan Bilzerian. Mr. Paul Bilzerian delivered two emails to Alan Richardson this morning which are inconsistent. The first email stated that Ignite would sign the attached LOI only to receive a second email to provide the LOI would be presented to the Ignite board for approval only after it is approved in full by RWLC with a comment that "[Paul] is highly confident [Ignite approval] will happen" and that David Bell would notify Alan if the LOI was approved.

Alan complied with Mr. Paul Bilzerian's request and RWLV told him that they will not review the LOI unless it is signed by Ignite and confirms that Mr. Dan Bilzerian has approved those portions of the LOI that require his personal services. Since Ignite board approval has not been obtained and RWLV is requiring an executed of copy of latest version of Ignite's LOI with the final changes as confirmed by Mr. Paul Bilzerian, can you please coordinate and deliver this executed LOI.

Once received, Mr. Richardson will then present the document to RWLV and until that occurs, we will be on hold. Any questions should be directed to the undersigned using the contact information above.

25.    The next day, Holden provided a copy of a letter of intent signed by Dan Bilzerian and thanked Richardson for his efforts.

Thank you for your letter and efforts to date.  We are very excited to have the opportunity to turn this Letter of Intent into a definitive agreement with Resorts World. Kindly find attached a copy of the LOI executed by Dan Bilzerian.  Given the tight turnaround time to obtain a definitive agreement and ensure that we are prepared for the Grand Opening, we kindly ask that you make every effort to return a fully executed version of LOI to my attention by end of day today.

26.    Before Resorts World signed the letter of intent, Richardson's counsel sought confirmation from Holden that once the letter of intent was signed by Resorts World, the Company had satisfied its obligations under the Letter Agreement to receive its compensation, subject to Resorts World and Ignite signing a definitive agreement. This confirmation was important because Paul Bilzerian was continuously trying to move the goal posts, and made threats that Ignite would not honor its contractual obligations if the Company refused to accede to *his* inconsistent, sporadic demands.

27.    Although the Company's counsel's request was directed to Holden, Holden as General Counsel for a publicly traded company, forwarded the email to Paul Bilzerian so that Paul

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

Bilzerian could respond. Paul Bilzerian, copying Dan Bilzerian, Holden, Bell, and Schaefer, made clear that the Company will have earned its compensation when a definitive agreement between Ignite and Resorts World is signed. Paul Bilzerian never said that the definitive agreement had to be signed by July 1, and he did not suggest, explicitly or implicitly, that the more favorable terms obtained by Richardson would cause an adjustment of the Company's compensation under the Letter Agreement.

> Paul Holden forwarded your email to me. . . . So that there are no misunderstandings, . . . pursuant to the letter agreement dated March 11, 2021, between Consulting by AR, LLC and Ignite ("Agreement"), your client will have earned **<u>nothing</u>** until a **<u>definitive agreement</u>** between Ignite and Resorts World is **<u>signed</u>**.

(Emphasis in original). After casting aspersions against Richardson, none of which are true, Paul Bilzerian made clear that "there is still a deal to be done that could be good for all involved but if Ignite does not receive the signed LOI by [April 26] it [would] move on." The April 26 deadline was invented by Paul Bilzerian.

28. Still, on April 26, Resorts World signed a final letter of intent ("Letter of Intent"). The following day, Schaefer as President and COO signed the Letter of Intent on behalf of Ignite International. The Letter of Intent provides that "[t]he Parties desire to form a strategic marketing alliance, which requires [Resorts World] to purchase and promote Ignite's Products, in exchange for Services by Ignite and other consideration, and both parties agree to negotiate a formal agreement governing this alliance." The Letter of Intent also provides that it was meant to "serve as a temporary and non-binding agreement (unless otherwise stated herein), evidencing the intended terms and conditions of the collaboration between the Parties agreed upon at this time (which good faith negotiations are continuing), while [a definitive agreement] is negotiated."

29. The Company's counsel provided Ignite with the contact person's information at Resorts World so that Ignite could move forward with finalizing the definitive agreements based on the deal brokered by the Company. Holden said that he would reach out to the contact person "to get the ball rolling."

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

**D.      Before Signing the Agreements, Dan Bilzerian Performed His Contractual Obligation by Appearing at Resorts World's Grand Opening Event**

30.      Once the Letter of Intent was signed, and based on Paul Bilzerian's unambiguous representation, the Company fulfilled all obligations that it could because the only remaining issue was finalizing the definitive agreements, which was controlled by Ignite and Resorts World.

31.      In early June 2021, Paul Bilzerian thanked Richardson for his efforts, and made clear that the "beneficial relationship between Ignite and Resorts World" was facilitated by Richardson.

> Dear Alan,
>
> I continue to receive positive reports regarding you and your efforts to help Ignite. I thank you for that. I would like to forget the difficulties of the past, forgive any hard words spoken between us, and work together going forward. Hopefully, we will get a definitive agreement with Resorts World signed soon. In any event, I look forward to the Resorts World opening which looks like it will be spectacular. By the way, everyone also speaks very highly of the Resorts World team, and it appears a *very mutually enjoyable and beneficial relationship between Ignite and Resorts World has developed. I am sure you had much to do with that as well*.

(Emphasis supplied).

32.      A few days later, the initial draft of a definitive agreement was provided by Resorts World to Ignite. Paul Bilzerian, copying Schaefer, Holden, and the Company's counsel, suggested to Richardson that the termination provisions proposed by Resorts World could "affect Ignite's agreement with [the Company]."

> Dear Alan,
>
> We have now received the proposed Resorts World definitive agreement, a copy of which is attached. There are several provisions over which we intend to negotiate for revisions. However, some of the provisions affect Ignite's agreement with you. Our main concern are the termination provisions which allows RW to immediately terminate the agreement for various reasons or without cause on 30 days notice. We cannot sign an agreement with Resorts World, pay you $██████, and then have RW cancel the agreement shortly thereafter. Not only would we have paid an excessive amount for a relationship that would yield no benefits, we would have to deal with the extremely negative affect of having to announce the termination of an agreement Ignite had announced it had signed which is worse than never having signed an agreement at all. ██████████████████████████████████ ██████████████████████████████████ We have every confidence the agreement will not only last 18 months but we hope it is extended. We would like your thoughts before we discuss our changes with RW.

16

The termination provisions and the concerns raised by Paul Bilzerian had never before been raised to the Company. In fact, the Letter Agreement, and all modifications insisted on by Ignite post-signing of the Letter Agreement never referenced the termination provisions. The Company's compensation was never tied to Resorts World's contractual ability to terminate any agreement with Ignite. This was a new concern brought up by Paul Bilzerian at the eleventh hour. Paul Bilzerian also never disclosed any other "issue" that he thought could "affect Ignite's agreement with [the Company]"—because there were none. Regardless, the manufactured issue over the draft termination clause proposed by Resorts World was ultimately resolved through the final definitive agreements.

33.     Before the Agreements were signed, Dan Bilzerian performed his contractual obligation by appearing at Resorts World's grand opening event held on June 24, 2021. If time were of the essence, which it was not, and if the Agreements had to be signed before any performance was provided by Ignite or Dan Bilzerian, Dan Bilzerian would have never performed his sole contractual obligation. After all, his focus was "about making money and Ignites [sic] bottom line," and not being someone's "slave." Dan Bilzerian performed his contractual obligations because he knew, like everyone else, that the strategic marketing and promotional partnership brokered by the Company had been materially finalized and the signing of the Agreements was imminent.

/ / /

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

17

34.    The grand opening event was a success for Ignite. Ignite was provided with an enormous area at the Resorts World pool that featured Ignite's products and other promotional items.

 

 

Resorts World Las Vegas Grand Opening Event



HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

35.    Right after Dan Bilzerian performed his contractual obligation, Bell told Richardson that Dan Bilzerian was happy with the grand opening event.

> Morning, had a great time last night. Highlight of the night was meeting your mother. She has special [e]nergy! We were up till 3 am and Dan did several more posts and tagged RW. He is happy with the event and how it went. You were a great host! Appreciate you!

36.    Hours later, Schaefer expressed his appreciation for Richardson's efforts: "I think [Resorts World] did an amazing job and it was a great opening. I thought we showed up well and ***truly appreciate you making it all happen for us [i.e., Ignite]***." (Emphasis supplied). Schaefer made clear he would tell Paul Bilzerian about "all of the things [Richardson] did [for Ignite] last night."

**E.    The Final Definitive Agreements that Were Brokered by the Company between Ignite International and Resorts World**

37.    After Dan Bilzerian performed his *single* contractual appearance obligation under the Agreements, Ignite's representatives made clear over the next several days that the deal was done and that the parties were cleaning up the documents for an imminent signing. On June 25, for instance, Richardson asked Schaefer about the status of finalizing the Agreements. Schaefer told him that "RW came back and ***changed a lot to our benefit*** so we should be good to go. It's in final review with [P]aul [Holden] now." (Emphasis supplied).

38.    On June 28, Holden provided Resorts World with a "revised agreement highlighting [Ignite International's] few ***final changes***."

> [A]attached is a revised agreement highlighting our few final changes. As discussed on our call, we want to settle and execute the retail license simultaneously with this Agreement. You have our commitment to turn that agreement quickly, once we are in receipt. . . .

(Emphasis supplied). Resorts World then provided a clean copy of the Strategic Marketing Alliance Agreement, and indicated that "[a]ll of Ignite's proposed changes on the last turn were accepted." Resorts World also provided a draft of Retail Pop-Up License Agreement, and asked Ignite whether it has its "liquor licensing in the State of Nevada[,]" and whether Ignite was prepared to obtain the appropriate tobacco licensing for its vape products. On information and

19

belief, Ignite still does not have all of the required licensing.

39. The following day and after the parties finalized a location for the kiosk, Resorts World asked Holden to let them know "[i]f everything else is good to go" so that it could provide a "clean retail agreement" for Ignite to "execute in tandem with the marketing agreement." Later that same day, Paul Bilzerian told Richardson that "[i]t does appear that the definitive agreement is close to being finalized[.]"

> Dear Alan,
>
> Nice to hear from you. Yes, I heard the grand opening was spectacular and wish I could have been there. It does appear that the definitive agreement is close to being finalized but [Resorts World] deleted the kiosk (which is important) so it is being dealt with in a separate agreement that Ignite received yesterday and should have [sic] reviewed and finalized by tomorrow. David Bell will meet with you tomorrow to finalize your deal so that everyone can enter the 4th of July weekend with hugs and smiles.

The pop-up retail (i.e., kiosk), however, was always being dealt with through a separate agreement as evidenced by the Letter of Intent. All the same, Paul Bilzerian never said in words or effect that because the deal will not be signed by July 1, the Company would not receive any compensation. Nor did he suggest that final definitive agreements, including their terms, that were "close to being finalized" would "affect Ignite's agreement with [the Company]."

40. The final definitive agreements that were brokered by the Company—a Retail Pop-Up Space License Agreement and a Strategic Marketing Alliance Agreement (collectively, "Agreements")—between Ignite International and Resorts World were signed on July 2. Schaefer signed the Agreements at 9:24 a.m. (PT), and Resorts World countersigned about an hour later. Paul Bilzerian provided copies of the Agreements to Richardson, and never informed him that based on the terms of the Agreements or any other reason, Ignite would not honor its commitments made to Richardson.

41. The Agreements include the more favorable modified terms sought by Ignite and secured by Richardson. Although much of the value of the Agreements is the marketing and promotional components, Richardson obtained even more value than Ignite sought originally through negotiations that yielded at least $4.5 million in additional value to Ignite and could exceed $13 million.

20

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134



| Provision | The Letter Agreement Between the Company and Ignite | Final Delivered Agreements Brokered by the Company Between Ignite and Resorts World |
|---|---|---|
| OOH Led Exposure | ███████████████ | ███████████████ *Benefactor: Ignite/Dan Bilzerian* |
| Product Integration | ███████████████ | ███████████████ *Benefactor: Ignite/Dan Bilzerian* |
| | ███████████████ | ███████████████ *Substantially the Same* |
| | ███████████████ | ███████████████ *Substantially the Same* |

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

| Provision | The Letter Agreement Between the Company and Ignite | Final Delivered Agreements Brokered by the Company Between Ignite and Resorts World |
|---|---|---|
| Hospitality Bank | ███████ | ███████ *Benefactor: Ignite/Dan Bilzerian* |
| Partner Exclusivity | ███████ | ███████ *Benefactor: Ignite/Dan Bilzerian* |
| Social Media Integration | ███████ | ███████ *Benefactor: Ignite/Dan Bilzerian* |
| Ignite Event Integration | ░░░░░░░ | ███████ |

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134



| Provision | The Letter Agreement Between the Company and Ignite | Final Delivered Agreements Brokered by the Company Between Ignite and Resorts World |
|---|---|---|
| **Appearances** | ███████████ | ███████████ *Benefactor: Ignite/Dan Bilzerian* |
| | ███████████ | ███████████ *Benefactor: Ignite/Dan Bilzerian* |
| | ███████████ | ███████████ *Benefactor: Ignite/Dan Bilzerian* |
| **Term** | ███████████ | ██ |

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134



| Provision | The Letter Agreement Between the Company and Ignite | Final Delivered Agreements Brokered by the Company Between Ignite and Resorts World |
|---|---|---|
| Launch Party | ██████████████████████████████ | ██████████████████████████████<br><br>*Benefactor: Ignite/Dan Bilzerian* |
| Poker Room | ██████████████████████████████ | ██████████████████████████████ |

**F.    Ignite Breaches the Letter Agreement, and Creates a Litigation-Driven False Narrative to Enshield Ignite from Its Bad-Faith Conduct**

42.    The Letter Agreement provides that ███████████████████████ ████████████████████████████████████████████ ████████████" to its compensation, including stock and certain stock options of Ignite Brands. █ ██████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ █ ██████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████



(Emphasis in original).

43.     The Company has never received any of its earned compensation, including the Ignite Brands' ██████████ shares valued at CA$ ████████, and a signed ██████████.

44.     Rather, Ignite, through Paul Bilzerian and Bell, began a schizophrenic approach of orchestrating a litigation-driven narrative by creating false issues and conditions designed to excuse Ignite from honoring its contractual obligations to the Company. Below are just some examples of dishonest representations made by Ignite's representatives to the Company.

/ / /

25

a.   **Ignite Accuses Richardson of "Poisoning the Relationship with Resorts World**. Paul Bilzerian and Bell accuse Richardson of poisoning the relationship with Resorts World, and refused to cause Ignite to honor its contractual obligations until they confirmed otherwise.

**July 5 (Paul Bilzerian)**

I spoke to David and he said he offered to meet with you and you refused. Much, much, much more troubling is he said you have poisoned the relationship with Scott. If that is true, how could you be so self destructive. You must have some kind of personality disorder to screw up something this good for everyone at this point. Everyone says you are a nice guy on the one hand and your own worst enemy on the other. What a shame.

**July 14 (Bell)**

Documents have not been prepared as of yet. Can you arrange a lunch or something with Dan and Scott or John and Scott. Think John will be there next week. Before the documents are circulated Ignite wants to be sure the relationship is still in tact with Scott and the opportunity for Dan and Ignite to build a relationship with him is still there.

If you want to speed this up I suggest making that happen as soon as possible. Once Dan and/or John feels good about it then we should be moving fast. Maybe reach out to John find out when he is there and tell him you are going to set up a lunch or dinner with Scott's

Once they realized that Richardson did not poison the relationship, Paul Bilzerian promised to provide draft document relating to a proposal that had been rejected by Richardson. Ignite, of course, never provided any documents.

**July 21 (Paul Bilzerian)**

Alan, I just wanted to let you know John met with Solomon and was convinced you did not, as we feared, poison the relationship with Resorts World so we will be proceeding with drafting documents that reflect the arrangement David discussed with you three weeks ago. I would expect Ignite will have them sent to you next week.

b.   ███████████████████████████████████████ ████████████████████████████████. On July 5, Bell told Richardson that Ignite needed to receive Resorts World's $████████████████████████ and if that did not happen, Ignite "want to pay you less." The timing of Resorts World's ████████

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

26

██████████ was never raised before the Agreements were signed. This was a post-signing of the Agreement condition invented by Ignite.

c. **Paul Bilzerian First Suggests that Richardson Work Out a Deal with Dan Bilzerian, Then Later Suggests that Him and Schaefer Design a Fair Resolution, and Finally Recommends Arbitration**.

July 23 Paul Bilzerian)

We have to do a valuation of the Resorts World deal for the Canadian Stock Exchange which we have ordered. We should have it done by Tuesday. Are you and Dan making any progress?
59m

July 29 (Paul Bilzerian)

I have convinced Dan to let John and I try to come up with a fair resolution because I just don't think the two of you will ever reach a settlement and even if you agreed to an arbitrator it wouldn't occur until September and having to wait that long just isn't fair to you. Whatever John and I come up with will still need Dan's and the Board's approval as well as the Canadian Stock Exchange. We will have a proposal to you by Monday. Hang in there.

Alan John told me there is no point to working on a deal for you as you will reject it. So I recommend submitting to binding arbitration. If you prefer to file suit and it damages the Resorts World relationship then Ignite will file a counterclaim against you. As I have written before you are self destructive so I will assume you will choose the most destructive path. If you wish to submit to binding arbitration let me know and the lawyers can work out the ground rules.

45. Despite the invented issues raised by Ignite—none of which impact the fact that the Company complied with its obligations under the Letter Agreement—Schaefer, Ignite's President and COO, admitted to Richardson that the Letter Agreement would be honored by Ignite Spirits and Ignite Brands.

Dear Alan,

Following up on our conversation. I did a walkthrough at Resorts World today and talked with Scott and Solomon regarding Ignite's partnership with Resorts World. It was clear they plan to honor their agreement with Ignite and will continue to work with us as strong brand partners. I spoke to Paul B[ilzerian] and David [Bell] about this, and they have both agreed Ignite should honor the deal made with you based on this feedback.

David should be contacting you this week to arrange the necessary paperwork and issuance of your shares. Please let me know if you have any questions.

Resorts World's commitment to honor the Agreements was not required by the Letter Agreement. This was a made up issue by Ignite. After the Agreements were signed, Dan Bilzerian told Richardson that he felt that Ignite's products were "gonna [sic] do well there [i.e., at Resorts

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

World].”

## G.   Company's Demand and Ignite's Anticipatory Declaratory Judgment Lawsuit

46.   On July 30, Holden sent a letter to the Company's counsel offering Paul Bilzerian's suggestion that the parties arbitrate the dispute with no appellate rights. Holden suggested that an arbitration would "enable the parties to resolve the matter much more quickly than a state or federal lawsuit, avoid counterclaims for collateral damage, and most likely reduce costs." He then "instructed Ignite employees and outside consultants not to have any further communications with [the Company] so that the matter can be dealt with professionally and with the best intentions and goodwill." Holden emphasized the confidentiality provision set forth in section 4 of the Letter Agreement that requires the parties to "mutually agree to waive confidentiality for any particular situation or generally or as required by law." He made clear that "Ignite w[ould] not waive confidentiality."

47.   Two weeks later, the Company made a formal demand on Ignite, and rejected Ignite's proposal to arbitrate with no appellate rights. The demand was only served on Holden. Paul Bilzerian was the first person to respond to that demand.

> Hi Alan, I understand that your lawyer sent a letter to Ignite that essentially said either Ignite accedes to your demands or suit will be filed next week. I know Ignite will not be happy with this response so it is pretty clear where this is headed at the moment. If you want to litigate then you have picked the right lawyer and you are on the right path. If you want to find a reasonable solution then you need to find another lawyer who is more interested in your best interests than maximizing his legal fees. I may not know much but I am an expert on this subject. I recognize you are most likely not going to listen to this message any more than my previous ones but I felt compelled to try anyway. Of course your lawyer will tell you that you have a great case and can't lose. I have heard that speech so many times over the past 43 years I lost count decades ago. In the beginning it always sounded good but after all these years I know it for what it is – the guarantee of a big payday for the lawyer and a lot of pain for the client. You do have some goodwill left on the Ignite side which is why Paul Holden suggested binding arbitration. It would be fast and inexpensive and, if the arbitrator agrees with you then you will get what you want without a lot of wasted emotional energy. Of course your lawyer would make a lot less money because you would get a fairly prompt decision. No appeals, no countless legal bills, no never ending discovery dragged out over the next three to five years. No bitter animosity that leaves everyone hating each other. Just a fairly prompt resolution. Obviously I won't have much to do with this going forward so you don't even need to answer this message. All you need to do is choose the path you want to follow: prompt, cost effective settlement or bitter, costly, scorched earth litigation with the only winners being the lawyers. I hope you make a good choice.

Holland & Hart LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134

48.   In response to the Company's demand, Ignite Spirits brought an anticipatory declaratory judgment action against the Company, and without the Company's consent as required by the Letter Agreement, Ignite Spirits' publicly filed complaint includes allegations relating to the "terms and conditions of th[e] Letter Agreement." This is another breach by Ignite, and a waiver by Ignite Spirits of the confidentiality provision.

49.   Ignite Spirits' anticipatory declaratory judgment action avoids reality by painting a false narrative of claiming that the Company failed to obtain certain so-called material terms. Below are examples of Ignite Spirits' false, litigation-driven narrative.

| Ignite Spirits' False Allegations | The Truth |
|---|---|
| "The July 1, 2021 date set forth in the Letter Agreement was materially important to [Ignite Spirits] because Resorts World was supposed to open by July 4, 2021." (Compl. ¶ 9). | The Letter Agreement has no time-of-the-essence provision, and there was never any discussion between the parties about the significance of that date. More significantly, though, Dan Bilzerian performed his sole contractual appearance obligation before the Agreements were signed. Time was never of the essence. |
| Defendant "failed to obtain the definitive agreement(s) . . . [that] Resorts World purchas[es] a certain minimum of Ignite's products[.]" | ███████████████████████ |
| Defendant "failed to obtain the definitive agreement(s) . . . [that] Resorts World . . . ensur[es] certain products of Ignite were available in the mini-bars inside Resorts World's hotel rooms[.]" | ███████████████████████ |
| Defendant "failed to obtain the definitive agreement(s) . . . [that] Resorts World . . . ensur[es] certain products of Ignite were available for sale at Resorts World controlled bars located in Resorts World[.]" | ███████████████████████ |
| Defendant "failed to obtain the definitive agreement(s) . . . [that] Resorts World . . . ensur[es] other products of Ignite were available for sale throughout Resorts World's property[.]" | ███████████████████████ |

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

| Ignite Spirits' False Allegations | The Truth |
|---|---|
| Defendant "failed to obtain the definitive agreement(s) . . . [that] Resorts World . . . cover[s] the cost of a kiosk for Ignite that would carry Ignite products and Resorts World staffing the kiosk[.]" |  |
| Defendant "failed to obtain the definitive agreement(s) . . . [that] Resorts World . . . host[s] a launch party at its grand opening featuring Ignite products[.]" | |

## COUNT ONE

### (BREACH OF THE LETTER AGREEMENT/SPECIFIC PERFORMANCE)

50.     The Company incorporates the previous paragraphs of these Counterclaims as if set forth fully here.

51.     The Letter Agreement is a valid and enforceable contract that is binding on Ignite Spirits and Ignite Brands.

52.     The Company fulfilled its obligations under the Letter Agreement as modified or waived by the post-signing conduct of Ignite and its representatives, including its keyman Paul Bilzerian, Dan Bilzerian, Schaefer, and Bell.

53.     Ignite Spirits and Ignite Brands materially breached their obligations under the Letter Agreement by, among other things, refusing to provide the Company with its earned compensation under section 2 of the Letter Agreement, which includes, among other things, certain stock and stock options of Ignite Brands. Ignite Spirits also breached the Letter Agreement by violating the confidentiality provision.

54.     As a result of Ignite Spirits' and Ignite Brands' material breaches, the Company has sustained economic harm, and has lost the expected benefits of the Letter Agreement.

55.     The Company is thus entitled to either specific performance of the Letter Agreement, including the issuance of certain stock and stock options, or an award of monetary damages, both of which exceed $75,000.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

56.     The Company is also entitled to an award of all reasonable costs and attorneys' fees as a result of Ignite Spirits' and Ignite Brands' breaches.

## COUNT TWO

### (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

57.     The Company incorporates the previous paragraphs of these Counterclaims as if set forth fully here.

58.     The Company, Ignite Spirits, and Ignite Brands are parties to the Letter Agreement.

59.     The covenant of good faith and fair dealing is implied into all contracts under Nevada law.

60.     Ignite Spirits and Ignite Brands breached the implied covenant by performing in a manner that is unfaithful to the purpose of the Letter Agreement, and defies the reasonable expectations derived from that agreement.

61.     Despite having sufficient time to negotiate and finalize the Agreements, Ignite Spirits and Ignite Brands delayed the signing of the Agreements that were brokered by the Company, so that they could later claim in bad faith that they were no longer obligated to perform under the Letter Agreement.

62.     Ignite Spirits and Ignite Brands also acted in bad faith by consistently moving the goal posts, threatening to modify the Company's compensation if Richardson failed to accede to their demands, and by orchestrating a false narrative trying to excuse their refusal to honor their commitments even though they knew that they insisted on certain terms be modified, and those terms were objectively more favorable than the ones originally sought by Ignite. Neither Ignite Spirits nor Ignite Brands ever claimed that any of the final terms would cause the Company to not be paid its earned compensation. Rather, they expressed their appreciation for Richardson's efforts, and acknowledged that the Company brokered a partnership that would be "very mutually enjoyable and beneficial" to Ignite. Yet now claim the Company is not entitled to its earned compensation based on a litigation-driven narrative created by Ignite.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

63. Ignite Spirits' and Ignite Brands' breach of the implied covenant of good faith and fair dealing has caused, and will continue to cause, damages to the Company. The Company's damages exceed $75,000, the exact amount of which will be proven at trial.

64. The Company is also entitled to an award of all reasonable costs and attorneys' fees as a result of Ignite Spirits' and Ignite Brands' breaches.

## COUNT THREE

### (EQUITABLE ESTOPPEL)

65. The Company incorporates the previous paragraphs of these Counterclaims as if set forth fully here.

66. Through its conduct, Ignite Spirits and Ignite Brands represented to the Company that it would honor its obligation under the Letter Agreement, that it was satisfied with the Company's efforts obtaining even more favorable terms than originally sought by Ignite under the Letter Agreement, and never raised any meaningful issue with the final terms of the Agreements until after they were signed and litigation was inevitable. The Company reasonably relied on Ignite Spirits' and Ignite Brands' representations to its detriment. Thus, Ignite Spirits and Ignite Brands are equitably estopped from claiming that any so-called material term was breached by the Company. The Company fully performed, obtained an even better deal for Ignite, and Ignite would have never been able to secure this strategic marketing and promotional partnership without the Company and its managing member, Richardson.

## COUNT FOUR

### (PROMISSORY ESTOPPEL—PLED IN THE ALTERNATIVE)

67. The Company incorporates the previous paragraphs of these Counterclaims as if set forth fully here.

68. Ignite Brands through its CEO and chairman Dan Bilzerian, its President and COO Schaefer, Bell, and its keyman Paul Bilzerian represented to the Company that if it brokered a strategic marketing and promotional partnership for Ignite with Resorts World, Ignite Brands would provide certain stock and stock options to the Company.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

32

69. The Company reasonably relied on these representations made by Ignite Brands' representatives, and did not know that Ignite Brands would orchestrate a false narrative trying to avoid honoring its commitments to the Company.

70. The Company relied, to its detriment, on these representations as evidenced by the extensive efforts by the Company and its managing member, Richardson, securing a more favorable partnership than originally sought by Ignite.

71. Ignite Brands should have reasonably expected that its promises would induce the Company to act of a definite and substantial character.

72. To Company's detriment, the Company acted of a definite and substantial character.

73. Ignite Brands' promises must be enforced to avoid injustice to the Company.

74. The Company has suffered damages well above $75,000, as a direct and proximate result of Ignite Brands' conduct, the exact amount of which will be proven at trial, including all reasonable costs and attorneys' fees.

**COUNT FIVE**

**(UNJUST ENRICHMENT OR QUANTUM MERUIT—PLED IN THE ALTERNATIVE)**

75. The Company incorporates the previous paragraphs of these Counterclaims as if set forth fully here.

76. If this Court finds that the Letter Agreement is unenforceable for whatever reason, including finding that the July 1, 2021 deadline was material, which it was not, the Company then seeks in the alternative, relief in the form of unjust enrichment or quantum meruit.

77. Under this alternative form of relief, and based on the facts alleged here, it is unfair and inequitable for Ignite to retain the benefits provided to them (i.e., the Agreements) without payment or compensation of value to the Company. By example, Paul Bilzerian represented to Richardson that it was critical to ensure that the product bought by Resorts World is not refundable, because Ignite Brands could then list that as an asset in the financial statements and represent a stronger value of Ignite Brands to its stockholders. Without the Company, the Agreements would have never materialized for Ignite.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

78.     The Company is thus entitled to equitable relief, as well as damages far more than $75,000, the exact amount of which will be proven at trial, including all reasonable costs and attorneys' fees.

### Relief Requested

The Company requests:

A.     a judgment be entered against Counterclaim Defendants;

B.     either specific performance of section 2 under the Letter Agreement (i.e., issuance of certain stock and stock options), or monetary damages, both of which exceed $75,000, and the exact amount of which will be proven at trial;

C.     an award for the reasonable costs and attorneys' fees incurred in connection with this lawsuit;

D.     an award of pre- and post-judgment interest; and

E.     any other relief to which the Company may be entitled.

Dated: September 1, 2021

/s/ *Jon T. Pearson*
Gregory S. Gilbert
Jon T. Pearson
Elody C. Tignor
HOLLAND & HART LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134

*Counsel for Defendant/Counterclaim Plaintiff Consulting by AR, LLC*

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

34

**CERTIFICATE OF SERVICE**

I certify that on September 7, 2021, an accurate copy of this **Consulting by AR, LLC's Answer, Affirmative Defenses, and Counterclaims, Public [Redacted] Version as Filed on September 7, 2021** was served by submitting electronically for filing and service with the United States District Court, District of Nevada's e-filing system, and served on counsel electronically in accordance with the E-service list to the following email addresses:

Kimberly P. Stein
FLANGAS LAW GROUP
3275 South Jones Blvd., Suite 105
Las Vegas, Nevada 89146
kps@fdlawlv.com

/s/ *Kristina Cole*
An employee of Holland & Hart LLP

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

35