# EXHIBIT 1 - Richardson Deposition Transcript

Exhibit 1 001

Ignite Spirits, Inc.

v.

Consulting by AR, LLC

Transcript of

# Alan Richardson

Volume I

May 13, 2022



(702) 476-4500 | www.oasisreporting.com | info@oasisreporting.com
400 South Seventh Street, Suite 400, Las Vegas, NV 89101

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY

Exhibit 1 002

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

IGNITE SPIRITS, INC., a          ) Case No.:
Wyoming corporation,             ) 2:21-cv-1590-JCM-EJY
                                 )
            Plaintiff,           )
                                 )
vs.                              )
                                 )
CONSULTING BY AR, LLC, a         )
Florida limited liability        )
company; DOES I through X,       )
inclusive; and ROE Business      )
Entities I through X,            )
inclusive,                       )
                                 )
            Defendants.          )
_____  )
(Complete caption on Page 2.)


        *** CONTAINS CONFIDENTIAL INFORMATION ***

    VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

                ALAN RICHARDSON
AS FRCP 30(b)(6) PERSON MOST KNOWLEDGEABLE DESIGNEE OF
            CONSULTING BY AR, LLC

    Taken on Friday, May 13, 2022, at 8:59 a.m. PDT

        Appearing via videoconference from
                Holland & Hart LLP
        9555 Hillwood Drive, 2nd Floor
                Las Vegas, Nevada


    By a Certified Court Reporter and Legal Videographer


Reported by:  Dawn Bratcher Gustin, CCR 253, RPR, CRR
                            California CSR 7124
Job No. 48862, Firm No. 061F

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

**2**

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

IGNITE SPIRITS, INC., a ) Case No.:
Wyoming corporation, ) 2:21-cv-1590-JCM-EJY
)
Plaintiff, )
)
vs. )
)
CONSULTING BY AR, LLC, a )
Florida limited liability )
company; DOES I through X, )
inclusive; and ROE Business )
Entities I through X, )
inclusive, )
)
Defendants. )
_____ )
)
CONSULTING BY AR, LLC, )
)
Counterclaim Plaintiff, )
)
vs. )
)
IGNITE SPIRITS, INC. (f/k/a )
Ignite Beverages, Inc.); )
IGNITE INTERNATIONAL LTD.; )
AND IGNITE INTERNATIONAL )
BRANDS, LTD., )
)
Counterclaim Defendants. )
_____ )

**3**

APPEARANCES:
(All participants appearing remotely)

For the Plaintiff/Counterclaim Defendant
Ignite Spirits, Inc.:
        KIMBERLY P. STEIN, ESQ.
        FLANGAS LAW GROUP
        3275 South Jones Boulevard
        Suite 105
        Las Vegas, Nevada  89146
        kps@fdlawlv.com

For the Defendant/Counterclaim Plaintiff
Consulting by AR, LLC:
        JON T. PEARSON, ESQ.
        HOLLAND & HART LLP
        9555 Hillwood Drive
        2nd Floor
        Las Vegas, Nevada  89134
        jtpearson@hollandhart.com

For the Counterclaim Defendant Ignite International,
Ltd., and Ignite International Brands, Ltd.:
        RYAN A. ELLIS, ESQ.
        RYAN ELLIS LAW CORPORATION
        3275 South Jones Boulevard
        Suite 105
        Las Vegas, Nevada  89146
        ryan@ryanellislaw.com

The Videographer:

        JOHNNY RANDALL, Legal Videographer

Also Present:

        PAUL SILVERBERG
        DAN BILZERIAN

**4**

                              I N D E X
WITNESS                                                    PAGE
ALAN RICHARDSON
    Examination by Ms. Stein                                 12
    Examination Resumed by Ms. Stein                        123


                          E X H I B I T S
EXHIBIT            DESCRIPTION                             MARKED
Exhibit 1         4/5/22 Notice of Deposition of             34
                  Consulting by AR 30(b)(6) from
                  Ignite Spirits (8 pages)
Exhibit 2         5/10/22 Cross-Notice of                    35
                  Deposition of Consulting by AR
                  30(b)(6) from Brands and Int'l
                  (3 pages)
Exhibit 3         5/9/22 Subpoena to Testify at a            36
                  Deposition in a Civil Action -
                  Alan Richardson from Ignite
                  Spirits (3 pages)
Exhibit 4         5/10/22 Pearson's Acceptance of            37
                  Service to Alan Richardson
                  Deposition Subpoena (2 pages)
Exhibit 5         5/9/22 Subpoena to Testify at a            38
                  Deposition in a Civil Action -
                  Alan Richardson from Ignite
                  Brands and Int'l (3 pages)
Exhibit 6         5/10/22 Pearson's Acceptance of            38
                  Service to Alan Richardson
                  Deposition Subpoena from Brands
                  and Int'l (2 pages)

**5**

                          E X H I B I T S
                            (Continued)

EXHIBIT            DESCRIPTION                             MARKED
Exhibit 7         3/3/21 Consulting by AR's                  38
                  Articles of Organization
                  (CONSULTING_03074 to 3075)
Exhibit 8         4/23/22 Florida Limited Liability          41
                  Company Annual Report
                  (IGNITE000300)
Exhibit 9         9/2/18 to 02/22 text messages              71
                  between Dan Bilzerian and Alan
                  Richardson (DAN0001 to 3)
Exhibit 10        2/20/21 to 2/22/21 text messages           74
                  between Alan Richardson, David
                  Bell, and John Schaefer
                  (CONSULTING_00642 to 676)
Exhibit 11        3/4/21 Henry Lichtenberger email           84
                  to David Bell attaching revised
                  draft of Letter Agreement with
                  redline (CONSULTING_0001 to 14)
Exhibit 12        3/5/21 Henry Lichtenberger email           90
                  to David Bell and Alan
                  Richardson re Revised Letter
                  Agreement (CONSULTING_00015)
Exhibit 13        3/5/21 David Bell email to Paul            92
                  Bilzerian re Revised Ignite
                  Letter Agreement
                  (BELL00039 to 55)
Exhibit 14        3/10/21 Paul Bilzerian email to            97
                  Alan Richardson re Revised
                  Agreement (CONSULTING_00033)
Exhibit 15        CONFIDENTIAL - 3/11/21 Letter             100
                  Agreement between Ignite
                  Beverages, Inc., and Consulting
                  by AR LLC (IGNITE000001 to 7)

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

**6**

E X H I B I T S
(Continued)

| EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 16 | 3/29/21 Alan Richardson email to Dan Bilzerian re Resorts World Partnership Outline (CONSULTING_00364 to 366) | 137 |
| Exhibit 17 | 3/30/21 Paul Bilzerian email to Alan Richardson cc Dan Bilzerian and David Bell re Confidential original signed agreement, etc. (DAN0046 to 58) | 142 |
| Exhibit 18 | 4/1/21 Alan Richardson email to David Bell forwarding Richardson's 3/30/21 email to Scott Sibella re summary of changes (BELL00026) | 145 |
| Exhibit 19 | 4/2/21 Alan Richardson email to Dan Bilzerian forwarding Solomon Schwartz 4/2/21 email to Alan Richardson re NDA Needed (DAN0006 to 11) | 146 |
| Exhibit 20 | 4/3/21 David Bell email to Alan Richardson forwarding John Schaefer 4/3/21 email to David Bell cc Paul Holden re Resorts NDA (BELL00027 to 35) | 148 |
| Exhibit 21 | 4/3/21 Solomon Schwartz email to Alan Richardson re Mutual Non-Disclosure Agreement (CONSULTING_00142) | 150 |
| Exhibit 22 | 4/8/21 Solomon Schwartz email to Alan Richardson cc'g Scott Sibella re Ignite - RWLV LOI (CONSULTING_00143) | 151 |
| Exhibit 23 | 4/8/21 Alan Richardson email to Paul Bilzerian cc David Bell attaching RW LOI (CONSULTING_00395 to 403) | 152 |

**7**

E X H I B I T S
(Continued)

| EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 24 | 4/16/21 Paul Bilzerian email to Alan Richardson re Resorts World (CONSULTING_00152 to 53) | 153 |
| Exhibit 25 | 4/18/21 Dan Bilzerian email to Alan Richardson re Fully Executed Letter Agreement (Ignite and Consulting by AR) (CONSULTING_00155) | 159 |
| Exhibit 26 | 4/19/21 Alan Richardson email to Dan Bilzerian re Ignite International Ltd. - Letter of Intent - RWLV 20210409 (003) - Ignite International Ltd. - Letter of Intent - RWLV 4.19.2021 (DAN0016 to 27) | 177 |
| Exhibit 27 | 4/22/21 Henry Lichtenberger email to Paul Holden cc Alan Richardson re Resorts World Las Vegas and Ignite Beverages (CONSULTING_00167 to 176) | 180 |
| Exhibit 28 | 4/23/21 Henry Lichtenberger email to Paul Holden and Alan Richardson cc David Bell re Resorts World Las Vegas and Ignite Beverages (BELL00063 to 64) | 185 |
| Exhibit 29 | 4/23/21 Paul Bilzerian email to Henry Lichtenberger cc Paul Holden, Dan Bilzerian, John Schaefer re Resorts World Las Vegas and Ignite Beverages (CONSULTING_00505 to 507) | 187 |
| Exhibit 30 | 4/26/21 Henry Lichtenberger email to Paul Holden cc Alan Richardson re Resorts World Letter of Intent - Final (CONSULTING_00205 to 214) | 189 |

**8**

E X H I B I T S
(Continued)

| EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 31 | 4/26/21 Solomon Schwartz email to Alan Richardson re FWD Signature Requested on Ignite International Ltd - Letter of Intent - Final (CONSULTING_00191 to 192) | 191 |
| Exhibit 32 | CONFIDENTIAL - 4/26/21 Letter of Intent between Resorts World Las Vegas LLC and Ignite (IGNITE000008 to 15) | 192 |
| Exhibit 33 | 4/26/21 Amendment to Letter of Intent between Resorts World Las Vegas LLC and Ignite International Ltd. (RW00001 to 2) | 194 |
| Exhibit 34 | 4/27/21 David Bell email to Alan Richardson cc Solomon Schwartz re... (BELL00056) | 195 |
| Exhibit 35 | 5/19/21 to 5/25/21 text messages between John Schaefer and Cal my Owner (Alan Richardson) (CONSULTING_00543 to 546) | 198 |
| Exhibit 36 | 5/26/21 to 6/1/21 text messages between John Schaefer and Cal my owner (Alan Richardson) (CONSULTING_00551 to 555) | 204 |
| Exhibit 37 | 7/31/21 Alan Richardson email to dvonbrod@dnafilms.tv cc John Schaefer re Booze Cream (CONSULTING_00485) | 211 |
| Exhibit 38 | 6/11/21 Paul Bilzerian email to Richardson cc Schaefer, Holden, Lichtenberger re Resorts World attaching Ignite International Ltd. Strategic Marketing Alliance Agreement RWLV 20210607(1) (BELL00075 to 92) | 213 |

**9**

E X H I B I T S
(Continued)

| EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 39 | 6/12/21 John Schaefer email to Alan Richardson re Resorts World (CONSULTING_00299 to 300) | 216 |
| Exhibit 40 | 6/21/21 text messages between John Schaefer and Alan Richardson (CONSULTING_00594) | 219 |
| Exhibit 41 | 6/28/21 Alan Richardson email to John Schaefer re Massage Agreement (CONSULTING_00471) | 220 |
| Exhibit 42 | 6/30/21 Alan Richardson email to David Bell re Fwd Resorts World (BELL00036 to 38) | 223 |
| Exhibit 43 | 7/1/21 Alan Richardson email to Paul Bilzerian re Resorts World (CONSULTING_00478 to 481) | 224 |
| Exhibit 44 | CONFIDENTIAL - 7/2/21 Strategic Marketing Alliance Agreement between Ignite International Ltd. and Resorts World Las Vegas LLC (IGNITE000051 to 68) | 228 |
| Exhibit 45 | CONFIDENTIAL - 7/2/21 Retail Pop-Up Space License Agreement between Ignite International Ltd. and Resorts World Las Vegas LLC (IGNITE000016 to 50) | 231 |
| Exhibit 46 | 7/5/21 Alan Richardson email to Paul Bilzerian re Screenshot 2021-07-05 at 10.18.48 AM and 10:18 Paul Bilzerian screenshot (CONSULTING_00482 to 483) | 233 |
| Exhibit 47 | 7/6/21 to 7/21/21 text messages between Dan and Scott (DAN0035 to 42) | 240 |

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

---

**10**

```
                    E X H I B I T S
                      (Continued)

EXHIBIT       DESCRIPTION                        MARKED
Exhibit 48    7/20/21 text messages between        240
              Alan Richardson and John Schaefer
              (CONSULTING_00628 to 629)
Exhibit 49    7/30/21 Ignite letter to Henry       248
              Lichtenberger re Letter
              Agreement dated 3/11/21 between
              Consulting by AR and Ignite
              Beverages (IGNITE00069 to 70)
Exhibit 50    7/2/21 to 7/30/21 text messages      250
              between Paul Bilzerian and Alan
              Richardson
              (CONSULTING_03050 to 3067)

Exhibit 51    8/2/21 letter from Holland and       252
              Hart to Paul Holden at Ignite
              (IGNITE00071)

Exhibit 52    9/1/21 Consulting by AR's            253
              Answer, Affirmative Defenses,
              and Counterclaims (35 pages)


CONFIDENTIAL INFORMATION           PAGE      LINE
                                    19        10
                                    20        19
                                    21        18
                                    21        20
                                    21        22
                                   253-258   23-11


INFORMATION REQUESTED              PAGE      LINE
                                   175        25
                                   176         6
                                   176       23-25
```

---

**11**

DEPOSITION OF ALAN RICHARDSON
Friday, May 13, 2022, 8:59 a.m., PDT
--oOo--
P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. Today is Friday, May 13th, 2022. The time is approximately 8:59 a.m. Pacific Standard [sic] Time. This is the remote deposition of Alan Richardson 30(b)(6) for Consulting by AR LLC in the case of Ignite Spirits Inc. vs. Consulting by AR LLC Inc. [sic], et al.

I am Johnny Randall with Oasis Reporting Services. I will be monitoring the proceedings and recording both video and audio today.

At this time, I will ask counsel to identify themselves, state whom they represent, and agree on the record that there is no objection to the court reporter administering a binding oath to the witness through remote videoconferencing. If no objection is stated, we will proceed forward with the agreement of all counsel. Let's begin the appearances with the noticing attorney.

MS. STEIN: Good morning. Kimberly Stein on behalf of the plainter [sic]/counterclaim defendant Ignite Spirits Inc.

MR. PEARSON: Good morning. Jon Pearson on behalf of Consulting by AR LLC.

---

**12**

MR. ELLIS: And good morning. Ryan Ellis on Ignite International Brands and Ignite International.

THE VIDEOGRAPHER: The court reporter today is Dawn Gustin with Oasis Reporting Services.

Will the reporter please swear the witness.

(Witness sworn.)

ALAN RICHARDSON,
having been first duly sworn, was
examined and testified as follows:
EXAMINATION
BY MS. STEIN:

Q. Good morning, Mr. Richardson.

A. Good morning.

Q. Can you please state and spell your name for the record.

A. Alan Richardson, A-l-a-n R-i-c-h-a-r-d-s-o-n.

Q. And where are you located today, what city?

A. Las Vegas.

Q. And is anybody in the room with you?

A. Just my lawyer.

Q. And who is that?

A. Jon Pearson.

Q. And is Mr. Pearson representing you today personally as well as on behalf of Consulting by AR?

A. Yes.

---

**13**

Q. And when did you retain Mr. Richard- -- I'm sorry -- Mr. Pearson personally to retain you for this deposition?

A. When I told him he can accept service for this. Well, there's two parts. The personal part or the business?

Q. The personal part.

A. That's -- that's right.

Q. Okay. So was that about a week ago?

A. Approximately.

Q. Okay. Now, have you ever had your deposition taken before?

A. Once.

Q. And how long ago was that?

A. Maybe ten years.

Q. Okay. And were you a party in that matter?

A. Wait. What does that mean?

Q. Were you -- was it part of a case that you were involved in, or were you a witness in that case?

A. I was party to the case.

Q. Okay. And where was that?

A. The deposition?

Q. The case.

A. It was either Florida or Las Vegas. I'm not sure the basis or the home base of it.

---

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

---

**14**

Q.   Okay.  Were you the plaintiff or the defendant?
A.   I was the plaintiff.
Q.   Okay.  And were you personally the plaintiff, or was that through an entity?
A.   I believe personal.
Q.   And what kind of case was it, just briefly?
A.   Had to do with my jewelry business.
Q.   Okay.  And did that case end up going to trial?
A.   No, it did not.
Q.   Okay.  And I'm assuming because it was several years ago that was in person as well; correct?
A.   The deposition?
Q.   Yes.
A.   Yes.
Q.   Okay.  So because it's been a while and because also this is via Zoom, I'm just going to go over a couple rules today.  Okay?
A.   Sure.
Q.   Okay.  First, you are doing a good job, but, as you know, we are on Zoom, and while this is being video recorded, our court reporter, Dawn, is also taking down everything you say.  So it's very important that -- first, that you give audible answers.  Okay?
A.   Okay.
Q.   Next thing is because she's taking down

---

**15**

everything we say, I will do my best to try not to interrupt you, and I would ask you to do the same.  Okay?
A.   Okay.
Q.   Also, because it's Zoom, there's sometimes a delay.  So I would just ask that -- and I, again, will try to do the same -- that you just wait a second or two before you answer my question.  Okay?
A.   Okay.
Q.   Also, because the court reporter is taking down everything you say, you will have the opportunity after this -- depositions today, both depositions, to review the transcript, but I do have to advise you that if you do make any changes to that transcript, that we could use that later if this matter proceeds to trial.  Okay?
A.   Okay.
Q.   Now, you -- one of the things is I'm not here to try to trick you today.  So if you answer my question, I will assume that you understood my question.  And as such, again, we're attorneys, and we're not perfect; so if you don't understand my question, please ask me to just go ahead and rephrase.  Okay?
A.   Okay.
Q.   Also, while we're not asking you to guess today, I am entitled to your best testimony.  And, as

---

**16**

such, I want to make sure you understand that I'm not asking you to guess, but, again, I'm asking you to do your best.  So I always use an example of if I was to ask you to estimate the size of the table that you're sitting at, you could do that because it's in front of you; correct?
A.   An example, yes.
Q.   Okay.  But you could not estimate the size of my desk because you can't see my desk; correct?
A.   Correct.
Q.   So that's kind of the difference.
     Do you understand that?
A.   Yes.
Q.   Okay.  Is there any reason that you cannot give your best testimony today?
A.   No.
Q.   Not on any medications that would affect your ability to testify?
A.   No.
Q.   Okay.  Have you ever been convicted of a felony?
A.   No.
Q.   And you do understand that your testimony today is under oath with the same penalties of perjury as if you were testifying in a court of law.

---

**17**

A.   Yes.
Q.   Now, also, this will be a long day.  There's a lot to go through.  So if you need a break at any point, please just let me know.  We're not in the same room; so it's hard for me to gauge that.  But I would ask if a question is pending that you answer that question first.  Okay?
A.   Yes.
Q.   Okay.  And, again, it's not like we're in elementary school.  You don't have to tell me the reason you need a break.  Okay?
A.   Say that again.  I'm sorry.
Q.   I said it's not like we're in elementary school.  You don't need to tell me the reason you need a break.  You don't --
A.   Oh.
Q.   -- need to ask for the bathroom pass.  Okay?
A.   Thank you.
Q.   Okay.  Tell me, in general, what you did to prepare for today.
A.   I read through emails, text messages, and other documents.
Q.   You say "other documents."  Were those documents that you produced in this case?
A.   Like the contracts, things like that, those

---



CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                        Ignite Spirits, Inc. v. Consulting by AR, LLC

18

type of documents.

Q. Okay. And we'll get into those in a minute.
Did you meet with your lawyer?

A. Yes.

Q. And I don't want to know what you talked about with your lawyer, but was anybody else present when you met with your lawyer?

A. During preparation, Mr. Silverberg was -- was around at -- (audio distorted)

THE COURT REPORTER: Was what?

THE WITNESS: Was around some of the time, not during the whole preparation.

BY MS. STEIN:

Q. Was anybody else around?

A. No.

Q. And during your meeting, did you call anybody else during that meeting?

A. No.

Q. And how long did you meet with your lawyer for -- in preparation for today?

A. Maybe 15 hours.

Q. So was that over a couple of days?

A. Yes.

Q. Or I was going to say Jon might have fallen asleep at some point.

19

And when was the last time you met with your lawyer?

A. Yesterday.

Q. I think I -- we'll start on a couple of background, and then we'll get into kind of the notices and talk about the differences.
Where do you currently live?

A. Do you want the street address?

Q. Sure.

A. ▮▮▮▮▮▮▮▮▮▮ Florida.

Q. Okay. And how long have you lived in that address?

A. Over ten years.

Q. Now, do you also sometimes come to Las Vegas and stay here for long periods of time?

A. Yes.

Q. Okay. And how often do you do that?

A. It -- (audio distorted)

THE COURT REPORTER: I'm sorry?

THE WITNESS: It varies.

BY MS. STEIN:

Q. So what I'm going to ask is when you come to Las Vegas, do you stay at a residence when you come for any time longer than a week or two?

20

A. I stay in a hotel.

Q. And what is the purpose that you come to Las Vegas for any length of time?

A. For pleasure.

Q. Okay. Any business that you do when you come to Las Vegas?

A. I mean, not, like, predetermined or preset business.

Q. And my understanding is you have two cell phones; is that correct?

A. That is correct.

Q. Okay. And just to make sure, we're in a protective order in this case, and I'm going to ask that your address be designated confidential, but I'm also going to ask for your cell phone numbers, and I'll designate those confidential.
So if you could just give me your cell phone numbers.

A. ▮▮▮▮▮▮▮▮▮▮ (audio distorted)

Q. So I'm going to have to ask you to repeat. And I don't know why we are getting a very large echo.

MS. STEIN: And, Dawn, I see you having the same problem. So I don't know if it's when you move in closer.

21

THE WITNESS: Let me see if there's a way to turn this down here.
How about now? Is it better?

MS. STEIN: Yes.

THE WITNESS: All right. I'll just -- I'm probably too close to it (audio distorted). There it goes again.
▮▮▮▮▮▮

BY MS. STEIN:

Q. Okay. So now we need to somehow move the camera so it's on -- focused on you. Sorry.

A. I'll move this away, and I'll move back over here.

Q. Okay. Okay. That's perfect. We can see you. Actually looks very -- like a flag behind you now.

A. All right. Well, hopefully the -- the other laptop that's got the speaker on it is further away now.

Q. Okay. So if you could go ahead and just repeat the phone numbers. Sorry, we could not hear.

A. ▮▮▮▮▮▮

Q. And the second one?

A. ▮▮▮▮▮▮

Q. Great. Thank you.
Are you currently married?

A. No.

Exhibit 1 008

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

22

Q. Have you ever been married?
A. (Audio distorted.)
Q. I'm sorry. I couldn't understand you.
A. I have not.
Q. Okay. Do you live with anybody currently?
A. You'll have to define "living."
Q. Okay. Does anybody permanently reside with you at your Florida address?
A. I have a girlfriend that resides with me, but I wouldn't say she lives with me because she, like, isn't moved into my house. She spends a lot of time with me.
Q. Okay. And what's her name?
A. She has her own address.
Q. And what's her name? Sorry.
A. Margaret Cutler.
Q. And did you speak with Margaret -- have you spoken with her regarding the deposition today?
A. Actually, I told her I have it, but she's currently not -- we're currently not together.
Q. Were you together in March of 2021?
A. Yes.
Q. Were you together in July of 2021?
A. Yes.
Q. Did you ever speak with her regarding any dealings surrounding the matters at issue in this case?

23

A. Not specific to the case.
Q. When you say "not specific" so just -- did you talk to her just in general that you were having any issues?
A. I mean, I'm going to assume that being present that she knows about the case, but it wasn't, like, I remember discussing the case or advice with her or anything of that nature.
Q. Kind of a thumbnail sketch on your education. Since high school, can you just describe your education.
A. I went to college for two years.
Q. Did you obtain a degree?
A. I did not.
Q. Okay. Where did you go?
A. University of Florida.
Q. And have you taken other -- any other types of educational classes since high school?
A. No.
Q. Okay. How would you describe your current occupation?
A. I'm a jeweler.
Q. And how long have you been a jeweler?
A. Thirty-five years.
Q. Have you had any other occupations in the last 35 years besides being a jeweler?

24

A. Have I done anything in the business world besides -- (audio distorted)
THE COURT REPORTER: Besides jewelry?
THE WITNESS: Yes.
BY MS. STEIN:
Q. Yes.
A. Yes, I've done other types of deals.
Q. Okay. Can you just kind of briefly describe -- you said you've done other types of deals -- what you mean by that.
A. I mean, I've bought and sold other items outside of the jewelry industry and had a cell phone business for a short period of time.
Q. And, again, we're getting really bad feedback.
A. I don't know. Let me just push this computer a little further away. See if it helps.
How about now?
Q. Worse.
Is there two laptops going in there, maybe?
A. Well, you're on a, like, big screen in front of me, and then there's a little laptop that's just connected with the wiring.
THE VIDEOGRAPHER: Can one of the volumes on one of the devices --
THE WITNESS: That's what I think might fix it.

25

If I can turn this volume down a little bit.
Okay. There we go.
BY MS. STEIN:
Q. Okay. I think that might be better. We'll try that again. So going back on the record, you said -- I believe you said cell phone business; is that correct?
A. I mean, yes, I did say that; correct.
Q. Okay. Sorry. It was very hard to hear. So I just wanted to make sure we get that right.
Have you also been a poker player at times?
A. I play poker. I play blackjack. I wouldn't call myself a -- (audio distorted)
Q. Nope. We got a problem again.
A. All right. We got it all the way down.
MR. PEARSON: Kim, give us -- give us five minutes to see if I can get the IT guys to come in here.
MS. STEIN: Yeah, why don't we do that because it's really bad, and I don't want to get the wrong testimony. So why don't we go ahead and take five minutes. Okay?
THE VIDEOGRAPHER: The time is now 9:17 a.m. We are off the record.
(A recess was taken from 9:17 a.m. to 9:23 a.m.)
COMPUTERIZED VOICE: Recording in progress.

 

26

THE VIDEOGRAPHER: The time is now 9:23 a.m. We are back on the record.

MS. STEIN: So before we went off the record -- and hopefully we've solved the technical difficulties -- I just want to note for the record that Mr. Pearson has switched rooms; is that correct now?

MR. PEARSON: Correct.

THE WITNESS: Hold on because I don't see anybody except myself. Not that I need to, but --

MS. STEIN: You don't have to. We'd be on top, but -- I'll give you an example. I'll show you a document, and as long as you can see that, it's fine.

Can you see the document?

THE WITNESS: It's a quarter of an-inch. That's why I had the other big screen. Let me see if I can figure out how to make this bigger.

Jon, can you come in here and make this bigger? It's like -- it's the same size as my photo was. It's, like, an inch by an inch.

MS. STEIN: Oh, I can solve that problem.

THE WITNESS: Okay.

MS. STEIN: Go to the top right where it says "view."

THE WITNESS: Okay.

Within the picture?

27

MS. STEIN: No, up top around the black. You should see something that says "view" on the Zoom.

THE WITNESS: Hmm.

I don't.

MR. PEARSON: Here, I'll go.

MS. STEIN: Okay. We will stay on the record. We'll just wait a minute. So I don't want to force Johnny to have to read again.

THE WITNESS: I've never seen you run before.

THE COURT REPORTER: Do you want this -- anything said on the record?

MS. STEIN: No, it's fine.

(A discussion was held off the record.)

BY MS. STEIN:

Q. Okay. Before we went off the record, we were talking about your occupations, and you said you play poker and some blackjack, but you don't consider that a career; is that correct?

A. I don't know that you asked me if it's a career. So if -- if "Is it a career?" a question, the answer is no.

Q. Okay. But you have played poker professionally; is that correct?

A. That's not correct.

28

Q. Okay. So when you are listed on some of the websites, the poker websites, do you know why you are listed there?

A. I don't know what website you're talking about, but every single poker player, with technology today -- or not -- I shouldn't say "poker players" because there's thousands of doctors and lawyers that are also listed, your winnings are just tracked by poker sites.

Q. Okay. Have you ever played in the World Series of Poker?

A. So the World Series of Poker is just the title of 50 or 60 different events, and I have played some of those events.

Q. What about the main event?

A. I don't think I've ever played the main event.

Q. I want to talk about -- have you ever held any professional business licenses?

A. I believe so.

Q. And what are those?

A. They're all related to the jewelry business.

Q. Okay. And can you just tell me what those are.

A. I don't necessarily remember the titles of them, but I know that I have licenses.

Q. Okay. And on those licenses, did you have to take any type of exam for those licenses?

29

A. No.

Q. Are they licenses or more like certifications?

A. They're licenses, I believe.

Q. Well, let's talk about your businesses. You said you're in the jewelry business. Do you have a -- currently do you have a company that you operate your jewelry business through?

A. Yes.

Q. And what's the name of that company?

A. Alan Richardson Fine Jewelry.

Q. And is that a corporation or an LLC?

A. I think it's an S corp.

Q. Okay. And are you the sole shareholder?

A. Yes.

Q. Are you the sole officer?

A. Yes.

Q. And is that a Florida corporation?

A. Yes.

Q. Do you hold any -- do you have currently any other Florida entities?

A. I believe I do have other corporations.

Q. Do you know the names of those?

A. AR Shores Holding.

Q. Any others?

A. I don't recall.

 

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC

Alan Richardson                                                           Ignite Spirits, Inc. v. Consulting by AR, LLC

---

**30**

Q.  Okay.  AR Shores Holding, is that an LLC or an Inc.?

A.  I don't recall.

Q.  Okay.  Are you the sole owner of that entity?

A.  I am.

Q.  Okay.  Are you familiar with a company called Miami Gold Buyer, Inc.?

A.  That was dissolved.

Q.  Was that one of your entities?

A.  Yes.

Q.  Okay.  In Florida?

A.  Yes.

Q.  Are you familiar with a company called America's Greatest Road Show Buyer LLC?

A.  Yes.

Q.  Was that one of your entities?

A.  Also dissolved, I believe, yes.

Q.  Okay.  What about Cash for Gold Jewelers LLC?

A.  Yes.

Q.  Is that also one of your entities?

A.  Yes.

Q.  And that also has been dissolved, do you believe?

A.  Yes.

Q.  What about Cellular Marketing Inc.?

---

**31**

A.  We already spoke about that.  Also dissolved.

Q.  Okay.  And that was the cell phone business that you talked about?

A.  Correct.

Q.  Okay.  What about Chip Leader Management Inc.?

A.  What's the question?

Q.  Are you familiar with that entity?

A.  Yes.

Q.  Okay.  Is that also formerly one of your entities?

A.  Yes.

Q.  Okay.  Was Gray & Sons Jewelry and Coins Inc. also one of your businesses?

A.  No.

Q.  What about Nuts Chips LLC?

A.  Yes.

Q.  Was that also dissolved?

A.  Yes.

Q.  How about We Buy Gold Jewelers LLC, are you familiar with that?

A.  No, I'm not.

Q.  What about Worldwide Gold Buyers LLC?

A.  I don't recall.

Q.  Okay.  Have you ever held any entities in Nevada?

---

**32**

A.  No.

Q.  What about AR Management Las Vegas LLC?

A.  Say it one more time.

Q.  AR Management Las Vegas LLC.

A.  I don't recall what that is.

And when you asked me if I held anything in Nevada, just the one that I own now that we obviously -- I shouldn't say obviously, but that we are talking about.

Q.  Are you talking about Consulting by AR LLC?

A.  Correct.

Q.  And you believe that's a Nevada entity?

A.  Correct.

Q.  Are you familiar with a lawyer in Las Vegas named Jay Brown?

A.  Yes.

Q.  And have you ever had Mr. Brown create an entity on your behalf?

A.  It's possible, but it was a really long time ago.

So now that you've stirred my memory, I owned a part of a -- it was a Florida business, I think, that owned part of a Nevada business, and I had part of the Florida business, or I may have had part of the Nevada business at that time for the Nevada entity.  I don't

---

**33**

remember.  It was a very long time ago.

Q.  So besides Consulting by AR, which we'll talk about in a minute, have you ever had any other companies or just done any other business which is not related to what we've spoken about, jewelry, cell phones?

A.  Have I ever done any other business where?

Q.  Anywhere.  Any type of business.

A.  Yeah, I mean, I've been what I would kind of consider an entrepreneur my whole life.  So I've done lots of other little deals over the years.  I just don't recall what at the very moment.

Q.  So I just want to kind of get an idea.  You say "little deals."  What do you mean?  Can you give me an example?

A.  I mean, the Vegas deal that you brought up with Jay Brown, which I forgot about, was a nightclub business.  So that would be another type of deal outside of the jewelry business that I've done before.

Q.  And I know you said you are an entrepreneur, but that's a broad term.  Is there any type of area that you specialize in as an entrepreneur?

A.  Just business as a whole.

Q.  Now, I'm going to go ahead, and we'll mark this Exhibit 1.

MS. STEIN:  And, Jon, you're okay with numbers?

---

 

34

Because it's going to be too hard with letters.

MR. PEARSON: That's fine.

MS. STEIN: Okay.

(Exhibit 1 was marked.)

BY MS. STEIN:

Q. And, again, if you need me to make this bigger, I will. But this is Exhibit 1. This is a Notice of Taking Videotaped Deposition of Corporate Representative of Consulting by AR LLC Pursuant to Federal Rule of Civil Procedure 30(b)(6). It's -- it was issued to the corporate representative of Consulting by AR LLC sent to Mr. Pearson set for today at 9:00 a.m. And then there's a series -- Exhibit A has definitions and a series of specific topics.

Now, first, can you see it, or do you need me to make this bigger?

A. I can see it.

Q. Okay. Have you seen this document before today?

A. Yes.

Q. Okay. When was the first time you saw this document?

A. Within the last week or so.

Q. This request is a deposition for several topics, and I'm going to go to Exhibit A, and there's a

35

series of definitions, and then you see Number II, Specific Topics for Testimony.

Do you see that?

A. I do.

Q. And it says:

"Pursuant to FRCP 30(b)(6), Consulting by AR LLC must designate one or more officers, directors, or managing agent, or other persons who consent to testify on its behalf with regards to the following matters:"

Did I read that correctly?

A. Yes.

Q. Okay. Are you the person designated by Consulting by AR regarding the Topics 1 through 22?

A. Yes.

Q. And what I want to do is I'm going to go through each topic, and I'm going to ask you what you did to prepare for the topic. Okay? And to kind of help us there, I'm going to go ahead and -- actually, just to make it clear for the record, so I'm going to go ahead and show you what I'm going to mark Exhibit 2 and come back to Exhibit 1.

(Exhibit 2 was marked.)

BY MS. STEIN:

Q. Just to show, this is Exhibit 2. This is

36

Ignite International Brands LTD and Ignite International LTD's Cross-Notice of Taking Videotaped Deposition of Corporate Representative of Consulting by AR LLC Pursuant to Federal Rule of Civil Procedure 30(b)(6).

You do understand that they're -- that Mr. -- and represented by Mr. Ellis has also cross-noticed this 30(b)(6) notice.

Did you understand that?

A. I don't know, necessarily, if I understand that or understood it, but I assume that's correct now that you're saying it.

Q. You understand that besides myself that Mr. Ellis might also ask questions later with regards to the same 30(b)(6) topics.

A. I did not know that, but okay.

Q. Okay. And would you also be the Consulting by AR's desig- -- 30(b)(6) designee for the same topics for Ignite International Brands and Ignite International?

A. Yes.

Q. Okay. And then I also -- let me go to Exhibit 3.

(Exhibit 3 was marked.)

BY MS. STEIN:

Q. And this is a subpoena to testify at a civil deposition to yourself that was issued also for today by

37

myself on behalf of Ignite Spirits. You are also here today to testify personally based on the subpoena.

Do you understand that?

A. Yes.

Q. Okay. When's the first time you saw this subpoena?

A. I'm not sure.

Q. Okay. But have you seen it before today?

A. This is my personal one.

Q. Yes.

A. I don't recall.

Q. And I'm going to go -- I'm going to mark this Exhibit 4.

(Exhibit 4 was marked.)

BY MS. STEIN:

Q. Just kind of some housekeeping. This is an Acceptance of Service of Subpoena to Testify in a Deposition in a Civil Action to Alan Richardson, and this is signed by Mr. Pearson on May 10th.

You did, in fact, authorize Mr. Pearson to accept service to the subpoena for you personally; is that correct?

A. That's correct.

Q. Okay. And then, again, I'm just going to do some housekeeping. So this is Exhibit 5.



CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

38

(Exhibit 5 was marked.)

BY MS. STEIN:

Q. This is a subpoena, again, to you personally, but this is issued by Mr. Ellis on behalf of Ignite International Brands and Ignite International. Were you aware that Mr. Ellis also issued a subpoena to you personally?

A. I -- I'm not sure if I was told or not.

Q. Okay. And then I'll go Exhibit 6.

(Exhibit 6 was marked.)

BY MS. STEIN:

Q. And this is an acceptance of service of that subpoena. Did you authorize your attorney to accept service of Mr. Ellis's subpoena?

A. Yes.

Q. And I'm going to stop for one second because I'm going to clear those out so we don't get into --

Before we go back to the topics, I'm going to go ahead, and I'll mark this Exhibit 7.

(Exhibit 7 was marked.)

BY MS. STEIN:

Q. And this will be -- these are Bates stamps at the bottom, if you're familiar with those. This will be a document Bates-stamped CONSULTING 3074 through 3075. And I'll represent to you based on the Bates stamps that

39

you would have produced them. "CONSULTING" would mean that your company, Consulting by AR, would have produced this document.

This is Articles of Organization For Florida Limited Corporation for Consulting by AR.

Have you seen these articles before?

A. I don't remember.

Q. Okay. This shows that the effective date is March 3rd, 2021.

Do you see that?

A. I do.

Q. And it was signed by Joseph D. Sachs.

Who is that?

A. That's my accountant.

Q. In Florida?

A. Yes.

Q. How long have you worked with him?

A. Over ten years.

Q. And it says the name and person authorized to manage the LLC, and it lists yourself; is that correct?

A. Yes.

Q. You are the manager, then, of Consulting by AR; is that correct?

A. That's what it says.

Q. Well, who do you understand the manager of

40

Consulting by AR to be?

A. Me.

Q. Okay. Is there any other managers of Consulting by AR?

A. No.

Q. Okay. Now, this shows that this entity was formed in Florida; is this correct?

A. Is it correct that it shows that?

Q. Yes.

A. That's correct.

Q. Okay. So based on this document, do you change your former testimony that Consulting by AR is a Nevada entity, or is there a different entity?

A. Consulting by AR is a Florida entity.

Q. Okay. And has Consulting by AR ever been qualified to do business in Nevada?

MR. PEARSON: Objection to form.

Go ahead.

THE WITNESS: Qualified by whom?

BY MS. STEIN:

Q. Have you ever filed any documents or caused to be filed by Consulting by AR in Nevada for the entity to do business in Nevada?

A. I'd have to check with my lawyer.

Q. And which lawyer would you be checking with?

41

A. Henry.

Q. Is that Henry Lichtenberger?

A. Yes.

Q. Is Mr. Lichtenberger still your counsel?

A. Yes.

Q. Is he your personal counsel or Consulting by AR's counsel or both?

A. I'm not sure. I would assume it's Consulting by AR but could be both.

Q. Okay. Now, I'll go ahead and -- let me stop that one -- go ahead; we'll mark this Exhibit 8.

(Exhibit 8 was marked.)

BY MS. STEIN:

Q. This is the 2022 Florida Limited Liability Annual Report, and this is Bates-stamped IGNITE, which means Ignite Spirits, and 300, and it shows --

Have you seen this document before?

A. I don't recall.

Q. Who is responsible to ensure that Consulting by AR -- for its corporate filings?

A. Which corporate filings?

Q. The filings with the State of Florida that I'm showing you here in Exhibit 8.

A. My accountant, Joe Sachs, the gentleman's name that's on there.

 

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

42

Q. So one thing -- and we're going to go back to the topics now. I just wanted to come back to this -- you do understand that you're also here in a 30(b)(6) capacity; correct?

A. Yes.

Q. Okay. And I know we're combining the depositions. So I'll try to remind you if I'm asking a question of you personally or of the entity, but I'm asking this question as you as the 30(b)(6) for Consulting by AR with regards to the entity itself and its filings, its formation documents, et cetera, and I'm asking you not for your accountant but on your behalf, your knowledge of a filing on April 23rd, 2022.

Did you review this document before today?

A. No.

Q. Let me stop there.

What documents with relation to Consulting by AR's formation did you review in preparation of today?

A. I don't recall which document. I just knew that Consulting by AR was a formed company and that I was the only member of it prior to today.

Q. Okay. And you are the only manager as well?

A. I don't know the technical terms, but I'm the only -- I'm the sole person on the company.

Q. And that's been since inception?

43

A. Correct.

Q. What is the purpose of Consulting by AR?

A. It was formed to do this deal with Ignite.

Q. Why was an entity formed versus you just doing the deal personally?

A. That was the advice of my lawyer.

Q. And, again, that's Henry?

A. Correct.

Q. And we'll spare the court reporter his last name. If you're okay, we'll call him -- we'll just say "Henry." Okay?

A. Okay with me.

Q. Okay. Does Consulting by AR have an operating agreement?

A. No.

Q. Does Consulting by AR have a bank account?

A. No.

Q. Does Consulting by AR hold any business licenses?

A. No.

Q. I'm going to go now back to what we marked as Exhibit 1. This is the 30(b)(6) notice. And I'm going to go to Exhibit A, and I want to go through the topics. First, I'll go through the definitions so we can be on the same page, if that's okay.

44

And can you see that?

A. I can.

Q. Okay. So first, when we refer to Ignite Spirits, you understand that I'm referring to Ignite Spirits Inc.; correct?

A. I do.

Q. And you're familiar with Ignite Spirits Inc.?

A. Familiar in what sense?

Q. You've heard the name before?

A. Yes.

Q. What's your understanding of what Ignite Spirits Inc. is?

A. I don't really have an understanding. To me, Ignites are just Ignite.

Q. Okay. So then that's why I want to go next to Ignite International. Just to make sure for our purposes today that that is referring to Ignite International Ltd. Okay?

A. Okay.

Q. Okay. And then Ignite Brands we'll be referring to Ignite International Brands Ltd., the Canadian corporation.

Do you understand that today?

A. Yes.

Q. Okay. And do you understand -- have any

45

understanding of Ignite Brands's relationship to the other Ignite entities?

A. No.

Q. Okay.

A. I mean, other than it's the parent.

Q. Okay. And that's a good understanding. So --

And when we refer to Consulting by AR or Consulting or -- that would be referring to you, to the entity that you're here as a 30(b)(6) for. Okay?

A. Okay.

Q. And then Resorts World Las Vegas LLC, you're okay if I call it Resorts World, that we're referring to the property and the entity? Okay?

A. Okay.

Q. And, you know, I didn't ask you in the beginning. I will call you Mr. Richardson, if you're okay with that, and if you would like me to call you --

A. Sure.

Q. -- something else, I'm more than happy to do so.

A. Alan works too.

Q. Okay. Okay. And you can call me Kim. Please feel free.

A. Thank you.

Q. Okay. When we refer to David Bell, you're



Exhibit 1 014

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

46

familiar with David Bell?

A. Yes.

Q. How are you familiar with him?

A. What do you mean how am I familiar with him?

Q. Well, when's the first time you met him? We'll start there.

A. I believe early in 2021.

Q. Okay. And how did you meet him?

A. Through Dan Bilzerian or Adam Bilzerian, I'm not sure.

Q. And how long have you known Dan Bilzerian?

A. Over 15 years.

Q. And how did you meet him?

A. I don't originally recall.

Q. Do you consider him a friend?

A. I did at one point.

Q. Before this lawsuit?

A. Well, before the lawsuit, yes, and then after we met, there was a time we weren't friends, and then we became friends again. And then at the current status/stage, we're not friends, obviously.

Q. You mentioned Adam Bilzerian. That's Dan's brother?

A. Yes.

Q. Okay. And did you -- did you meet Adam before

47

Dan or through Dan?

A. I don't remember.

Q. Do you consider Adam a friend?

A. Yes.

Q. When's the last time you spoke with Adam Bilzerian?

A. Within the last three months.

Q. What did you talk to him about?

A. He called me asking me if -- there was some conversation about picking some of his friends and picking some of my friends and trying to resolve this issue.

Q. So you talked to him about this case?

A. We didn't really talk about the case. We -- he specifically didn't really even, I remember, want to get into any of it. He just said a solution or a thought on the solution to resolving it.

Q. And do you know if he called on behalf of Dan Bilzerian?

A. I don't know.

Q. Okay. So you said you met David from Dan, David Bell.

A. I said that I wasn't sure if I met him through Dan or through Adam, I believe.

Q. Oh, sorry.

48

Q. Did you meet him prior to kind of the reasons we're here today?

A. I mean, it could have been. I don't know. It certainly wasn't far -- far in the distant past prior to this.

Q. Did you ever play poker with David Bell?

A. Yes.

Q. When was the first time you played poker with David?

A. I couldn't tell you.

Q. But that would have been after Dan would have introduced you or somebody would have introduced you?

A. Not necessarily.

Q. Okay. You could have played with him before really knowing him?

A. Correct.

Q. So I'm going to keep going on the definitions. Dan, just for ease sake, will be Dan Bilzerian. Okay?

A. Okay.

Q. And I think we're all familiar with Dan. And you're familiar with Paul Bilzerian; correct?

A. Yes.

Q. That's Dan's father?

49

A. Yes.

Q. Have you ever met Paul Bilzerian in person?

A. No.

Q. And then another term we'll talk about is the letter agreement. That's the agreement between Consulting by AR and Ignite Spirits dated March 11th, 2021.
    You're familiar with that agreement?

A. Yes.

Q. And then you're familiar if I say letter agreement?

A. Yes.

Q. Okay. And then if I refer to documents with regards to Resorts World -- it's not listed here, but I just want to -- we'll kind of say if I say Resorts World letter of intent, you understand what I'm talking about?

A. Yes.

Q. So now I want to go to each topic. And, again, this starts under Roman numeral II, and the first topic is:
    "Consulting's formation documents, including, but not limited to, articles of organization, operating agreements and minutes and any amendments thereto."
    And the first question I have is what did you do



CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                           Ignite Spirits, Inc. v. Consulting by AR, LLC

---

50

to prepare for this topic?

A.  I figured out which of those topics exist or don't exist.

Q.  Now, did -- when you were preparing, did you take any notes?

A.  No.

Q.  So you took no notes to prepare for today?

A.  Well, no notes concerning Topic 1.

Q.  Okay.  Did you take notes overall to prepare for today?

A.  Yes.

Q.  Okay.  And do you have a copy of those with you?

A.  No.

Q.  Where are those notes?

A.  They would be in my room.

Q.  Okay.  And I'm just going to go ahead and ask you to preserve them in case they're needed later.  Okay?

A.  Okay.

Q.  Okay.  So I'm going to keep going.  And actually, just kind of when we're on Topic 1, we've talked about it a little bit, you said there's no operating agreement.  Were -- is there any minutes done as part of forming Consulting by AR?

---

51

A.  No.

Q.  I'm sorry.  I couldn't hear you.  I apologize.

A.  No.

Q.  And were there any minutes ever taken with regards to anything to -- any meetings or any activities for Consulting by AR?

A.  No.

Q.  Okay.  Were there ever any amendments to the articles of organization that I showed you earlier that was Exhibit 7?

A.  I don't know.

Q.  But in looking and preparing for today, you didn't see any documents that would have shown any amendments; is that correct?

A.  Correct.

Q.  So I'm going to go to Topic 2:
    "Consulting's managers and/or managers from
     inception to present."
    What did you do to prepare for that topic?

A.  Nothing.

Q.  And why is that?

A.  Because it doesn't -- there's nothing to prepare for.  I'm the only manager.

Q.  Okay.  And you always have been from the inception?

---

52

A.  Correct.

Q.  And since inception -- you said it earlier.  I just want to make sure I get this right -- it was because of this -- because of the letter agreement, correct, this deal?

A.  The initial reason I formed this company was because of the letter agreement.

Q.  Has this company done any other business since that time?

A.  No.

Q.  So now I'm going to go to Topic 3:
    "Consulting's management structure and
     activities from inception to present,
     including, but not limited to, any and all
     business licenses held and qualifications to do
     business."
    What did you do to prepare for that topic?

A.  Same thing.

Q.  And when you say "same thing," what do you mean?  Sorry.

A.  I mean, these -- these statements aren't specific to do anything to prepare for.

Q.  Because, again, you're aware of the management structure; correct?

A.  I'm the only member.  I'm the only manager.

---

53

Q.  And to confirm, Consulting by AR does not hold any business licenses?

A.  Correct.

Q.  And Consulting by AR has -- again, there was some confusion at the beginning, but as we sit here now, do you understand Consulting by AR is a Florida limited liability company?

A.  Correct.

Q.  And as we sit here today now looking at this topic and in preparing, are you aware if Consulting by AR was ever qualified to do business in the state of Nevada?

A.  I was told it was.

Q.  You were told it was by whom?

A.  Henry.

Q.  Have you ever seen any documents or verified -- to verify that?

A.  I did not question my counsel's opinion.

Q.  In preparing for today, did you do any research, or did you contact Henry to verify that that was true?

A.  I may have asked Jon the same question as we went through it and was told the same.

Q.  And what were you told?

A.  That you don't need a business license for a

---



54

one-time type of deal like this.

Q. Okay. Let me go to Topic 4:

"Information known or reasonably available to Consulting regarding the letter agreement, including, but not limited to, the negotiation, preparation, and execution of all versions of the letter agreement, all drafts of the letter agreement, all proposed amendments to the letter agreement, the performance of the letter agreement, and all representations and warranties made by you thereunder."

Did I read that correctly?

A. Yes.

Q. And with regards to this topic, what did you do to prepare?

A. I read as much of the letter agreement versions that I could find.

Q. And when you say "versions," who drafted the letter agreement?

A. Which version?

Q. Who drafted the initial?

A. I'm not positive. I think it was David Bell.

Q. Is David Bell an attorney?

A. I don't know.

Q. And you said "which version?" Now, I just want

55

to make sure, you engaged Henry with regards to the letter agreement; is that correct?

A. Yes.

Q. Okay. And as the agent for Consulting by AR and for you; correct?

A. Yes.

Q. And did you -- you're not a lawyer; correct?

A. Correct.

Q. Okay. But you were involved in the negotiations of the terms that went into the letter agreement; is that correct?

A. Yes.

Q. Now, again, kind of going through what you did to prepare, did you review emails?

A. Yes.

Q. Texts?

A. Yes.

Q. Drafts?

A. Yes.

Q. For what time period?

A. From the time period that it started till the time period that it ended.

Q. When do you consider that it -- the time period that it started?

A. I would imagine the date of the first draft or

56

the first discussion of it.

Q. And when do you consider it ended?

A. When it was signed.

Q. The letter agreement was signed?

A. Yeah.

Q. Okay. But this also talks about proposed amendments. So would that have continued after the signing of the letter agreement?

A. Yes.

Q. Okay. So when you -- and, again, I'm not trying to trick you. So would you consider it ending, actually, when the agreements with Resorts World were signed?

A. No. It ended the day that it was signed.

Q. Okay.

A. The proposed stuff I'm going to surmise what you're talking about. There was -- there was only proposals, as this so-called paragraph refers to, as to Ignite trying to change the deal and making new proposals, I suppose. There was never a change to the deal or any proposals from -- from myself.

Q. Now, it also talks about in this paragraph the performance of the letter agreement. What dates do you consider that to be?

A. I didn't really understand what that meant.

57

Q. Well, under an agreement, you -- there was certainly obligations by Consulting by AR; correct?

A. I -- ask the question again, please.

Q. I'll ask it differently. Sorry. Again, this is where we say sometimes we don't ask the right questions.

What was Consulting by AR's understanding of what it was supposed to do pursuant to the letter agreement, its obligation?

A. It was supposed to bring Ignite a deal with -- with certain criteria laid out in the letter agreement.

Q. And to do that, what was the time frame to do that, perform?

A. I'm not sure of your question.

Q. Well, the letter agreement, and we'll look at it later, I'll just represent to you was signed March 11th, 2021.

Would you agree with that?

A. Yes.

Q. Okay. And you said that there was certain criteria. And we'll get into the letter agreement. I'm just trying to get to where we're preparing right now; so we'll keep going. But you said there was certain performance about bringing a deal. When -- what time frame was that supposed to be performed? On the same



58

day as March 11th or later than that?

A. I mean, there was different drafts, and it changed as it went along till the final draft.

Q. No, I understand. But there's performance. In other words, you said you don't understand what performance is. I'm just trying to get to that -- when Consulting would have done those obligations, in your mind what was that time frame?

A. Well, it was Resort World [sic] that had the obligations and Dan Bilzerian that had the obligations.

Q. So your understanding as from Consulting by AR is that there -- once the agreement was signed, there was no obligations after March 11th.

Is that what you're saying?

A. No. I'm saying that the -- the agreement represented two different parties that both had to perform, and there wasn't -- it wasn't me that had to do the performance, it was those parties.

Q. So under the letter agreement, I'm just trying to understand, what performance did -- what did Consulting by AR have to perform?

A. I had to bring a deal to Ignite with substantially similar terms that were laid out in the letter agreement.

Q. And in preparing for looking at that

59

performance, what dates of documents did you look at?

A. I'm not sure of your question.

Q. Okay. Again --

A. The document was signed on the 11th.

Q. Okay. So -- but we talked about you looked at texts and this and that. I'm talking specifically performance of the letter agreement by Consulting by AR, did you look at anything beyond March 11th?

A. I don't understand what you're asking. I looked at different -- I looked at different versions and different drafts. As this thing says, all drafts, proposed amendments, which we talked about, the performance, which we just talked about. So I'm not really sure what you're -- which one of four you're asking me.

Q. Well, why don't we go to five, then.

A. Okay.

Q. "Any and all efforts and/or actions taken by you," which is Consulting by AR, "on behalf of Ignite Spirits with Resorts World and/or interaction with Resorts World on behalf of Ignite Spirits in relation to the letter agreement, including, but not limited to, the negotiation, preparation, and execution of any definitive agreements."

60

What did you do to prepare for this topic?

A. Same answer. Looked at emails, text messages, and drafts.

Q. And my question now is in what time frame were those emails, text messages, and drafts?

A. I don't know. I mean, I looked at so much stuff concerning all these things. I don't have separate pockets of time frame for each one of these specific numbers.

Q. But you believe in preparing for today to be fully prepared, you would have had to go back and look at communications between, for example, yourself and Resorts World people; correct?

A. I looked at literally thousands of documents.

Q. I'm going to go to 7:
    "Information known or reasonably available to
    Consulting regarding Ignite Spirits and its
    communication therewith."
    What did you do to prepare for this topic?

A. Same answer.

Q. And who specifically did you communicate with with regards -- with -- Consulting communicate with with regards to Ignite Spirits that you would have looked at?

A. I don't understand the difference. I mean, they're all -- what I did to prepare for all of your

61

numbers is the same thing. I looked at text messages, emails, drafts, everything that was available in this case.

Q. Okay. So when I'm asking specifically with regards to 7 with regards to Ignite -- and we can combine 8, which regards to Ignite International, and 9, Ignite Brands, because you've already said you believe Ignite's the same -- whose text messages or emails or communications -- whose specifically at Ignite texts or emails did you look at?

A. I couldn't tell you.

Q. Did you look at communications with David Bell?

A. Yes.

Q. Dan Bilzerian?

A. Yes.

Q. Paul Bilzerian?

A. Yes.

Q. John Schaefer?

A. Yes.

Q. Paul Holden?

A. I looked at all the documents. All the documents. All the text messages and all the emails from all the parties that are involved in this case.

Q. Okay. So then going to 10 with information known or reasonably available to Consulting regarding

OASIS
REPORTING SERVICES

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                        Ignite Spirits, Inc. v. Consulting by AR, LLC

62

David Bell's role with regards to the letter agreement and then 11 regarding Paul's role with the agreement and 12 Dan's role, I'm assuming you're saying it's the same thing for those topics as well?

A. Yes.

Q. Now, on 13, this is about information known to Consulting regarding Ignite Spirits's communications with Resorts World.

What did you do to prepare for that topic?

A. Same answer.

Q. Same answer for 14?

A. Yes.

Q. 15?

A. Yes.

Q. Okay. 16?

A. Yes.

Q. Now, 17 specifically, what did you do to prepare for any -- just about any agreements that you would -- that Consulting had with Henry or his firm?

A. Same thing.

Q. And did you review any type of retainer agreement?

A. I don't recall.

Q. But, again, because you're the person, you're -- in your belief you're familiar with that

63

topic; correct?

A. Which topic are you asking about?

Q. 17.

A. Am I familiar with the topic of agreements between me and Sklar Williams or Henry?

Q. Yes.

A. Yes.

Q. Okay. What did you do to prepare for 18: "Information known or reasonably available to Consulting regarding Dan's efforts to locate responsive documents to your subpoena duces tecum"?

A. I mean, I -- I've listened to his deposition --

Q. Okay.

A. -- and spoke to -- prior to this, not per se this -- to Jason Verona.

Q. And you were also present at Mr. Verona's deposition; correct?

A. Yes.

Q. What did you do to prepare for Topic 20, Consulting's document retention policy/policies used?

A. What did I do to prepare for that?

Q. Yeah.

A. I don't -- I don't know how -- it's not something I prepare or don't prepare for. It's -- I

64

mean, I retained all documents since day one.

Q. Okay. And how do you retain those documents?

A. You'll have to be more specific. Which document are you asking about?

Q. All documents from Consulting with regards to the letter agreement in this litigation, how are those maintained? For example, we'll start with emails. How do you maintain them?

A. I mean, they're in my email box.

Q. And what kind of email is it? Who supports your email?

A. AOL.

Q. Okay. Did you download those emails from AOL, or do they remain in your AOL account?

A. I went to a third-party company that took everything off my server or off -- off my email account.

Q. And did that third-party also take everything off of your phone?

A. They did.

Q. Did they use both of your phones?

A. The phones are linked together.

Q. What do you mean by they're linked together?

A. I only have one email account. You can pull it up on either phone.

Q. What about text messages, though?

65

A. They -- they are on separate phones. I don't -- there's -- the phone that I used for all my communications with this case is the phone that they took all the information off of.

Q. What about -- you also use certain apps for text messaging; correct?

A. Yes.

Q. And those include WhatsApp?

A. Yes.

Q. Do they include anything else?

A. Do I have other apps for communication?

Q. Yes.

A. Yes.

Q. Which are those?

A. Signal.

Q. Is that also on the same phone?

A. Yes.

Q. And WhatsApp, is that also on the same phone?

A. I only have that on one phone.

Q. And that's the phone that you gave to the server?

A. Correct. Well, to the sever, to the company, I don't know if that's the same thing.

Q. Okay. Does Consulting by AR -- do you maintain a separate laptop or computer for files?

 

66

A.  No.

Q.  Do you have a laptop?

A.  Yes.

Q.  Okay.  Do you maintain a separate folder with regards to Consulting by AR documents?

A.  A separate folder for what?

Q.  Well, how do you maintain knowing that they are Consulting by AR documents versus something else?

A.  I pulled all the emails that concern this case, and I only have one email.

Q.  But I'm also talking documents.  Did you also pull documents besides emails?  Agreements?

A.  Yes.  I mean, they're all in the emails.  So you can't get a document without getting an email unless somebody handed it to you.

Q.  Do you, though, maintain those documents separately from email, or do you rely on email?  That's what I'm asking.

A.  I don't understand your question.  Do I rely on them?  What -- I don't -- what do you mean?

Q.  Well, do you pull certain documents off of email and save them down, or do you rely on them being saved in your email?

A.  I mean, they're the same to me.

Q.  Okay.  Going to Topic 21, what did you do to

67

prepare for information known or reasonably available to Consulting regarding its counterclaim?  What did you do --

A.  Same thing.

Q.  -- to prepare for that?

A.  Same thing.  Reviewed emails and text messages and documents.

Q.  Did you review the counterclaim?

A.  Yes.

Q.  And then last topic is:
     "Any and all efforts you made or were made on
     your behalf to obtain payments for your
     services under the letter agreement."
     What did you do to prepare for that topic?

A.  Same thing.

Q.  Has Consulting by AR ever had any employees?

A.  No.

Q.  Have you ever been paid any monies by Consulting by AR?

A.  No.

Q.  Have you filed taxes on behalf of Consulting by AR?

A.  Consulting by AR hasn't been open for a tax season yet.

Q.  Okay.  Do you personally as Alan have any

68

agreements with Consulting by AR for -- as a contractor?

A.  No.
    Can we take a two-minute break?

Q.  Yeah, I was going to say, it's actually a good time.  I'm going to switch topics.  So why don't we go ahead and take five minutes, if that's okay.

A.  I'm just going to the bathroom real quick.  So -- um, five minutes?  Oh, not supposed to tell you.

Q.  That's okay.

A.  Five minutes is fine.
    THE VIDEOGRAPHER:  The time is now 10:17 a.m.  We are off the record.
    (A recess was taken from 10:17 a.m. to
    10:31 a.m.)
    THE VIDEOGRAPHER:  The time is now 10:31 a.m.  We are back on the record.
BY MS. STEIN:

Q.  Okay.  Mr. Richardson, I wanted to kind of start talking about how -- prior to the letter agreement, how, in your words, it came about.

A.  I spoke to Dan about a potential marketing idea that I thought would be good for him and -- and that's how it came about.

Q.  And how did you speak to Dan?  Did you see him in person?  Did you call him, text?

69

A.  I don't remember initially.

Q.  And what was your initial idea?

A.  I don't remember.

Q.  When you first approached him, though, it had to do with Resorts World?

A.  Yes.

Q.  And prior to approaching Dan, had you spoken with Scott Sibella at Resorts World?

A.  I don't remember.

Q.  How long have you known Scott Sibella?

A.  Five years.

Q.  How did you meet him?

A.  I don't remember.

Q.  Had Scott Sibella reached out to you about wanting to meet Dan?

A.  I don't remember.

Q.  But you said "you," you had some idea.  So it was your idea initially for Dan to do something with Resorts World; is that fair to say?

A.  I believe so.

Q.  But you don't remember kind of your idea of what that initially was?

A.  It's a marketing -- it was a marketing idea with, you know, Dan being the marketeer and Resort World being the home to market.

 

Exhibit 1 020

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                                         Ignite Spirits, Inc. v. Consulting by AR, LLC

70

Q. So how did you go about -- after having this idea, you spoke to Dan; right?

A. Correct.

Q. Okay. And from there, kind of tell me in your own words what you did next from your initial discussion with Dan.

A. I think the next step, Dan was interested, and he put me in touch with David Bell to work out the details.

Q. And why would he put you in touch with David Bell? Did you know? Did he tell you?

A. I can't tell you why he did, but I can tell you what I conclude or concluded by the end of the day.

Q. Well, what did you think at the time why he put you in touch with David Bell?

A. To make the deal.

Q. Now, did you think the deal was Dan personally, or was your idea involving his company Ignite?

A. I mean, I can't tell you what I thought about a year and -- a year and a half ago.

Q. Okay. So I'm going to go ahead, and we will mark this -- we're up to Exhibit 9. And, again, this is Bates-stamped documents -- this is DAN1 through DAN3, which means actually -- Dan actually would have produced these documents.

71

(Exhibit 9 was marked.)

BY MS. STEIN:

Q. And this is an iMessage, starts February 18th, of 2021 is what I'll let you know, and this is a conversation, looks like, between -- it's supposed to be between yourself and Dan. And I'm going to go down to DAN2, and on February 20th, it says:

"Good morning. Tour at 12. All set."

Do you know if that's related to a tour at Resorts World?

A. I have to see more. I'm trying to move my pictures out of the way so they're out of the --

Q. Here, I can move it up a little bit. If you want to read through, just let me know, and I'll start -- it starts on February 18th.

A. "...12 o'clock tomorrow with Bill Richardson.

"Bill Richardson okay...coming to the house. He said 12 at your place. And grilled chicken works.

"Perfect. I come 11:40...at 1:30...to set an alarm. Let's do 12:30."

(Court reporter interrupts.)

THE WITNESS: I'm not -- I'm not reading for the record.

/////

72

BY MS. STEIN:

Q. Yeah, so just read to yourself because otherwise she has to take it down.

A. Okay. Can you (indicating).

Okay. Your question was is that tour of Resort World?

Q. Yes.

A. I believe so.

Q. Okay. And this is about the right time frame, February 20th?

A. The right time frame for what?

Q. For you initi- -- after you initially met with Dan before entering into the letter agreement.

A. Correct.

Q. Okay. And it says "Tour all set"; that would be you. And is that Dan answering "Cool. David said I should come in 45 minutes"?

A. I mean, you have the paper in front of you, which shows the names. This doesn't show any names. I mean, if you're asking an obvious question to who wrote it, you can tell better than me.

Q. Okay.

A. Well, I don't know -- why is this not, like, complete? Like, my text messages, I think, have who says -- like, names next to them. Just -- maybe it's

73

just not big enough on my screen, but I can't see names.

Q. It doesn't have names. This is from Dan's phone.

A. I mean, my phone has names on it from my text messages.

Q. This one doesn't. So I'm just asking you a question.

A. Okay. I don't want to say the wrong answer. I can't tell you because it doesn't have a name. And then you're asking me from memory a year and a half ago if -- who that matches.

Q. But you did actually -- did you introduce Dan to Scott Sibella?

A. Yes.

Q. Where did that take place?

A. I don't remember initially.

Q. Did you ever bring Scott Sibella to Dan's house?

A. Yes.

Q. How many times?

A. I think once.

Q. Was that for a UFC fight?

A. I don't think it was for a UFC fight. I don't remember what the event or what it was, but, like, I don't think Scott ever went there for a UFC fight.

 

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC

Alan Richardson                                              Ignite Spirits, Inc. v. Consulting by AR, LLC

74

Q.  Go ahead, and I'm going to show you -- we'll mark this 1-0 -- Exhibit 10.  Sorry.
(Exhibit 10 was marked.)
BY MS. STEIN:
Q.  This is CONSULTING 642 through 676.  These are text messages.  Is this what you're referring to with names and how you produce text messages?
A.  Yes.
Q.  Okay.
A.  But even on, like, screenshots, not this professional company, there's names on screenshots.
Q.  So here if we start, and we're on the first page, which is, again, CONSULTING 642, it's from, it says, "Cal my (owner)."
That's your phone number; correct?
A.  Yes.
Q.  And it says "To," there's a phone number, "David Bell."
That's David Bell we've been speaking about?
A.  Yes.
Q.  And then it says "To:  John Shafer President Ignite."  Schaefer spelled wrong.  Just for the record, it's not S-h-a-f-e-r.
When's the first time you ever communicated with John Schaefer?

75

A.  I couldn't tell you without looking at my call log or text logs or what have you.
Q.  Okay.  Then it says "To:  gem4you@aol.com."
That's your email; correct?
A.  Yeah.
Q.  So I'm going to go down further on the page, though.  Start time is February 20th, 2021.  Last Activity: 7/14/2021.  Participants:  David Bell and Alan Richardson.
So if it shows here a start time for text messages between yourself and David Bell as February 20th, 2021, is that the first time, then, you would been texting with David Bell?
A.  If this log is correct, then that would be it.
Q.  Does that seem right to you?
A.  Yes.
Q.  And it says "Last Activity:  7/14/2021."
Is that the last time you would have texted with David Bell?
A.  Same answer.
Q.  When's the last time you spoke to David Bell?
A.  I don't know.
Q.  What would help you remember?
A.  Looking at the call log on my telephone.
Looking at -- when you say "spoke," I assume you don't

76

mean text.
Q.  Correct, or met in person.  When was the last time you saw David Bell?
A.  I know we had communication after 7/14.
Q.  Okay.  When you met with David Bell, was that in Las Vegas or in Florida?
A.  Las Vegas.
Q.  And do you know where David Bell lives?
A.  In Fort Lauderdale.
Q.  Did you ever meet with him in Florida?
A.  No.
Q.  So then the bottom of the page -- sorry -- this first page here, it says on 2/20, shows read, and it's from David Bell to you:
"Good morning, Alan.  This is David.  Let me know what time you are thinking today."
And then the next page is a response:
"Morning.  Awaiting Scott to get back to me."
Are you referring to Scott Sibella?
A.  Yes.
Q.  Just for the record, Sibella is S-i-b-e-l-l-a.
And then if I go further down here and it says -- just for the record, CONSULTING 644.  At the top, it says:
"Okay.  So we have a tour at 12:00."

77

This was sent to David Bell from you at 9:41 a.m.; is that correct?
A.  Yes.
Q.  So during this tour, did this tour occur on February 20th, 2021, at noon?
A.  I don't know from what you are showing me.
Q.  Okay.  But do you -- what -- do you remember there was a tour at some point of Resorts World; is that correct?
A.  There was.
Q.  Okay.  And who was present at that tour?
A.  Dan, David, myself, and Scott and maybe some other Resort World people.
Q.  And what was the purpose of the tour?
A.  To show Dan the property.
Q.  Okay.  Did you also discuss during that tour Dan doing something with Resorts World based on your marketing ideas?
A.  I don't remember.
Q.  I'll go down -- this is CONSULTING 668.  It's a text, again, from you to David Bell asking:
"Have you already discussed in principal all facts?"
This is on 2/21 at 5:30.  Are you talking about a possible deal with Resorts World?



78

A.  I can't tell from one text message what that's referring to.

Q.  Okay.  Now, as of February 20th, 21st, was Henry engaged at that point by you for this deal?

A.  I don't know.  I don't remember.

Q.  Now, at some point you were sent a draft of the letter agreement; correct?

A.  Yes.

Q.  Okay.  And at that point, did you respond, or did you have Henry respond on behalf of Consulting by AR?

A.  I don't remember.

Q.  So, again, I'm not going to -- I mean, I -- I'm going to -- actually now asking you not as a person. I've asked you some questions, but I'll kind of clarify when we do because, again, we're combining this with a 30(b)(6).  And under -- as a 30(b)(6) as one of the topic sections under 4 about the drafting of the letter agreement, I will just let you know under a 30(b)(6), "I don't remember" is not an acceptable answer.  So --

A.  From what I --

Q.  -- what would help -- help you remember?  Let me finish please.

What would help you remember?

A.  Looking at my text messages when I first talked

79

to Henry and when I probably said, "Can I come to your office?  What day?"  What the date of the appointment would be.  And then that would be the date that I -- I met Henry.

Q.  Had you worked with Henry prior to this deal?

A.  No.

Q.  Now, after you received the letter agreement, after Consulting by AR received the letter agreement, a draft, you said it was received by you; correct?

A.  I mean, at some point I received a draft, yes.

Q.  Did you respond, or did you cause Henry to respond?

A.  You've already asked me that.

Q.  And I'm asking you again as a 30(b)(6).

A.  I don't remember who initially responded to which version of which draft at which time.

Q.  Okay.  Did you ever personally respond with regards to a draft letter agreement?

A.  Can you be way more specific?  Did I respond saying I received it?  Did I respond saying we need to change something?  Did I respond saying I'm alive on the planet and let's talk about this?  Like, did I respond is just honestly very general.  I don't know what you're --

Q.  Okay.  Well, we'll start there.  Did you

80

respond that you received it?

A.  I don't remember.  I assumed that there was ongoing communication since the first draft.  So I obviously responded.  I didn't -- you know, I didn't fall off the planet and never talk to him about it.  So I'm not being -- not trying to be sarcastic, but, of course, there was a response at some point.  I don't know if I -- you know, I don't know what you are specifically asking, if I responded -- I mean, David and I continued up until, you know, the end of July talking about this letter agreement or terms of this letter agreement.  So it never, per se, ended, and I don't know, you know, my time frame of response back and forth.  It's --

Q.  Let's talk about more in general, and we'll get specific and go through some documents.

But at some -- okay.  Again, you would agree, at some point a letter agreement was executed; correct?

A.  Yes.

Q.  Okay.  Prior to that, there were drafts back and forth; is that fair to say?

A.  Yes.

Q.  Okay.  In that process with regards to drafts, did you have meetings with people regarding terms of the letter agreement?

81

A.  Yes.

Q.  Were those meetings in person, on the phone?

A.  I imagine both.

Q.  And who was involved in that process?

A.  David Bell, Paul Bilzerian, Solomon Schwartz, Scott Sibella, Dan Bilzerian, John Schaefer, Paul Holden, Henry, the lawyer.  I think that's it.

Q.  I'll go back.  I know initially you said Dan introduced you to David.  How did Paul Bilzerian get involved?

A.  I can't tell you initially how he was first brought to -- brought to the conversation.  It had to be through Dan, either Dan or David.

Q.  Now, again, I'm only talking about the letter agreement before it was executed.  So we're talking February 20th, 2021, to March 11th, 2021.  Was Solomon Schwartz involved?

A.  Yes.

Q.  Who is Solomon Schwartz?

A.  He is the gentleman that handled the terms for Resort World.

Q.  And did you consult with him as part of the process for negotiating the letter agreement?

A.  Yes.

Q.  Did Solomon Schwartz also consult with David



CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson
Ignite Spirits, Inc. v. Consulting by AR, LLC

82

Bell during this time?

A. No. No.

Q. How about Paul Bilzerian?

A. No.

Q. Dan Bilzerian?

A. No.

Q. Okay. Now, you also said Scott Sibella. Same questions, did Scott Sibella, again, February 20th to March 11th of 2021 -- did he have involvement with regards to the letter agreement?

A. No.

Q. So when you listed him, you were talking about later?

A. I was talking about -- well, it's a little overlapping because the letter agreement, he would not have had any involvement with and neither would Solomon Schwartz, I guess. The letter agreement was just between myself and Ignite. So it would be all the Ignite people I mentioned and myself.

Q. Now, you said "all the Ignite people." Again, you're not sure which Ignite; correct?

A. What do you mean which --

Q. Which entities: Spirits, Brands, International?

A. To me, correct, Ignite is Ignite.

83

Q. So you said all the Ignite people. Do you consider David Bell an Ignite person?

A. I mean, he represented Ignite in -- in my letter agreement capacity as well as throughout the term of the entire project. He was at one point the only person I was authorized to be allowed to talk to.

Q. Now, did David Bell sign the letter agreement?

A. No.

Q. Okay. John Schaefer did; correct?

A. Yes.

Q. Now, when was the first time -- was John Schaefer involved between February 20th and March 11th with regards to the letter agreement?

A. I would have to check my communications. I don't know -- I don't know if I was discussing the letter agreement with him at any point or not. I don't remember.

Q. When was the first time you met John Schaefer?

A. I would have to check documents to tell you the date.

Q. Was it before or after he signed the letter agreement?

A. I don't want to guess. I'm not positive of it.

Q. And you said "Henry, the lawyer." So I just want to make sure, there's not a separate lawyer. You

84

are talking about Henry, the lawyer, or are you talking about a different lawyer?

A. No, Henry, whose last name you didn't want to put into the record, spell into the record.

Q. Again. I just don't want to say it again because the court reporter would have to keep typing his name, but -- okay.

A. Lichten- --

Q. Lichtenberger.

A. -- berger. Yeah.

Q. You and I get it right. Your attorney sometimes doesn't.

A. Try and spell it.

Q. I can.

Okay. What I want to do is I'm going to go next to -- we'll mark this Exhibit 11. This will be, just for the record, CONSULTING 1 through CONSULTING 14. This is an email from Henry Lichtenberger sent March 4th, 2021, to dbell@leangroup.com cc'g gem4you@aol.com.

(Exhibit 11 was marked.)

BY MS. STEIN:

Q. So, again, do you know this to be David Bell's email?

A. It's clearly one of his emails, yes.

Q. And gem4you we discussed earlier is your email;

85

correct?

A. Yes.

Q. And the subject is "Revised Letter Agreement Ignite and Consulting by AR."

Did I read that correctly?

A. Yes.

Q. "I also created a marked version to show the changes from the draft that Alan provided to us last week. I do not think the marked draft is worth reviewing given the changes made and related formatting."

Did I read that correctly?

A. Yes.

Q. So this talks about marked changes from the draft that you -- you're Alan -- provided; correct?

A. Yes.

Q. If I go to page 2, CONSULTING 2, there is -- looks like it's a not-dated agreement with some highlights in yellow.

Do you see that under 2, and I can go through 3 to 4.

Do you see that?

A. Do I see what?

Q. At the bottom that you see this agreement, looks like there's an agreement here and it has some



CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

86

yellow highlights.

A. Yes, I see that.

Q. Okay. And just to show, it's not signed; correct?

A. Correct.

Q. Okay. Now, I'm going to go back up to CONSULTING 2, and under this section, you'll see Section 1, do you see that, titled "Resorts World Agreement"?

A. I don't see Section 1, no.

Q. Right here (indicating).

A. Okay. Yeah.

Q. Okay. See the Number 1? Sorry.

A. Yeah.

Q. The last sentence says:
"Ignite will diligently and in good faith negotiate with Resorts World to cause a binding letter of intent or similar instrument to be finalized and executed no later than 120 days from the effective date."
Did I read that correctly?

A. You did.

Q. Okay. Do you know where that term came from?

A. From Ignite.

Q. Okay. And do you know if that term was eventually changed in the final agreement?

87

A. I do.

Q. And was it changed?

A. It was.

Q. Why was it changed?

A. Because I assume that 120 days from the effective date wasn't far enough -- a long enough time period to conduct the conditions that needed to be done.

Q. So is it fair to say that this term was a negotiated term?

A. Is it fair to say which term is a negotiated term?

Q. The time frame here that -- of the sentence I just read about the time frame to negotiate was a negotiated term, the time frame?

A. I mean, is that a legal term?

Q. I'm just asking your opinion. I'm not asking you as a lawyer. I'm just asking in your opinion. As an entrepreneur, you understand negotiations; correct?

A. I would not label it as a negotiated. I would say it was changed.

Q. And you had input into that change as Consulting by AR; correct?

A. I don't really recall. I imagine that I did.

Q. Now, if I go down now, you see this is Number 2, "Compensation to C-AR." And then it says at the very

88

bottom in yellow and bolded:
"Please provide name of transfer agent and Canadian broker that C-AR can open an account with or if you have a U.S. broker that will accept the shares for deposit."
Did I read that correctly?

A. Yes.

Q. Did Consulting by AR ever open a brokerage account in Canada?

A. No.

Q. Did C-AR ever open a brokerage account in the United States?

A. No.

Q. Does C-AR currently have a brokerage account as we sit here today?

A. Yes.

Q. And where is that account located, the U.S. or Canada?

A. U.S.

Q. And when was that opened?

A. When was my first broker's account opened?

Q. Yeah, for C-AR.

A. I'm sorry. Can you ask the first question again.

Q. Oh, I apologize. You said -- and that's why

89

I'm a little confused. You said -- I asked you about C-AR having a brokerage account --

A. Oh, I'm sorry.

Q. -- in U.S. or Canada.

A. I thought -- I thought you meant do I have a broker's account.

Q. No. I'm assuming you do; so I wasn't asking you.

A. Okay. C-AR does not have a broker's account.

Q. Okay. And it's never had one; is that correct?

A. Correct.

Q. Okay. I'm going to keep going. Now, in this draft, this is still the same draft, but on CONSULTING 5 there's an Exhibit A. And I think you kind of alluded to, but -- and, again, this is not the final terms, but you were saying there were substantial terms that had to be put into an agreement. Is Exhibit A the example of those terms? And, again, I'm not saying these are the final terms.

A. Yes.

MR. PEARSON: Objection to the form.

Hold on, Alan.

Objection to the form.

You can go ahead and answer.

/////



90

BY MS. STEIN:

Q. And then it was -- and your answer was "yes"?

A. Yes.

Q. Okay. Okay. And then I'm going to go -- we're going to start at CONSULTING 8. It's like it's a similar agreement, but it looks like this is a redline; is that correct?

A. I'm not -- what -- ask more specifically. Is there red lines on this page? Yes.

Q. That's what I'm asking. Okay.

And the first redline, it has a date. There was a February 22nd date, and then there's a March date. Do you remember if you received a draft of the letter agreement on February 22nd?

A. I don't remember.

Q. Do you know who did these redlines?

A. I do not remember.

Q. Did you review these redlines?

A. I don't remember.

Q. Did Consulting by AR -- I'm asking you now as your capacity as a 30(b)(6) -- review different drafts and redlines of the letter -- of this letter agreement?

A. Yes.

Q. Go now -- go ahead and mark this Exhibit 12.

(Exhibit 12 was marked.)

91

BY MS. STEIN:

Q. This is Bates-stamped CONSULTING 15. This is an email from Henry Lichtenberger dated March 5th, 2021, to David Bell and yourself; correct?

A. Yes.

Q. Okay. And it starts out:

"After spending some time reading your blunt email from last night and our intense conversation this morning, I still believe what we drafted (in green below) is exactly what was expected - you get nothing until the deal with Resorts World is executed."

Did I read that correctly?

A. Yes.

Q. Now, did you as Consulting by AR -- was Mr. Lichtenberger authorized to send this email for Consulting by AR?

A. Yes.

Q. Now, if you go further into that paragraph, it says:

"While we did discuss the language in Section 1 several times, I believe the desire to get the document out coupled with working on the document for the good part of six hours, may have resulted in the final draft containing

92

this incorrect language."

Did I read that correctly?

A. Yes.

Q. And then it says:

"I believe the real terms of the deal in Section 2 with respect to the compensation remains accurate."

Did I read that correctly?

A. I'm not sure where you are reading.

Q. Right here, second-to-last sentence of the first paragraph.

A. Yes.

Q. And it says:

"My draft, my document, my fault. Not what you want to hear, but it is the truth."

Did I read that correctly?

A. Yes.

Q. Now, this goes to a conversation. Do you remember a conversation on March 4th, 2021, between David Bell, yourself, and Henry?

A. No, I don't remember.

Q. Go ahead, and we're going to mark this Exhibit 13.

(Exhibit 13 was marked.)

/////

93

BY MS. STEIN:

Q. This will be BELL -- so this means David Bell produced it -- 39 through 55. And this is, again, an email now from David Bell sent March 5th, 2021, and it's to Paul -- Bilzerian, I'll represent -- and it says:

"See below and attached. Let me know if we are okay with this version."

And then it's forwarding an email from Henry Lichtenberger on March 5th at 2:33 p.m. that was to David Bell cc'ing you, and it says:

"Please see attached revised letter agreement. I also included a marked version to reflect the changes from the draft circulated last night."

Did I read that correctly?

A. Yes.

Q. Now, if I go to the next page, which is BELL40, we see another draft of the letter agreement, and I will go to the signature page, which is BELL42.

This was also not signed; correct?

A. Correct.

Q. And on this signature page, it has -- stated underneath your name, there's a -- like, a little bit of stars, and then it says:

"The undersigned hereby joins in the execution of this agreement to confirm its obligations

 

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                          Ignite Spirits, Inc. v. Consulting by AR, LLC

94

set forth in this letter agreement," and it states "Ignite Brands"; correct?

A.  Correct.

Q.  If I go back to BELL40 under Number 1, it states, again, at the end of the last sentence of the paragraph, this one doesn't have any time frame; correct?

A.  Where -- where -- what are you saying?  Where do you want me to read to look?

Q.  Under Section 1 at the last part of the section, remember we looked at the 120 days before?  This Section 1 does not even have anything about the 120 days, does it?

A.  Correct.

Q.  Now, one question I do have on this compensation, and we'll get to the final agreement, did you ever represent to Dan that you were splitting this compensation with Scott Sibella?

A.  I did not.

Q.  Now, if I go down on the same -- this is BELL47 -- under Number 1, also this is a redline; correct?

A.  What was the question?

Q.  This is a redline; correct?

A.  In paragraph 1, there is redline, yes.

95

Q.  And here, the redline actually deletes the last sentence about the 120 days; correct?

A.  It redlines the last sentence.

Q.  And by the way, going back on Scott Sibella, did you ever text Dan to tell him that you were splitting your compensation with Scott Sibella?

A.  No.

Q.  Did you ever tell Dan not to tell Scott Sibella what your compensation was under this agreement?

A.  No.  I actually told him he could tell.  He asked me once, and I told him he can tell Scott.

Q.  Going to that, what did you tell Dan about your relationship with Scott Sibella before introducing Dan to Scott?

A.  What did I tell Dan about my relationship with Scott?

Q.  Yeah.

A.  That he's a friend of mine, and he's the president of the hotel, and he's the sole deciding factor in deals.

Q.  Did you ever tell Dan that you helped Scott cheat on his wife in exchange for favors?

A.  Never.

Q.  Did you ever help Scott cheat on his wife?

A.  No.

96

Q.  Did you ever take girls down to Cabo with Scott?

A.  I've never been to Cabo in my life with Scott.

Q.  Did you ever ask Dan to hook Scott up with women?

A.  No.

Q.  Do you remember a dinner with Dan and his 19-year-old girlfriend and Scott?

A.  Yes.

Q.  And do you remember if Scott hit on Dan's girlfriend?

A.  I don't remember Scott ever hitting on Dan's girlfriend.  I remember -- I remember Dan saying that he did, and my girlfriend at the time spoke to his girlfriend after the fact, and his girlfriend told my girlfriend that she never said that and that wasn't true.

Q.  Did Scott give Dan's girlfriend a thousand dollars at dinner that night?

A.  I -- I gave her the thousand dollars.  Or, actually, I'm the one who put the money up, not Scott, from my memory.

Q.  Why did you do that?

A.  There was some joke that she wouldn't eat some kind of sushi or something, and I said -- or he wouldn't

97

eat it or -- I don't remember.  There was something about "I wouldn't eat that."

And I said, "I bet for a thousand dollars you would eat it."

And they said, "Yeah, give me the thousand."

So I -- I said, "Eat it first."

And they ate it, and then I gave them the thousand dollars.

Q.  So she ate it, then?

A.  I don't remember exactly who or what, but the gist of it was "I'll bet you'll eat it for a thousand dollars."

Q.  Okay.

A.  And that was the gist of it.  So it was definitely not Scott giving her a thousand dollars.

Q.  Now, go ahead and mark this Exhibit 14.

(Exhibit 14 was marked.)

BY MS. STEIN:

Q.  This is CONSULTING 33.  It's an email dated March 10th, 2021, to yourself from Paul Bilzerian, Subject:  Revised Agreement, and it says:

"Dear Alan, it was a pleasure speaking to you.  Attached is the revised agreement for your review."

And it references an attachment:

 

98

"Letter Agreement.version9 PB.docx."

Why would Paul Bilzerian only send you a draft of the letter agreement and not copy Henry?

A. You'll have to ask Paul Bilzerian.

Q. Did you forward this email to your lawyer?

A. I don't remember. I could have.

Q. But it also states that you spoke with Paul. Did you speak with Paul how many times between February 22nd, 2021, and March 11th, 2021?

A. I don't know.

Q. More than once? Was it more than once?

A. I'm thinking.

Q. Oh, sorry. I didn't know if you couldn't hear me. Sorry.

A. I don't know. It could have been. I would say it was less than a dozen, but it could have been more than once.

Q. And when you spoke with him, was Henry on the call with you?

A. I called Paul at least once from Henry's office. So I don't know time frame which call which time, but I remember calling Paul from Henry's office.

Q. Was David Bell on any calls with you and Paul?

A. At what point?

Q. Anytime during this time frame, February 22nd,

99

2021, to March 11th, 2021.

A. Was there ever, like, a conference call with both of them?

Q. Yeah.

A. I don't believe so.

Q. Was Dan involved during this time with regards to the drafting of the letter agreement between February 22nd and March 10th, 2021?

A. Yes.

Q. And how was he involved?

A. I met at his house several times with David Bell to discuss different terms of it. And then also he was copied on emails as well.

Q. You said he was copied on emails. Did he ever answer those emails?

A. I should say emails and text messages, and I remember only one that he did answer, but there could have been more.

Q. You mentioned text messages. In your experience in knowing Dan now for more than 15 years, he's not a prolific texter; correct?

A. That's actually not true. He's -- he is a prolific texter, in my opinion.

Q. So did he give you any texts regarding terms of the letter agreement?

100

A. I don't know if he gave me terms, but he gave me feedback.

Q. Through texts?

A. I would have to check, but for sure I have over a thousand pages of text messages with him. So that's why or how I would call somebody a prolific texter in a short time period.

Q. Do you know who Paul Dowdall is?

A. It's not ringing a bell.

Q. Under -- this will be Exhibit 15.

(Exhibit 15 was marked.)

BY MS. STEIN:

Q. This is IGNITE1 through IGNITE7, and this is dated March 11th, 2021, Letter Agreement. And I'm going to ask you first on IGNITE1, do you see initials there?

A. On the lower right corner?

Q. Yes.

A. Yes, I do.

Q. Okay. Do you know if -- if any of those initials your initials?

A. I do know.

Q. Are those your initials?

A. Yes.

Q. Okay. And then we go to page IGNITE2, is it also your initials in the bottom right?

101

A. It is.

Q. Okay. And then there's a signature under Alan Richardson, Manager.

Is that your signature?

A. Yes.

Q. Okay. And then also next to that signed by John Schaefer, President. You're aware that John Schaefer would have signed this?

A. I see we -- I see what you're referring to. That's John Schaefer's name, president.

Q. Okay. Now, this is page 2, and it's also IGNITE2. But remember we looked at earlier, there's no signature here by Ignite International Brands's acknowledgement that we looked at earlier in one of the drafts; correct?

MR. PEARSON: Objection to form.

THE WITNESS: Say it again, please. I didn't hear the question.

BY MS. STEIN:

Q. So earlier we looked at one of the drafts, and it had an acknowledgment by Ignite International Brands. Remember that?

A. I honestly don't remember it.

Q. Okay. But on this page, you don't see any acknowledgment on page 2 from Ignite International

 

102

Brands, do you?

MR. PEARSON: Objection to form.

BY MS. STEIN:

Q. You can answer.

A. Do you want me to read the whole page?

Q. This is page 2 under the signatures. So, again, I'm just showing you, do you see -- under the signature area, do you see any signatures underneath your signature and Mr. Schaefer's signature with relation to Ignite International Brands?

A. I do not.

MR. PEARSON: Objection to the form.

Go ahead, Alan.

THE WITNESS: I'm sorry.

I do not.

BY MS. STEIN:

Q. Okay. Now, going back to this agreement on page 1, IGNITE1 of this exhibit, which is Exhibit 15, it says: "This binding letter agreement" --

Do you see that right in the first paragraph?

A. Yes.

Q. Okay. And it states it's between:

"Ignite Beverages Inc., a Wyoming corporation," in quotes, "('Ignite'), will deliver compensation to Consulting by AR LLC, a Florida

103

limited liability company..."

Did I read that correctly?

A. Yes.

Q. So, again, just to make sure, that's -- you're here on behalf of Consulting by AR LLC; correct?

A. Yes.

Q. Okay. And then it says:

"...resulting from Ignite obtaining a definitive agreement with Resorts World (defined herein) not later than July 1, 2021, which contains all of the terms and conditions detailed in Exhibit A attached hereto."

Did I read that correctly?

A. Yes.

Q. Now, if I go to -- under this, under Number 1, the last sentence of 1 says:

"In the event the Resorts World agreement is not fully executed by July 1, 2021, Ignite shall have no obligation to compensate C-AR or to reimburse C-AR for any costs or expenses."

Did I read that correctly?

A. You did.

Q. And you signed this agreement; correct?

A. I did.

Q. Now, I want to go back up to the first

104

paragraph we read through. It says "resulting from Ignite obtaining a definitive agreement with Resorts World; right?

A. Those are the words.

Q. Okay. And it says "which contains all of the terms and conditions detailed in Exhibit A"; correct?

A. Correct.

Q. Okay. And I'm going to go, then, to Exhibit A, which is CONSULTING 3, and ask you on the bottom under -- on the bottom right, are those your initials?

A. Yes.

Q. Okay. Is this the final Exhibit A?

A. Yes.

Q. Now, it says here:

"The Resorts World Agreement will contain, among other things, all of the following items"; right?

A. That's what it says.

Q. Okay. And I just want to make sure again, because I guess I'm confused, under this agreement -- this is the final agreement, correct, the letter agreement; right?

A. Yes.

Q. This agreement was never amended; correct?

MR. PEARSON: Objection to form.

105

BY MS. STEIN:

Q. You can answer. Sorry.

A. Correct.

Q. And, again, your attorney is allowed to object. Plus, it also -- sometimes with the delay -- you can answer unless he instructs you not to. Okay?

A. Okay.

Q. Under this agreement, what services was Consulting by AR providing to Ignite?

A. Ask the question again, please.

Q. Under this letter agreement, what services was Consulting by AR providing to Ignite?

A. I was working on behalf of Ignite to achieve the terms that they wanted in the addendum or the -- whatever you call it -- amend -- addendum A.

Q. So if I go back to Exhibit A, it says -- again, there's A through -- I hate when they letter it versus number -- A through M.

Do you see that?

A. Yes.

Q. Now, you're familiar with whether definitive agreements were eventually signed with Resorts World and Ignite?

A. Yes.

Q. And they were; is that correct?

 

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

106

A. Yes.

Q. Okay. And states under A here:
"Ignite will cause Dan Bilzerian to host the July 4th of --" I'm sorry "-- to host the Fourth of July 2021 launch party at the pool club for grand opening of Resorts World and post on his social media."
Did I read that correctly?

A. Yes.

Q. When did Resorts World open?

A. June 24th.

Q. And you attended that opening; correct?

A. Yes.

Q. And was there a -- did Dan Bilzerian attend the opening?

A. Yes.

Q. And did Dan Bilzerian host the launch party at the pool club for the grand opening?

A. Was he there on the 24th?

Q. Yes.

A. Yes. That was his requirement to be there for the contract.

Q. Did he host a launch party on the 24th?

A. You're using semantics. The 24th was the opening date. That was -- the entire intent of the

107

contract was for him to be at the opening party and for him to perform there, and he ultimately did perform at the 24th opening pool party. Pool part- --

Q. Did that --

A. I mean, this -- these words here like launch party is the same as the grand opening party.

Q. Was -- it says Dan was to host. Did he host the party?

A. Well, this says he was to host a party on July 4th, which he never did.

Q. Okay. But it was -- the launch actually occurred earlier than July 4th; correct?

A. Well, if you want to get caught up on semantics, the grand opening party, which is the whole -- the whole intent of what the agreement was structured around, happened on June 24th, and he performed at June 24th, and most of that event was at the pool.

Q. Okay. Under the second sentence, it says:
"Ignite Vodka and all other legal Ignite products will be featured at the event."
Were Ignite Vodka -- was Ignite Vodka featured at the June 24th grand opening of Resorts World?

A. In my opinion, it was, yes.

Q. What do you mean in your opinion? Tell me how.

108

A. Well, you're back using semantics, but there -- there was a gigantic booth that had I don't even know how many hundreds and hundreds of bottles of Ignite at the booth, lights, ice sculptures, pictures, all sort of marketing material, tabletops, as well as a separate VIP cabana for Dan which also had more Ignite material at that.

Q. Now, where was this booth that you're talking about located at the opening?

A. At the pool.

Q. Was there anything inside the hotel?

A. I don't know.

Q. Okay. And then how many vodkas were actually available, would you estimate?

A. How many vodkas?

Q. Yeah, at the opening.

A. Thousands. I mean, if you're talking about drinks. Are you talking about cases, bottles, drinks?

Q. Did you ever promise that Ignite would be the exclusive vodka for Resorts World?

A. Before you go there, did you want me to clarify, or did you want to clarify when you said how many vodkas?

Q. No. I'm just --

A. Oh. Okay. Sorry.

109

Q. No.
Did you ever promise that Ignite would be the exclusive vodka for Resorts World?

A. I never promised that. That was a discussion in the beginning as the deal progressed as a possible deal term, but clearly it was never promised because it's not in the end agreement.

Q. Now, you said you were at the grand opening. Did you do any work for Ignite at this grand opening on June 24th?

A. I did.

Q. What did you do?

A. I got them more rooms, which David Bell said they needed, I got them more tickets, and I physically carried items from -- I believe it was from the giant booth to Dan's cabana and helped Mr. Schaefer set up the cabana.

Q. What do you mean by "tickets"?

A. You had to be, I think, wristbanded to get into the event. So tickets, wristbands, they only got so many. And I assisted them in getting more -- more entries.

Q. So you're talking about the entry into the hotel or the pool?

A. The entire property was shut down. So from

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC

Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

110

memory, I think they were one and the same. I don't know if there was different color wristbands for different, like, access.

Q. Was there food at the pool area?

A. I don't remember.

Q. Do you remember if -- did you actually get an invitation for this party prior?

A. I don't remember.

Q. Do you know how you got invited to the party? Like, did Scott call you? Did you receive an email?

A. I don't remember.

Q. During the party, did Dan ever leave the pool area?

A. I have no idea.

Q. Okay. Did you?

A. Did I ever leave the pool area?

Q. Yeah.

A. At what point?

Q. During the party. You said you were really busy with Ignite helping. Did you ever go into the main party inside the hotel?

A. I think I came from the inside of the -- I mean, clearly you can't get to the pool deck without being in the hotel. But I think I was in the hotel prior to the pool event beginning.

111

Q. But the main party -- besides the pool event, there was also a main party going on; right?

A. I -- I think -- I think that some of the restaurants were open, and they were handing out, like, hors d'oeuvres, and there was, like, entertainment around the floor of the hotel.

Can we -- can we take another two-minute break?

MS. STEIN: Why don't we go ahead and take five, and we'll come back. How's that?

THE WITNESS: My mom's blowing up my phone. I hope she's okay.

MS. STEIN: I hope everything's okay.

THE WITNESS: Thank you, ma'am.

THE VIDEOGRAPHER: The time now is 11:33 a.m. We are off the record.

(A recess was taken from 11:33 a.m. to 11:46 a.m.)

THE VIDEOGRAPHER: The time is now 11:46 a.m. We are back on the record.

BY MS. STEIN:

Q. So before the break, Alan, we were talking about the opening event on June 24th. I guess my question was do you know if Ignite Vodka was served inside away from the pool area?

A. I don't know. I do remember having a

112

conversation with David or -- or Schaefer shortly right after the party that there was two issues: They didn't have enough vodka available to give more, and, at some point, the vodka was -- was not allowed to be served as vodka because it had too much sugar in it and it was considered a liqueur and they had to change the formula and that was going to take some time for them to get more bottles.

But I don't know -- I'm just putting little pieces of -- of the puzzle in my head -- that they didn't have enough vodka to circulate -- to circulate around the whole hotel for the first few, you know, weeks maybe or a month. I don't remember exactly the time frame.

Q. Now, was Solomon Schwartz at the opening?

A. I don't know. I imagine, but I don't know. Or maybe I saw him. I don't -- I just don't remember.

Q. Was Scott Sibella there?

A. Yes.

Q. Are you familiar with Trevor Scherrer?

A. Yes.

Q. And how are you familiar with him?

A. I just have met him in the past.

Q. Okay. Do you know if he had a role with regards to the opening of Resorts World?

113

A. I don't know.

Q. Okay. Do you know if he -- did you see him at the opening?

A. I don't remember.

Q. Was Scott's wife at the opening?

A. I don't remember. I -- actually, I think she was there.

Q. Do you know if Trevor's wife was there?

A. I don't know.

Q. Was the marquee for the hotel, the big sign out front, working for the opening?

A. I believe so.

Q. Was Ignite featured on that marquee during the opening event?

A. I don't know.

Q. Did you -- you never -- did you personally not see Ignite on that marquee?

A. I do not recall seeing them on the marquee.

Q. Was there any signage inside the hotel directing people to the Ignite party at the pool during the opening?

A. I would believe there was. I mean, I think they spent a lot of money for the -- they had some very expensive DJs out at the pool, and the pool was one of the highlights of the -- of the evening.

 

114

Q. In your opinion; right?

A. In my opinion, the pool was one of the highlights, yes. I mean, that's -- I mean, it's not just a guess. It's based on, you know, who they had performing out there, all the -- all the different, like, Ignite booths or companies that were involved, presence, as well as, like, activities going on inside the swimming pool and -- and it was, like, a big enough gathering space, maybe the only big enough gathering space, to handle the amount of people that were actually there. They couldn't, you know, per se, fit in one room. So it was -- it was pretty busy.

Q. Pretty crowded that night; right?

A. Yes.

Q. So you couldn't see everybody that was there; correct?

A. Could I see them? I mean, I suppose if that was my goal for the night to go walk around for an hour and see everybody who was there, I probably could have.

Q. Did anybody from the hotel, from Resorts World that night, come up to you and have any issues with regards to Ignite?

A. I don't remember.

Q. Did anybody contact you from Resorts World after the June 24th event saying that there was any

115

issues with Ignite?

A. Issues from the party?

Q. Yes.

A. Not that I can remember. I mean, John Schaefer contacted me about it, but not -- I don't remember anybody from Resort World contacting me. And Paul Bilzerian contacted me; I remember that.

Q. Why did John Schaefer contact you?

A. He contacted me twice, once when he got there to find the location of Dan's VIP cabana, which I took him to, and he contacted me the next day saying what a wonderful event it was -- actually, David Bell contacted me the next day also -- what a wonderful event it was. He thanked me for making all that happen. I think that's kind of a direct quote.

Paul Bilzerian did the same thing. Said he heard the event was wonderful and -- he heard the event was wonderful and Dan had a good time. And his quote was something like "I'm sure you had a lot to do with making this happen."

And then David Bell contacted me the next morning and said Dan had a really good time. He -- he posted, and they gambled, and he appreciated everything I did, and he called me a very good host.

Q. Let me go back to what we marked Exhibit 15.

116

And this is Exhibit A, which is IGNITE3. And, again, we're still on A of Exhibit A.

Dan, in fact, was required to post based on his social media because of the opening; correct?

A. The -- the terms for the letter agreement, the final agreement, included Dan coming to the opening night party and doing at least, I think it was at least, one post approved by Resort World. So I'm just clarifying the answer to your -- your question that he was required to post, yes.

Q. By the way, on this Exhibit A, did Dan approve all of the terms on this Exhibit A?

A. I guess you'd have to ask the president of Ignite, John Schaefer, who signed it, if Dan approved it or not. I mean, that's kind of a hard question to ask me if Dan approved a deal that the president of his company signed.

Q. Did Dan ever express to you that he didn't agree with the terms in Exhibit A?

A. Dan, along the way, sent me messages, and I think most of them were prior to the final, the final draft, calling the deal all kinds of names and literally changing things. I'm sorry. A lot of it was after because I literally said to him, "You know, Dan, you've already signed this."

117

And if I'm not mistaken, Dan himself signed one of the agreements.

Q. Okay. So going back here on Exhibit A again under Number A -- under letter A, the last sentence says:

"Ignite will receive 20 percent of the gross revenue from the pool unless Resorts World has the event at no charge or chooses this event to be one of the four per year."

Did Ignite receive 20 percent of the gross revenue from the pool from the June 24th event?

A. You read it yourself, and I'll reread it. It says "unless," "unless Resorts World has the event at no charge." He got 20 percent of the gate. It was a no-charge gate. So he got 20 percent of no charge.

Q. What is it -- if it chooses this event to be one of the four per year, what does that mean?

A. So in this signed agreement, Dan had to post -- or I'm sorry -- Dan had to appear four times.

Q. Okay. And that's under Number D?

A. Yes.

Q. Okay. All right. I want to keep going under B, kind of keep it in order. Says:

"Resorts World will purchase a minimum of $1,000,000 of Ignite products within three



118

months of the execution of the Resorts World agreement..."
Did that happen?
A.   When you say "did that happen," are you asking me is this what wound up in the final agreement?
Q.   Yes.
A.   That did not happen.
Q.   Okay.  And it says:
"...and ensure the Ignite Vodka is available in all its minibars..."
Did that happen?
A.   I believe so.
Q.   "...as well as Resorts World controlled bars on property."
Did that happen?
A.   Yes.
Q.   And it says:
"Inventory will be guaranteed buyback."
Did that happen?
A.   That did not happen.
Q.   Under number -- under C:
"Resorts World will insure Ignite Synthetic Nicotine Vape devices and Ignite's Energy Drink ZRO," which is Z-R-O, "are available for sale throughout the resort excluding the minibars."

119

Did that happen?
A.   Yes.
Q.   Did that happen as of opening or after?
A.   I couldn't tell you when it happened.  I know that it happened.  I don't know if -- again, I know Ignite had issues with licensing.  So they weren't legally allowed to sell their vape until they got licensed.  So if they weren't licensed and it was illegal for a couple weeks or a couple months, I'm just going to go out on a limb and assume it didn't happen because they didn't have a license.
And as far as, like, the energy drink, I know the energy drinks, I know personally, are in all the gift shops and stuff because I've seen them there.  I can't tell you, once again, if they were there on opening night or the second day or the third day or if there was a supply issue, but I know they're there because I've seen them.
Q.   And I guess that's the other thing I should have asked earlier when you said about Consulting by AR under the letter agreement was to make sure the definitive agreement, these terms, got done.  After the definitive agreements with Resorts World were signed, did Consulting by AR have any further obligation under the letter agreement?

120

A.   My thought would be I had no more obligation.  Once the definitive -- once the definitive agreement was signed.  Is that what you're saying?
Q.   Yes.
A.   Yeah.  I mean, technically once they agreed to all the terms and signed it, then it was -- should have been done.
Q.   But you've been to Resorts World since July 2nd, 2021; correct?
A.   I'm not cutting you off, but the food has arrived.  I don't know if you saw that pop up a second ago.
Q.   I just saw it, yeah.
A.   No worries.
The answer is I've been there since, what, February 2021?
Q.   Since July 2nd, 2021.
A.   Have I been to Resort World since then?  Yes.
Q.   Yes.
And you've actually attended Ignite events at Resorts World since July 2nd, 2021; correct?
A.   Did I attend an event on July 2nd at Resort World?
Q.   No.  After July 2nd, 2021, you've actually attended an Ignite event at Resorts World; correct?

121

A.   Which event is that you're asking about?
Q.   Any event.  Have you not?
A.   I'm only familiar with one event off the top of my head.  It was the -- the launch party for Ignite, and I did not attend that.
Q.   You didn't attend a party at Resorts World a couple weeks ago?
A.   You just asked me -- I thought you asked me an Ignite event.
Q.   Yeah.
A.   What -- what Ignite event was at Resort World a couple weeks ago?
Q.   There was another Ignite under -- you know, he has to host a certain amount of events.  Ignite had an event at Resorts World.
Did you not attend an event?
A.   I've been out of town for the last four weeks.  So I don't know anything even about that event.
Q.   You said you've been out of Las Vegas for the last four weeks?  Is that what you mean by "town"?
A.   Yes.
Q.   Okay.  Why don't we go ahead -- I don't want your food to get cold; so we'll let you guys go ahead and eat --
A.   Thank you very much.

 

122

Q. -- and why don't we come back at 12:30, if that works for everybody.

MS. STEIN: Is that good, Jon?

THE WITNESS: It's fine with me.

MR. PEARSON: That's fine.

MS. STEIN: Okay. We'll see everybody at 12:30.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: The time is now 12:01 p.m. We are off the record.

(The midday recess was taken at 12:01 p.m.)

--oOo--

123

DEPOSITION OF ALAN RICHARDSON
Friday, May 13, 2022; 12:35 p.m. PDT
--oOo--

THE VIDEOGRAPHER: The time is now 12:35 p.m. We are back on the record.

EXAMINATION (Resumed)

BY MS. STEIN:

Q. Alan, I just want to remind you that you're still under oath. Okay?

A. Okay.

Q. During the lunch break, did you speak with anybody besides your attorney?

A. My mom.

Q. Okay. Anybody else?

A. I called Margaret.

Q. Did you talk to her about this deposition or something else?

A. I mean, I just called her, you know, on lunch break at the depo.

Q. Okay. That's fine.

So, again, I'm just going to go back to what we've marked as Exhibit 15. And this is, again, Exhibit A of the letter agreement. This is IGNITE3, and we were, before the break, going through the various sections of Exhibit A. And so I want us to go back now

124

again on Exhibit D and -- I'm sorry -- part D of Exhibit A and ask you here, again, as we talked about -- just to remind you up top -- this was what the Resorts World agreement was to contain and:

"Subject to an approved annual plan, Ignite will cause Dan Bilzerian to host four events at Resorts World at no charge for Dan's appearances, which will be named and agreed to by the parties."

Did that requirement end up in the final agreement --

A. No.

Q. -- of Resorts World?

A. No.

Q. Okay. Did any requirement for Dan to host events at Resorts World end up in the final agreement?

A. Yes.

Q. How many were there?

A. One.

Q. And was that event the grand opening event, or is it another event?

A. No, it's the -- it's the one event -- you were asking me about an event two weeks ago before we left. I don't know if we're going back there, but the event -- the event that Dan was obligated to perform at, he did

125

perform at and completed that on June 24th, the opening pool party, launch party, or the five things they've called it. But that was -- that was the one event that his requirement was satisfied by.

That's why when you said he went there last week for something, I don't know what you're talking about. He had no more requirements. He already -- he already met his requirement, and he said I was there, and I wasn't there.

Q. Okay.

MS. STEIN: I'm just going to ask the court reporter, Mr. Bilzerian is trying to get into the deposition. It says it's locked.

THE VIDEOGRAPHER: I have now unlocked the deposition.

MS. STEIN: Thank you.

BY MS. STEIN:

Q. And we can keep going. We'll just note if he joins.

Now, under D, it also has -- the last sentence says:

"Appearances will be for a minimum of two hours."

Was Mr. Bilzerian required to be at the June 24th event for a minimum of two hours?

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC

Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

126

A. I think the final agreement said two hours also. We can check it.

Q. Okay. Now, under E, it says --

A. Could you --

Q. -- Resorts --

A. There you go. Thank you.

Q. Yeah. Sorry. I was starting to move it. If you need me to make it bigger, let me know.

A. No.

Q. I see the screen a little differently than you do because every screen is a different size. So just let me know.

A. No worries. It's good for now.

Q. Says:
    "E. Resorts World will cover all the cost to
    build a pop-up kiosk in the mall that will
    carry Ignite products."
    Did Resorts World cover the cost for a pop-up kiosk at -- for Ignite?

A. I don't believe so.

Q. Was there a pop-up kiosk for Ignite at Resorts World?

A. Yes.

Q. And when this refers to the mall, what is that referring to?

127

A. The mall.

Q. Is -- where is that in relation in the hotel?

A. East -- east -- it's the eastmost part of the hotel running parallel to the Las Vegas Strip.

Q. Okay. Thank you.
    And then the last sentence under E says:
    "All cost to staff the booth will be paid by
    Resorts World."
    Did that occur in the final agreement?

A. I don't believe so.

Q. Under F, it says:
    "Ignite will receive 20 percent of the gate for
    Ignite events hosted by Resorts World and
    sponsored by or featuring Dan Bilzerian."
    And, again, under D, though, we saw that there was not to be four events. So did this also not occur?

A. "Ignite will receive 20 percent of the gate for the Ignite...hosted...sponsored..."
    You're asking me if this made it to the final agreement?

Q. Yes.

A. It actually got changed in the final agreement to Dan will be paid 200,000 or 250,000 for any -- any event that he will host other than the one event that he had already hosted, which was free, according to the --

128

to the agreement.

Q. And was Resorts World required to have Dan at any events with this $250,000 fee?

A. No. I think it read mutually agreed upon.

Q. And then under G:
    "Resorts World will feature Dan and Ignite
    monthly on the LED."
    Did this occur?

A. So the final agreement was written that it would occur daily.

Q. And did that actually occur --

A. Yes.

Q. -- daily?

A. Yes.

Q. Okay. Now, under H, it says:
    "Subject to Resorts World's final decision and
    approval, Resorts World may name the high
    stakes poker room Bilzerian's Room."
    Did that occur?

A. It did not.

Q. Was any language relating to the poker room being named put into the final agreement?

A. I don't remember off the top of my head. I don't believe so.

Q. During Consulting -- your role for -- and I'm

129

asking on behalf of Consulting by AR's -- when performing your services under the letter agreement, did you negotiate with Resorts World concerning the poker room?

A. Yes.

Q. Who did you negotiate with?

A. Solomon, probably Scott.

Q. Now, under I, it says:
    "Resorts World will provide Ignite with
    complimentary Palace/Villas for ten nights per
    year."
    Did that make it into the final agreement?

A. Yes.

Q. And under the final agreement, were there any minimum number of rooms, or was it always just to Palace/Villas?

A. Your question isn't -- isn't logical with what the point is.

Q. Okay. Well, explain to me what you think is logical with the point.

A. It says:
    "Resorts World will provide Ignite with
    complimentary Palace or Villa for ten nights
    per year."
    And then you asked me is there any additional

 

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

---

**130**

rooms. It's either a Palace or a Villa for ten nights per year. What do you mean by --

Q.   What do you "or"?

A.   Well, a slash means -- in the world I grew up in means or.

Q.   Okay.

A.   A Palace/Villa -- there's two different categories. So it can only mean or because there's no such thing as a Palace/Villa as a one-unit room. It's either a Palace room or a Villa room. It can't be -- there's no room called "Palace/Villa room."
     Does that make sense?

Q.   Okay. And at Resorts World, are there Palaces and/or Villas?

A.   Yes.

Q.   And on the --

A.   It's one or -- one or the other. It's not the same.

Q.   That's what I was asking. Sorry. I was trying not -- to be clear.

A.   Yeah.

Q.   During the opening, was Dan giving a -- given a room at Resorts World?

A.   I believe he had a bunch of rooms.

Q.   But did Dan -- was he given a Palace room?

---

**131**

A.   Well, we'd have to ask him. I don't really know.

Q.   Was he given a Villa?

A.   We'll have to ask him. I don't know. I didn't go to his room.

Q.   Did Dan not complain to you that he was given a standard Hilton room with a broken fridge?

A.   He did mention some complaint about a room, but that has nothing to do with this contract.

Q.   Okay.

A.   I mean, it's potentially -- I don't know the exact words in the final agreement, but my guess is upon availability, that he -- he gets ten nights per year of a Palace or a Villa upon availability. They only have two Palaces, I think. If the Palaces are occupied, I don't think anywhere in the contract it says they're going to throw a guest out. If Dan gives them, you know, a request he wants a Palace, they're not throwing any guest out to give Dan the Palace.
     So hypothetically the Palace may or may not even -- I don't think they were even built, to be honest with you. The Palaces weren't even built on the 24th. They weren't even ready yet. So he couldn't have gotten a Palace; they weren't even built yet.

Q.   Okay. I'm going to go to K. It says:

---

**132**

     "Ignite will cause Dan Bilzerian to participate in three experiences per year for high rollers, which, for example, might include shooting, dune buggies, or poker games. All expenses of such experiences will be paid by Resorts World."
     Did this make it into the final contract of Resorts World?

A.   It did not.

Q.   Under L, it says:
     "Ignite and Dan Bilzer- --"

A.   I didn't mean to interrupt. Did we skip J on purpose?

Q.   Yeah. I'm just going through.

A.   Okay. No problem.

Q.   Under L: Ignite and Dan Bilzerian agree that any promotions for Las Vegas Strip hotels will be limited to Resorts World exclusively."
     Was this in the final agreement?

A.   No.

Q.   Under M:
     "The initial term of the Resorts World agreement will be no less than 18 months with an option to renew for another 18-month term."
     Was this in the final agreement?

---

**133**

A.   I believe so.

Q.   Now, if I go down, there's Exhibit B, which starts on IGNITE4, and it's a Form of Option Agreement.
     Do you see that?

A.   Yes.

Q.   Okay. And then it's -- under IGNITE5, there's a signature. Is that your signature under Consulting by AR?

A.   Yes.

Q.   Okay. But this is not signed by Ignite International Brands; correct?

A.   Correct.

Q.   Did Ignite International Brands ever sign this exhibit?

A.   I don't know. This is -- obviously not; it's not signed.

Q.   Have you ever seen Ignite International Brands's signature on any of the exhibits relating to the letter agreement?

A.   Well, the president of Ignite International Brands is John Schaefer, and I've seen his signature on documents relating to me, yes.

Q.   Okay. But in this agreement going back to IGNITE2, Mr. Schaefer signed as president of Ignite Beverages Inc.; correct?

---

 

Case 2:21-cv-01590-JCM-EJY Document 90-1 Filed 07/07/22 Page 37 of 69

134

MR. PEARSON: Objection to form.

THE WITNESS: Incorrect. Incorrect.

BY MS. STEIN:

Q. So you believe he signed as -- what? -- as it -- when it says here president?

A. I think he signed exactly as what it says, president.

Q. Of what company?

A. Who knows? That's -- they're interchangeable. Even Dan during his depo said they're interchangeable. So I can't be honest with you and tell you because they didn't title his signature, and he's president of Ignite Brands as well.

Q. But in IGNITE5, this is -- Ignite International Brands did not sign here; correct?

A. You've already asked me that.

Q. I'm just asking again.

A. Yes, ma'am, they did not sign. The signature line is empty.

Q. And then under Exhibit C, Form of Renewal Option Agreement under IGNITE7, again, your signature, but Ignite International Brands is also blank; correct?

A. Yes, ma'am.

Q. So, again, we've established this was signed on March 11th, 2021, the letter agreement; correct?

135

A. May I ask you one quick question?

Q. Honestly, it's not the time. I would tell you not to. Your lawyer would probably tell you not to.

A. Well, it's to answer -- it's to answer your question. I want to be more clear.

Q. You can go ahead and clarify, if you'd like.

A. Please.

Can you pull the document page back up?

Q. Sure.

So we're talking about Exhibit 15.

A. The one you just asked me about.

Q. The last --

A. The signature --

Q. IGNITE7?

A. The signature line.

Q. Yes.

A. Yeah.

If you look -- can you scroll down just a hair? Scroll up.

Go -- okay. Stop.

Whose signature or initial is that from Ignite on the page?

Q. And, again, I couldn't tell you. That would be something for your lawyer to ask.

A. All right. Just -- when you asked me was it

136

signed by them, it's not signed on the line, but it is signed by -- it is signed by somebody on --

Q. It's initialed; correct?

A. Correct, by somebody on Ignite. So I just want to be clear when you asked me, the line that you asked me isn't signed by Ignite, but the page is signed by somebody from Ignite.

Q. Okay.

A. Just clarifying.

Q. That's fine. And, again --

A. Appreciate you scrolling back. Thank you.

Q. So after March 11th, 2021, and the letter agreement was signed, what next steps did Consulting by AR take with regards to performing its services to obtain a definitive agreement for Ignite with Resorts World?

A. I guess negotiating all the points and all the changes that continued to occur from Ignite to get better deal points, better deal terms for Ignite and for Dan Bilzerian.

Q. So did Consulting by AR contact Resorts World or did -- or have -- or did Ignite contact Resorts World after March 11th as a first contact? Would that have been Consulting by AR?

A. Yes.

137

Q. And how would that -- who -- who did Consulting by AR contact at Resorts World?

A. Solomon Schwartz was my point man.

Q. And was that in writing, or was it via a meeting in person?

A. Probably writing and -- and meetings.

Q. And as part of those meetings, would you have then included people from Ignite?

A. No.

Q. So I'm going to go to -- this will be Exhibit 16.

(Exhibit 16 was marked.)

BY MS. STEIN:

Q. And this will be CONSULTING 364 to 366. And if you start at 364, it's an email from yourself dated March 29th, 2021, to dan@danbilzerian.com.

That's Dan's email; correct?

A. Yes, or was at the time.

Q. Okay. And its attachments says "Resorts World LV x Dan Bilzerian_Partnership_Outline.pdf."

Did I read that correctly?

A. Yes.

Q. And if I go to the next page, it just says "Ignite & Resorts World Las Vegas."

Is that this partnership outline?

138

A. I assume so.

Q. I don't want you to assume. Take a look at it.

A. Well, I mean, I don't think I'm the one who titled it. So I'm, you know, just -- maybe I forwarded it, but the -- go ahead and you can scroll down and show it to me, and I can tell you if that's the outline or that's the file. I don't know if it's the number. I assume the document integrity is correct and that's the document that matches that number.

Q. Okay. Well, you introduced this document. It came from Consulting by AR. And maybe I'm confused. You sent this email that's not forwarded, from what I can see; correct?

A. To Dan Bilzerian, Resort World Partnership Outline pdf.

Can I see the document, please?

Yeah. Okay.

Q. So I guess that's my first question. Who created this document?

A. Looks like Resort World.

Q. And why do you say that?

A. Well, it's -- it's on -- to me, it's on Resort World stationery.

Q. Okay. Did you have any input in creating this document?

139

A. Yes.

Q. Okay. And what input did you have?

A. I probably gave them all the deal points that Ignite wanted to have done in the -- in the agreement.

Q. Did Ignite have any representatives provide any input to this partnership outline?

A. Yes.

Q. And who from Ignite?

A. David Bell, Paul Bilzerian, and, I'm sure, Dan.

Q. Okay. But you're the one forwarding this on March 29th to Dan; correct?

A. Yes.

Q. Okay. Now, did Resorts World have anybody from Ignite's permission to use their copyrighted mark?

MR. PEARSON: Objection to form.

BY MS. STEIN:

Q. You can answer.

A. I don't know.

Q. Do you know who provided the goat skull logo to Resorts World?

A. I don't know.

Q. Have you ever used a goat skull logo?

A. Have I ever used it?

Q. Yeah.

A. I don't -- I mean, maybe in the -- in the --

140

maybe in this agreement on a piece of paper or on a document. I mean, technically am I using it if I just sent this email and it's on there? Does that consider me using it? I don't know what legal means using.

Q. Did you ever create a document -- I'll ask it a little differently.

Did you ever create a document and use the goat skull logo?

A. Not that I recall.

Q. Did you ever create a document using the Resorts World logo?

A. Not that I recall.

Q. Now, you said this document was created. How long did this document take to create, do you know?

A. No, I don't know.

Q. Was it more than one meeting with you and Resorts World before receiving this document?

A. I don't know.

Q. When you received this document before sending it to Dan, did you review this document?

A. I assume so.

Q. And you say you assume so. If you had -- if you disagreed with it, would you have made a comment somewhere?

A. If I disagreed with the document?

141

Q. Yeah.

A. You are going to have to be more specific and I -- I don't know what you are asking me. Like, I believe Resorts World created this based on the deal points that Ignite wanted, and I don't know if this is, you know, a version 1, version 2, version 3. I don't know what -- what this is.

Q. Okay. But -- and you said, though, you gave input based on the deal points in the letter agreement; correct?

A. Yes.

Q. Okay. So if I go to CONSULTING 365, and I'll just go to product integration, it says:

"Resorts World to purchase $500,000 in all Ignite product."

Did I read that correctly?

A. Yes.

Q. And that's within 60 days of contract execution; right?

A. Yes.

Q. Okay. But that's not a million dollars; correct?

A. Is $500,000 a million dollars?

Q. Yeah.

A. No, 500,000 is not a million dollars; correct.



142

Q. So then that was, again, 3/29/2021. And I'll just show you, again, that was Exhibit 16. So that was March 29th, 2021.

Do you see that?

A. Yes.

Q. Now I want to go to -- the next exhibit is Exhibit 17.

(Exhibit 17 was marked.)

BY MS. STEIN:

Q. This is DAN46 through 58. Starts with an email from Paul to you, Alan Richardson, cc'ing Dan and David Bell sent Tuesday, March 30th.

That's the next day; correct?

A. Is Tuesday March 30th the next day from what?

Q. The exhibit we just looked at, which was March 29th.

A. Yes. That would be the next day.

Q. Okay. And it says:

"Dear Alan, thank you for getting us the outline from Resorts World. I have attached the original signed agreement with you, the Resorts World outline, and a comparison of the two highlighting the disparities."

Did I read that correctly?

A. You did.

143

Q. Says:

"We probably need to figure out if we can move -- move Resorts World and, if not, what adjustment we should make to your compensation."

Did I read that correctly?

A. You did.

Q. "We will now need to present this to Ignite's Board of Directors, which consists of five outside directors plus Dan. Let us schedule a call later this week to discuss it further."

Did I read that correctly?

A. You did.

Q. Okay. Now, when you received this email, did you review it?

A. I assume I did.

Q. Okay. And if you go to the summary of changes, for example, under Number 2, it says:

"Initial purchase of product will be 500,000 instead of 1,000,000"; right?

A. That's what it says.

Q. And then under 4, for example, it says:

"The pop-up retail kiosk can be closed on a seven-day notice by Resorts World and RW's share of the profits is 50 percent instead of

144

10 percent."

Did I read that correctly?

A. You did.

Q. Okay. And then it also states that:

"We need to figure out if we can move forward and what adjustment we should make to your compensation."

Did I read that correctly?

A. You did.

Q. Was there ever a discussion after March 30th, 2021, regarding adjusting your compensation under the letter agreement with Ignite?

A. There was multiple discussions or I should say attempted discussions.

Q. Okay. But, again, to be clear, the letter agreement was never amended; correct?

MR. PEARSON: Objection to form.

BY MS. STEIN:

Q. You can answer.

A. The letter agreement was never amended, but the final agreement was amended.

Q. And what do you mean the final -- the final -- I'm talking the letter agreement with Consulting by AR and Ignite was never amended; correct? And I'm asking you in your capacity as Consulting by AR's 30(b)(6).

145

MR. PEARSON: Objection to form.

THE WITNESS: I said that that was never amended, but the final agreement was.

BY MS. STEIN:

Q. And the final agreement, what are you referring to, the -- your agreement with Resorts World?

A. Yes.

Q. Okay. I'm going to go ahead, and I'll mark this Exhibit 18.

(Exhibit 18 was marked.)

BY MS. STEIN:

Q. This will be BELL26. It's an email on April 1st, 2021, to David Bell from yourself, and it's forwarding a message.

Do you see that?

A. Yeah.

Q. And the message that's being forwarded is from you to Scott Sibella on March 30th; is that correct?

A. Yes.

Q. And it starts with "A summary of the changes are"?

A. Yes.

Q. And why did you forward these changes to Scott Sibella?

A. Because these were Paul Bilzerian's concerns

146

that he wrote in the email you just showed me earlier saying that we need to get these changes made or he wants to adjust my commission. So in the avoidance of a -- of changing my commission and continuing to try and make Ignite, Paul, Dan, and David happy, I sent it to the person who would be making the decisions or have the ability to make the decisions to get this done as quickly as possible to satisfy Paul's concerns so he wouldn't have to move my commissions.

Q. That's an interesting term. You said "my commissions." You mean Consulting by AR's commissions; correct?

A. Yes.

Q. And why do you call it a commission?

A. We can call it whatever makes you happy.

Q. Well, no, you called it that. I want to know why you used that term.

A. It's just the term that came to my mind about my compensation, my commission, my payment. I'm not Webster's dictionary here.

Q. Go ahead; we'll mark this Exhibit 19.

(Exhibit 19 was marked.)

BY MS. STEIN:

Q. And this will be DAN6 through 11.

And, again, it's an email from yourself to Dan

147

dated Friday, April 2nd, 2021, and, again, forwarding a message. The subject is "NDA Needed." And this is from Solomon Schwartz to yourself; correct?

A. Yes, it is.

Q. And it says:

"Please have Dan B. or Ignite International Ltd. fill out and sign the attached NDA. Our legal needs before creating an NDA."

Did I read that correctly?

A. Yes.

Q. And so you forwarded this NDA; is that correct?

A. If that's what it says, yes.

Q. So prior to this time, were you aware as Consulting by AR -- was Consulting by AR aware if there was any NDA in place between Ignite and Resorts World prior to April 2nd, 2021?

A. I -- you are asking me my capacity to -- do I remember at the time of April 2nd if I knew there was an NDA?

Q. If you knew that there was -- was there any other agreement between Resorts World and Ignite prior to April 2nd, 2021?

A. Concerning an NDA?

Q. Yeah.

A. I don't remember.

148

Q. Well, did -- and it's my question, as of April 2nd, 2021, did Consulting by AR have an NDA with Resorts World?

A. I don't remember.

Q. What would help you to remember?

A. Call my lawyer, probably.

Q. And which lawyer is that?

A. I would call Henry.

Q. Did you have an NDA -- Consulting by AR, have an NDA with Ignite prior to entering into the letter agreement?

A. I don't remember.

Q. And, again, would that be calling your lawyer?

A. I -- probably. I mean, I don't know who I would call. I would ask somebody at Ignite.

Q. And with regards to the NDA that was requested by Resorts World, did you eventually get a signed NDA from Ignite?

A. I couldn't -- I couldn't tell you from memory.

Q. Okay. We'll go ahead, and we'll mark this Exhibit 20.

(Exhibit 20 was marked.)

BY MS. STEIN:

Q. This will be BELL27 to BELL35. Again, it's an email to yourself from David Bell dated April 3rd.

149

Subject is "Resorts NDA," and it's a forwarded message as well from John Schaefer to David Bell copying Paul Holden.

Who's Paul Holden?

A. He's an Ignite lawyer.

Q. And the body of the email from John to David is:

"Please see NDA attached with our information completed and my signature. Let me know if you need anything changed."

And you received this email; correct?

A. I believe so.

Q. Okay. And after receiving this email, did you forward the signed NDA to Resorts World?

A. I don't remember.

Q. Well, did Resorts World come back to you and ask you, "We haven't seen it," and follow up with you?

A. I don't remember.

Q. But the deal went forward with Resorts World. So would you -- do you believe it was eventually -- an NDA was signed?

A. I do.

Q. Okay. If I go down to BELL31, this is titled "Mutual Nondisclosure Agreement," and it shows the name Ignite International Ltd.; correct?



CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

150

A. Yes.

Q. And under BELL35 on the signature, it shows "Ignite International Ltd.; Name: John Schaefer, President and COO; Dated: April 2nd, 2021"; correct?

A. Yes.

Q. Okay. And this is unsigned by Resorts World; correct?

A. Yes.

Q. Did Consulting by AR ever receive a signed copy from Resorts World of this NDA?

A. I don't -- I don't know.

Q. Did Consulting by AR follow up with Resorts World regarding an NDA?

A. If I was asked to, I'm sure I did.

Q. Go ahead, and mark this Exhibit 21.

(Exhibit 21 was marked.)

BY MS. STEIN:

Q. This is CONSULTING 142. It's an email from Solomon Schwartz dated 4/3/21 to yourself saying:

"Received it. Sent over to legal. Cheers. Solomon."

Does that help remind you that you would have -- that you followed up and that Resorts World received a signed NDA from Ignite?

A. I mean, that's what it says, sure.

151

Q. So after we saw a partnership outline, we've seen an NDA, the next step with Resorts World, was a letter of intent then drafted?

A. I don't know what you mean by "next step," but I guess the next goal would be -- would be the letter of intent.

Q. I'm going to move next -- this will be Exhibit 22.

(Exhibit 22 was marked.)

BY MS. STEIN:

Q. This is CONSULTING 143. It's an email from Solomon Schwartz to you copying Scott Sibella dated April 8th, 2021, "Subject: Ignite RWLV LOI."

Did I read that correctly?

A. You did.

Q. It says:

"Hi Alan, thank you for your patience. Please see attached letter of intent. Looking forward to kicking this partnership off."

Did I read that correctly?

A. You did.

Q. Was Solomon Schwartz aware that Consulting by AR was being paid a commission to get this deal done?

MR. PEARSON: Objection to form.

THE WITNESS: I -- I don't know.

152

BY MS. STEIN:

Q. Did you ever work with Solomon Schwartz prior to this deal?

A. No.

Q. Now I'm going to go -- this will be Exhibit 23.

(Exhibit 23 was marked.)

BY MS. STEIN:

Q. This is CONSULTING 395 to 403. This is an email dated April 8th from yourself to Paul Bilzerian copying David Bell, and it says "Attachments: Untitled attachment." And next page, CONSULTING 396, is produced as a Letter of Intent dated April 9th, 2021, between Resorts World Las Vegas LLC and Ignite International Ltd.

Do you see that?

A. Yes.

Q. And if I go to CONSULTING 403, the last page, it has two signature lines, but both are unsigned; is that correct?

A. Yes.

Q. Is this the first time Consulting by AR saw a draft of the letter of intent on April 8th?

A. I don't know when I saw it the first time.

Q. Do you know when -- eventually -- I'll ask a different question. Sorry. It's a bad one.

153

Eventually, though, a letter of intent was signed between Resorts World and Ignite International; correct?

A. Yes.

Q. But not on April 9th; is that correct?

A. Correct.

Q. And, again, if I go on this draft under -- CONSULTING 397 under Product Integration under "B.i.," do you see that, "Product Purchase"?

A. I do.

Q. It again here says:

"RWLV to make a minimum purchase order of $500,000 U.S. of Ignite product."

Did I read that correctly?

A. Yes.

Q. Next, this will be Exhibit 24.

(Exhibit 24 was marked.)

BY MS. STEIN:

Q. This will be CONSULTING 152 to 153. It's an email dated April 16th, 2021, to yourself from Paul Bilzerian, and its subject is Resorts World.

I'm going to go ahead and just ask you to read this email and let me know when -- to yourself, and let me know when you're finished.

A. Okay.

 

154

Q.  Did you receive this email?

A.  Yes.

Q.  Okay.  And the first line says:
"I've been advised the Resorts World deal is dead, which is a shame."
Did you believe as of April 16th, 2021, the Resorts World deal between -- with Ignite was dead?

A.  I cannot tell you my mind frame on April 16th.

Q.  Was there a time between -- we'll just use it -- March 11th 2021 and April -- the end of April -- so we'll just say April 30th, 2021, that you believed that there -- there could be issues concerning Ignite and Resorts World's deal?

A.  Yes.

Q.  Then it -- if you go down, second paragraph from the bottom, it says:
"I also understand that if these issues were to remain unresolved, you were willing [sic] to adjust the compensation described in your agreement to reflect these unresolved issues."
Did I read that correctly?

MR. PEARSON:  Objection to the form.

BY MS. STEIN:

Q.  I just asked if I read it correctly.

MR. PEARSON:  And I'm not trying to interrupt.

155

I'll make more specific -- misstates that sentence.

BY MS. STEIN:

Q.  I'll read it again.
"I also understand that if these issues were to remain unresolved, you were willing [sic] to adjust the compensation described in your agreement to reflect these unresolved issues."
Did I read that correctly?

MR. PEARSON:  Objection.  It says "unwilling."

MS. STEIN:  I'm sorry?

MR. PEARSON:  I'm not trying to be difficult.

MS. STEIN:  I said "you were unwilling."

THE WITNESS:  You did not --

MR. PEARSON:  It's unwilling.

THE WITNESS:  -- say that.

MR. PEARSON:  You said "willing."  You said "willing."

MS. STEIN:  Oh, I apologize.  I thought I said unwilling.  I do apologize.

BY MS. STEIN:

Q.  So changing it to "unwilling," did I read that correctly?

A.  Yes.

Q.  Why were you unwilling to adjust the compensation at this time?

156

A.  I mean, it's pretty black and white.  We had a letter agreement signed between myself or my company and Ignite that spells out what I have to get done, and Paul Bilzerian and David Bell and Dan Bilzerian continuously tried to alter for their best interest changes which they already agreed to and they already signed off on that I had to produce.  I mean, it's -- it's black and white.
If they've already agreed to my commission, my payment, my -- my compensation, and I had to produce A, B, C to get it and then a week later they say, "Now you have to do D, E, F, J, K, L, M, N, O, P or we're not going to pay you," why would I adjust my commission or my payment or my compensation when they've already signed that all I have to do is A, B, C?
I mean, I know it's a rhetorical question and you won't answer me, but I hope that helps --

Q.  That's fine.

A.  -- answer your question.

Q.  But you would agree, though, if there was no definitive agreement ever signed between Resorts World and Ignite, that you were not to be paid under the letter agreement; correct?

MR. PEARSON:  Objection --

THE WITNESS:  Oh.

157

MR. PEARSON:  -- to form.
Go ahead, Alan.  Sorry.
THE WITNESS:  I don't even agree to that because if I performed and deliver what I was supposed to deliver and then both parties performed, then I should be paid for my performance.  And why would both parties hypothetically -- because that's not what happened.  But if both parties performed according to the agreement that I delivered and that I -- I worked to put together, why would I not want to or not think I should get paid?

BY MS. STEIN:

Q.  But if the agreement -- I'm saying if Ignite never signed a definitive agreement with Resorts World --

A.  I would still -- I don't mean to cut you off.  Are you -- do you want me to answer?

Q.  No.  That's fine.  That's fine.

A.  So if the deal went down exactly the way that it did and Ignite never signed the agreement, we would still be here today.  The deal was done.  The terms of the deal were already performing long before July 1st, and I should be paid for putting this deal together.

Q.  We've already gone over part of those deal terms were not provided in the final agreements;


Exhibit 1 042

158

correct?

MR. PEARSON: Objection to form.

BY MS. STEIN:

Q. You can answer.

A. We went over the exact verbiage of what was written on that paper, and I simply answered you yes or no.

Q. Now, keep going here back to this exhibit, the last paragraph:

"Please confirm no later than Monday, April 19th, that my -- 2021, that my understanding is correct and that the deal is dead and no longer worth pursuing. If I do not hear from you by then, I will assume my understanding is correct and proceed accordingly. Thanks, Alan."

Did you respond to this email before -- no later than -- sorry -- Monday, April 19th, 2021?

A. I don't recall from memory the date that I responded to it.

Q. But you did respond to it; is that correct?

A. I believe there was a response to it. Whether it was me directly to Paul or whether it was my lawyer at the time or whether it was Dave and I, I don't know, but there obviously was a response because we continued along to do the deal.

159

Q. And it was beneficial to Consulting by AR to do the deal; correct?

A. Correct. Well, it wasn't beneficial. I haven't been paid.

Q. But if there was no deal, you wouldn't be paid either; correct?

A. It depends what point in time you're asking the question. As of today? The answer would be different as of March 31st or whatever. It really is based on -- on how much production and how much the parties performed.

Q. Go ahead, and we'll mark this Exhibit 25.

(Exhibit 25 was marked.)

BY MS. STEIN:

Q. This is CONSULTING 155. And I'm going to go to the bottom because it goes up and starts on April 17th where it's an email from you and then looks like Mr. Bilzerian responds on April 17th later that day:

"Yeah, that deal is shit, but --"

A. Can we -- can we go top to bottom instead of bottom to top because --

Q. Well, I have to go bottom to top because it goes --

A. I don't know what --

Q. -- in date order.

160

A. -- you're asking me or what you will be asking me to what Dan's comment that deal was shit. I don't know, is that -- is that a proposal? Is that the final agreement? Is that the letter agreement? I mean, you can tell me what it refers to, and then I can take your word for it, but --

Q. Why don't you do this: Why don't you read this exhibit, and then we can go through.

A. That makes more sense. Then I know what he's talking --

Q. Just read it to yourself, and let us know when you're done.

A. So you want me to start with "It's not a deal?"

Q. Wherever you want to start. Again, I can go back to top or top to bottom.

A. I don't know what you're going to ask me on the bottom. I'm sure it has something to do with something on the top that I haven't read yet. So if you just show me what it refers to on the bottom, I'll read that part on the top.

Q. The only thing on the bottom that shows -- refers to is "Fully Executed Letter Agreement." There is nothing else. This is from you. And then it goes back up.

A. All right. Let me just read what's up there.

161

I think Dan's calling it a piece of shit. It's something maybe on the top. I'm not sure.

Q. Go ahead.

A. Okay. You can scroll a little bit, please. Okay. Perfect.

Q. Okay. So let me go back down.

So, again, because I'm going to start top to bottom because it goes -- you sent an email to Dan and Dan responded, correct, that:

"Yeah, that deal is shit, but it includes the poker room, 1 million order and 20 percent of the gross from the four events"?

Did I read that correct?

A. Yes, you did.

Q. And Dan's referring to the fully executed letter agreement between Ignite and Consulting by AR; correct?

A. I -- I don't know. I think he is. I can't -- I can't assume. But if you do scroll back down, then maybe -- I don't know if you are allowed to correct me if I'm wrong, but if he's referring to the fully executed letter agreement and then you read his writing, it says, "20 percent of the gross from the four events." The -- the contract that he signed, he doesn't have to do four events. It was only one event.

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                        Ignite Spirits, Inc. v. Consulting by AR, LLC

162

So the timing in here, and pardon me for being confused, the end deal that Ignite ultimately signed is only one event.

Q.   But the letter agreement had four; right?

A.   Yeah.  The deal got better.  He was supposed to do four, which he said is a shit deal.  Then he had to do one deal in the end, and the one deal wasn't a grossing event.  It was -- we already talked about it. It was the opening -- the opening pool party/launch party/grand opening that he already performed at, and it wasn't a paid event.  So he couldn't get 20 percent. And it even said if it's not a paid event, he doesn't get anything.

So I'm a little confused.  Maybe -- I don't know, maybe you can ask me what -- or maybe you know more what he's referring to.  Because I think Dan all along the way was confused to the first agreement, to the second agreement, to the third draft, to the fourth draft.  But the end draft, the end draft, which he signed, only has one event.  He can't get 20 percent -- we talked about it.  He can have 20 per- -- he can have a hundred percent of it.  It wasn't -- there was no money generated.

And he wrote it includes the poker room. Everything you and I read today, everything that you

163

showed me said may include the poker room.  May include the poker room.  May.  Everything.

So what is he talking about that includes the poker room?  I don't think any drafts ever included the poker room.  Every single draft always said may at the discretion of Resort World.  So, honestly, I'm confused what he's even talking about here.

Q.   Now, you actually wrote back in the middle of the page here on April 17th at 11:28 p.m. --

A.   Exactly, I --

Q.   -- that it doesn't include the poker room.

A.   I clarified it.

Q.   Okay.  But -- and you said -- and you see the next sentence, though:

"And the 1 million order was refundable, which I got changed."

A.   Yeah, that was --

Q.   Did you --

A.   -- a humongous thing that I got done after the fact, after the fact, at the request of Paul Bilzerian and David Bell.  He went on to explain to me after he already agreed and signed off on it that -- that they don't want it to be refundable, that that actually hurts the company's bottom line because it becomes a liability, not -- I don't know if the word is asset, but

164

they can't book it as a sale.

And they begged me, begged me, begged me to please go back after the fact and get it changed to nonrefundable, and then that way they can book it as an asset or, you know, a profit to the company, which, in turn, is worth 40 times more to the -- the pro rata, the ratio, the -- whatever they call the multiple, the multiple for the company.

So I changed it.  I got it changed.  That was one of the many changes I got done at the request of either Paul, Dan, or David from a $1 million order, which was refundable, to a $500,000 order, which was not refundable.  And I was surprised and happy, and Paul was happy, and David was happy that I got that changed because that was worth, like, $20 million to Ignite once it became nonrefundable, that they can book it on their books.

Q.   As we sit here today, are you aware if Resorts World had ever purchased $500,000 in total orders from Ignite?

A.   As we sit here today, I can tell you that I got them a signed contract that says that they will purchase $500,000 nonrefundable during the term of the contract, and if they didn't fulfill that contract, that has nothing to do with me.  That's between Ignite and Resort

165

World.  My -- my role in this was to deliver on paper and have Resort World sign off that they will give Ignite a $500,000 order that is not refundable.  That's what I was supposed to deliver, and that's what I delivered.

I'm not liable, in my opinion, if Resort World doesn't honor their contract with Ignite.  I don't -- I don't -- I don't have my compensation based on Resort World potentially in breach of a contract with Ignite or vice versa.  My delivery, which it clearly states in my letter agreement, is I have to deliver those -- those agreements in substantial form, and I did, or I delivered better.

So this million-dollar order you just asked me about was changed on behalf of Paul Bilzerian asking me to do them a favor and see if I can get it changed, and I did, and he literally told me it's worth $20 million to the company getting it changed.

So I thought it was a very -- very good thing I managed to get done for him.  So I hope that clarifies it.

Q.   Now, you go on, though, and say:

"Anyway, your dad sent yet another text telling me that he [sic] sending a retraction of all talks on Tuesday to resorts and to me."

166

Did I read that correctly?

A.   Yes, ma'am.

Q.   "Unless we come to some agreement prior"; correct?

A.   Yes, ma'am.

Q.   "I have no clue he thinks -- who he thinks I am supposed to be talking to."
Did I read that correctly?

A.   You did.

Q.   "However, it doesn't seem like you're so excited about this, and every talk, there's more and more changes that you want."

A.   Exactly.  And you did read that correct, if that's your next question.

Q.   Okay.  So why go forward with this deal with Dan as of April 17th if he's not excited?  It seems like you're having a lot of problems.  Why go forward at that point?

A.   Because at the end of the day, they already signed a letter agreement with me giving me the compensation that I agreed to take for delivering this deal, and I'm going to do everything in my power to deliver the deal to earn that compensation.  I mean, I'm not sure if you're asking me why would I just give up on doing a deal that I already put all this work into, and

167

I already received a letter agreement telling me deliver A, B, C and you get A, B, C.
And now this is clearly -- as I state right here in the paragraph you just asked me to read, this is everybody on the Ignite team -- well, not John Schaefer, but this is Dan, Paul telling me now we don't care about A, B, C anymore, which we signed off on; we want D, E, F, H, I, J, K, L, M, N, O, P as well.  And I'm just, you know, as I expressed multiple times, jumping through hoops.
I even said right there I don't know who they think I am.  Like, they're asking for things for me to get done after they already agreed to the other things that it was all I have to get done, and now they want me to go get modifications, changes, or I'm not going to earn my compensation.  How can you change my compensation when you already signed off?  Alan, go get us, you know, A, B, C, and we're going to pay you A, B, C.  And now, well, if you don't get D, E, and F, we're not going to pay you the same thing.
So to answer your question, which I think this answers it pretty clearly, why do I expect payment and, if I'm unhappy, why would I still want to get paid, I'm simply doing them way and above the call of duty to try and make this deal happen for everybody.  And that's

168

what I ultimately did, and that's what they ultimately signed.

Q.   Well, let's break this down a little bit.

A.   Let's do it.

Q.   This is April 17th, 2021.

A.   Yes.

Q.   It's a month and six days after you signed the letter agreement; correct?

A.   I mean, I can't do math as quickly as you can, but something like that.

Q.   It's pretty close; right?
So what -- how much hours did you put in through Consulting by AR with regards to this deal on behalf of Ignite between March 11th, 2021, and April 17th, 2021?

A.   I don't have an hour log, but it was -- it was day -- full day after full day after full day after full day for that whole period of time, including up till this date.  And it clearly shows right here on this date that they're still getting me to make changes or attempting -- you know, having me attempt to get them changes.  And if you want --

Q.   What did --

A.   I'm sorry?

Q.   Sorry.  Go ahead.

169

A.   I mean, you want to guess on hours, I mean, it was, you know, I don't know, hundreds of hours.

Q.   What did you personally -- did you personally draft any documents besides emails -- any documents on behalf of Ignite and/or Resorts World between March 11th, 2021, and April 17th, 2021?

A.   Why would I draft any documents?

Q.   Just a simple question.  So you didn't draft anything; correct?

A.   I mean, our letter agreement was already signed.  I was working for the LOI for them.  I didn't draft the LOI, if that's what you're asking.

Q.   And you're not a lawyer; correct?

A.   Correct.

Q.   And when you are negotiating terms, we've seen a couple of emails, but how many meetings between March 11th, 2021, and April 17th, 2021, did Consulting -- I'm asking on behalf of Consulting by AR -- did you have with Resorts World, Scott Sibella, or Solomon Schwartz in that time?  How many total meetings?

A.   I have no idea.

Q.   More than one?

A.   Yes.

Q.   More than five?

A.   I mean, we could start counting the changes



Exhibit 1 045

170

that they asked me to make and we can assume --

Q. I'm not going to the changes, sir. I'm asking you to ask [sic] my question.

A. Well, I'm giving you an answer to --

Q. I'm asking you a very specific question --

A. -- your question.

Q. -- about a meeting.

A. And I can answer it the way I choose to answer it, can't I?

Q. No, you cannot. I'm asking a question; you're unresponsive. I'm asking you -- so I'm going to ask it again. This is not your deposition.

What I'm asking you very clearly, it's a very specific question. On -- based on Consulting by AR and performing under the letter agreement, how many meetings did Consulting by AR have with Resorts World on behalf of Ignite -- and that includes Scott Sibella or Mr. Solomon -- how many meetings in person between March 11, 2021, and April 17th, 2021?

A. The answer is I don't know.

Q. And, again, that's not an acceptable answer under a 30(b)(6). This is a topic you should be prepared for.

Do you keep a calendar?

A. No.

171

Q. How would you -- how do you keep track of meetings that you have that you're supposed to be going to, sir?

A. I don't get paid by the hour or by the meeting. I don't track or need to keep track of them.

Q. But when you're supposed to be somewhere like for today, do you calendar that somewhere that you're going to have to show up on a certain day?

A. No, I don't.

Q. Okay. And you're saying you have no idea -- you cannot -- going through your emails, which you said you had to do and be prepared for today -- and I understand it's a lot, but you have to be prepared. You had notes, which I haven't seen. What I'm asking you specifically, when you were going through that, during this time frame -- this is important to you. As you say, you have to perform -- is it more -- I mean, are you saying you had no meetings? One meeting? More than one? Can you say that?

MR. PEARSON: Objection to the form.

MS. STEIN: Well, I'm going to object to the fact that your witness isn't prepared, but we'll go there later, and I'm reserving all rights.

BY MS. STEIN:

Q. But please go forward, Mr. Richardson.

172

A. I don't know how many meetings I had.

Q. Again, let's go through it. More than one?

A. I don't know how many I had. I would say for sure, obviously, it was more than one.

Q. More than two?

A. I don't know how many. I'm not going to continue to speculate with you.

Q. It's not about speculating. This is about your 30(b)(6) testimony, and I'm entitled to this testimony. And if -- you're saying there is absolutely nothing that can help you prepare to understand how many meetings?

A. I said that we can count how many changes they asked me to make, and every time they make -- ask me to make a change, that would qualify as a meeting, in my mind. So at some point I can go back and count the changes, if you like.

Q. I'm not asking you changes with Ignite. I'm asking you negotiations with Resorts World. I'm asking in-person meetings.

Do you have a log of your travel to Las Vegas? Because these would be meetings that would take place here in Las Vegas; correct?

A. I don't keep a calendar. You've already asked me that.

Q. I'm not asking you that. I'm asking you --

173

A. I don't -- I don't have a log.

Q. Okay. I'm asking you again, sir, you had in-person meetings. I'm asking about in-person meetings with Resorts World. So you have to travel from your home in Florida; correct?

A. Not correct.

Q. Why wouldn't you have to travel to be in an in-person meeting if you live in Florida, sir?

A. Because during this time frame, I was staying in Vegas.

Q. Where were you staying, sir?

A. At a hotel.

Q. Which hotel?

A. I don't recall. It was either the Bellagio or The Cosmopolitan.

Q. Now, you're saying this time period -- we're talking over a month. Did you stay at the same hotel in that month?

A. Most likely.

Q. Do you keep a vehicle here in Las Vegas?

A. I do.

Q. Where is that vehicle housed when you're no -- when you're not in Las Vegas?

A. It's either at the hotel I'm staying at's parking garage or at a friend's house or at the airport.

174

Q.   And with regards to Consulting by AR with regards to travel, if you came here originally from Miami, correct -- and that's where you're from -- would you have paid for that through Consulting by AR's credit card or a personal credit card?

A.   Consulting --

MR. PEARSON:  Objection to the form.

THE WITNESS:  Consulting by AR does not have a credit card.

BY MS. STEIN:

Q.   But when you travel, do you travel on private plane or do you travel by public?

A.   Both.

Q.   Okay.  You said you were here.  So when did you -- prior to March 11th, 2021 -- let's just start March 11th, 2021, were you in Las Vegas?

A.   Yes.

Q.   Okay.  And what -- when did you arrive in Las Vegas prior to March 11th, 2021?

A.   I don't know.

Q.   Okay.  Well, we know -- I believe you're Jewish -- I'm not trying to insult you -- we know Hanukkah's in December, right, of 2020.  Were you in Las Vegas continuously before Hanukkah or after Hanukkah of 2020?

175

A.   I don't recall.

Q.   Now, you said, though, after you signed the letter agreement, you were in Las Vegas.  Did you stay in Las Vegas until the opening in June of 2021?

A.   I don't recall if I was here a hundred percent of the time, but I was here, from my memory, most of the time.

Q.   And during this time, because Resorts World wasn't open, you couldn't stay there; correct?

A.   Correct.

Q.   And so would you drive to a meeting at Resorts World?

A.   Yes.

Q.   So you're saying you cannot give me your best estimate as we sit here today and there's no documents that can help you remember in-person meetings with Resorts World during this time; is that correct?

A.   That's correct.

Q.   And reviewing emails and going back and looking at all your emails and text messages, can you, in fact, go back and figure out an estimate -- your best testimony as a 30(b)(6) with regards to how many meetings you would have during this time?

A.   I certainly can try.

Q.   Okay.  I will go ahead; I'm going to ask you to

176

do that, and I'm going to ask the court reporter to put a place in this transcript for you to fill in the number of meetings that you believe between March 11th, 2021, and April 17th, 2021, for in-person meetings after you go through that.

And then I'm also going to ask the same question for the time frame of April 17th -- I'm sorry, April 18th, 2001 [sic], until July 2nd, 2021, and I'm specifically asking in-person meetings between Consulting by AR, yourself, which is represented by you, and Resorts World, in-person meetings during those time frames.  Okay?

THE WITNESS:  Jon, did you write those dates down?  I don't have a pen and paper to.

MR. PEARSON:  We have a transcript.  Let's just keep this moving.

THE WITNESS:  Okay.  Because I don't have those dates.

BY MS. STEIN:

Q.   It will be in the transcript for you to fill in.

A.   Thank you.

INFORMATION REQUESTED:

177

Q.   Okay.  All right.  So let's keep going.

I want to go back to -- again, I'm a little confused here.  I know you keep talking about "most of the time," and there's a lot of time here, but, again, you don't keep track of your hours; right?

A.   I don't keep track of my hours that I put into this case; is that what you're asking me?

Q.   Into your deal.  You said you don't keep track of hours; right?

A.   Correct.

Q.   And you understood that this wasn't a finder's fee.  This was -- you had to perform services under the letter agreement; right?

MR. PEARSON:  Objection to the form.

THE WITNESS:  Yes.

BY MS. STEIN:

Q.   Let me go next, this will be Exhibit 26.

(Exhibit 26 was marked.)

BY MS. STEIN:

Q.   This is DAN16 through 27.  It's an email you wrote dated on April 19th, 2021, to Dan Bilzerian.  And, again, the subject is "Ignite International Ltd. - Letter of Intent - RWLV 20210409."  And it says:

"These are all your changes, I think.  I am not sure I can get all this done.  But let me know

 

178

if I get these changes done, will you sign this?"

Did I read that correctly?

A. Yes.

Q. Did Mr. Bilzerian respond to you after this email?

A. You'll have to scroll down and let me read it.

Q. That's all the email says, and then it has an attachment of an LOI with redlines.

A. I don't know if he did or didn't without looking at my emails.

Q. Okay. On these redlines, did you personally make these redlines?

A. I don't believe I did.

Q. Who would have done that on behalf of Consulting by AR?

A. I don't know that Consulting by AR made those redlines. You went way too fast.

Q. I'll go back to your email that says:

"These are all your changes, I think."

A. So those are Dan's redlines. They're his changes; right? If I'm reading that right.

Q. I don't know. I'm asking you. You wrote this email, sir, not me. You're sending this to Mr. Bilzerian.

179

A. "These are your changes, I think." So I'm sending this to Dan. So these are Dan changes; so the redlines would be Dan's changes. That's what the email says.

Q. So you're interpreting this to say that Mr. Bilzerian is making changes or -- and not that you're sending him proposed changes in the hopes to try to continue this deal?

A. "These are your changes." So that's Alan to Dan. My email to Dan, I'm saying to Dan:

"These are your changes. I am not sure I can get all these done."

So I am assuming these are Dan's changes. I'm not assuming it. This is what I wrote. "These are your changes." You/your means Dan's changes.

Q. Why didn't you copy on this email David Bell?

A. Because, in my mind, I'm thinking they're Dan's changes and Dan needs to be copied because they're his, not David's.

Q. How come Paul Bilzerian is not copied on this email?

A. Same reason. And those are Dan's changes on behalf of Ignite, I guess, not on behalf of Dan even though Dan --

Q. If you --

180

A. -- Dan wanted those changes.

Q. During this time, though, you're having some issues with Paul Bilzerian, are you not?

A. I don't know the time frame, if it was that time. But at some point there were some not-so-nice words said to me from Paul Bilzerian, yes.

Q. Okay. In fact, he sent you an email asking you not to communicate with him any further, written or oral; correct?

A. He did.

Q. Did you -- after that email, what did you do? Did you try to contact Paul?

A. I -- I don't believe I did until he reached back out and said to disregard that email and let bygones be bygones, and he opened the door back up.

Q. And at the same time did -- isn't it true that David Bell stepped in on behalf of the company?

A. In my opinion, David Bell never stepped out. I spoke to him from the start till way late in July when he was inviting me to go on a -- on a cruise with him in Italy. So there was never, ever in my memory or opinion a breakdown with -- with David telling me not to speak to him or -- nor him stopping speaking to me.

Q. Okay. Go ahead; we'll mark this Exhibit 27.

(Exhibit 27 was marked.)

181

BY MS. STEIN:

Q. This is CONSULTING 167 to 176. It's an email from Henry dated April 22nd, 2021, to Paul Holden copying you, Subject: Resorts World Las Vegas and Ignite Beverages: "Please see attached letter."

Go to the next page, which is CONSULTING 168, you'll see a letter, again, April 22nd. And I'm going to ask you to go ahead and read the letter to yourself. Let me know when you're finished.

MR. PEARSON: Kim, can we take a break after you ask -- when we get to a good point? Sorry.

MS. STEIN: Yeah, let me just get through this exhibit, if that's okay.

MR. PEARSON: All right.

THE WITNESS: Okay.

BY MS. STEIN:

Q. Okay. Now, did you authorize Henry to send this letter on your behalf?

A. I don't remember.

Q. The last sentence says:

"Once received, Mr. Richardson will then present --" sorry, the second-to-last sentence -- "will then present the document to RD --" I'm sorry "-- RWLV, and until that occurs, we will be on hold."



182

Did you -- do you agree that you were on hold until you received a response to this letter?

A. I don't remember the time frame or at that time frame what -- what Henry and I were discussing or what he was recommending for me to do or not to do. Like, was I on hold? I just -- I don't remember.

Q. But you agree Henry was your agent at this time; correct?

MR. PEARSON: Objection to --

THE WITNESS: Henry --

MR. PEARSON: -- form.

THE WITNESS: -- was my lawyer.

BY MS. STEIN:

Q. And attached to this agreement -- to this letter -- sorry -- is another letter of intent, but it has a different date now; correct --

A. A different date --

Q. -- of April 22nd?

A. I'm sorry. A different date than when?

Q. Than the April 9th, 2021, letter of intent we saw earlier; is that correct?

A. Yes, if it's -- yes, it's a different date.

Q. Okay.

MS. STEIN: Why don't we go ahead and -- do you

183

want to take five minutes, or do you want a little bit more time? Do you want to do ten?

MR. PEARSON: Ten's fine, yeah. Thank you.

MS. STEIN: Okay. Why don't you go walk around, and then we'll come back. Okay?

THE WITNESS: Jon, can you bring me some Tylenol, please?

THE VIDEOGRAPHER: The time is now 1:57 p.m. We are off the record.

(A recess was taken from 1:57 p.m. to 2:11 p.m.)

THE VIDEOGRAPHER: The time is now 2:11 p.m. We are back on the record.

MR. PEARSON: And before we begin just so we're -- have a clean record, can we just make sure -- if Dan Bilzerian can just turn on his camera real fast and off -- that it's him participating, please?

MS. STEIN: I don't know if Dan can turn on his camera where he is. I'm not sure he's actually there right now, but let's see. Hold on.

I can verify that it is Dan.

MR. PEARSON: How about this, at some point, if he can turn it on and off if he's available. It can literally be a second or two just so we're all on the same page that he's on. And I won't hold this up

184

anymore.

MS. STEIN: Okay. Like I said, sometimes -- I don't think he's there full-time. He's in and out, is my understanding.

MR. PEARSON: Okay.

MS. STEIN: I can tell you that he's been communicating with me. So he has been on at times, but that is his Zoom handle.

THE WITNESS: Is that Oasis Reporting?

THE COURT REPORTER: That's the videographer.

MS. STEIN: That's the videographer. It's "Middleclass Dan."

THE WITNESS: I don't -- I don't even see that.

MS. STEIN: Oh, okay. Well, I see it. So we're --

THE WITNESS: I'm okay --

MS. STEIN: -- okay.

THE WITNESS: -- with it. It's just not on my screen.

MS. STEIN: Okay. Let's keep going, and I'll let you know if I hear back from him, Jon.

MR. PEARSON: Thank you.

BY MS. STEIN:

Q. Okay. So I just want to go back. This was Exhibit 27 before the break, and, again, I just want to

185

note this was that letter, it's April 22nd, 2021; correct?

A. Yes.

Q. Okay. And I do this so I don't make everybody sick when I switch.

Go ahead; this will be Exhibit 28.

(Exhibit 28 was marked.)

BY MS. STEIN:

Q. And this is an email from Henry Lichtenberger sent April 23rd, 2021, to Paul Holden, to you, copying David Bell.

Do you see that?

A. Yes.

Q. And it says:

"Sorry for the delayed response, but did not want to wait until Monday to reply to your email. I just spoke with Alan, and he was able to discuss the new terms of the executed LOI by Ignite with Resorts World, and it appears that they will be receptive to the revisions."

Did I read that correctly?

A. You did.

Q. And in the last -- the second-to-last paragraph, it says:

"Upon receipt of the requested written

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

186

confirmation that the terms and compensation of the letter agreement remain unchanged, Alan will proceed with obtaining the signature from Resorts World."
Did I read that correctly?

A. Yes.

Q. Did you authorize Henry to send this letter -- this email? Sorry.

A. I don't remember if I authorized him or not, but I'm sure -- I mean, it was okay.

Q. And I just want to make sure I understand. Under the letter agreement between Consulting by AR and Ignite. Are -- is Consulting by AR performing work for Ignite on behalf of Ignite or on behalf of Resorts World?

A. On behalf of Ignite.

Q. Go next, this will be Exhibit 132 -- I'm sorry -- 29. I'm getting ahead of myself. I promise there's not 132 exhibits.

A. Is there 32?

Q. We're at 29 right now. I said there's not 132.

A. No, I said is there 32?

Q. Yeah, there is going to be probably -- we're looking 60 or so, if not more. So -- but this is going to be Exhibit 29.

187

(Exhibit 29 was marked.)

BY MS. STEIN:

Q. This is CONSULTING 505 to CONSULTING 507. And this is on 505. It's an email from Paul Bilzerian to Henry copying Paul Holden, Dan, John Schaefer, and it states:

"Dear Henry, Paul Holden forwarded your email to me. I appreciate your efforts on behalf of your client; I only wish they had come much earlier. Ignite had assumed the deal was dead when it did not hear from anyone nor receive the signed LOI from Resorts World. Your email states that 'I am requesting written confirmation from Ignite that upon Alan's delivery of the executed LOI by Resorts World, Alan will have satisfied in full all of the conditions set forth in the letter agreement dated March 11th, 2021, that addresses the fees to be paid, assuming Resorts World and Ignite execute a definitive agreement.'"
Did I read that correctly?

A. Yes.

Q. Okay. Then it continues:

"So that there are no misunderstandings, which is clearly something that seems to regularly

188

happen with Alan, pursuant to the letter agreement dated March 11, 2021, between Consulting by AR LLC and Ignite, your client will have earned nothing," and that's underlined and red, "until a definitive agreement," again, red and underlined, "between Ignite and Resorts World is signed," again, red and underlined.
Did I read that correctly?

A. Yes.

Q. Then it says:
"If this is not your understanding (which your email below seems to indicate), then Ignite will assume the transaction is dead."
Did I read that correctly?

A. Yes.

Q. Okay. So my question for you is did this email -- did you -- did Henry forward this email to you on or around April 23rd, 2021?

A. I -- I don't remember sitting here today. I imagine that he did.

Q. Okay. And when you saw this language that you would earn nothing until a definitive agreement was signed, did that concern you in any way?

A. I don't remember my mindset at that time,

189

but -- but if the performance continued to happen on behalf of myself and both companies, then, in my mind, the deal was a done deal.

Q. And you said on behalf of both companies, but you're only working on behalf of Ignite; correct?

A. I'm working on behalf of Ignite, but if Resort World never did what they were supposed to do prior, like, didn't give Ignite the booth at the pool party or didn't put their products in the rooms or didn't, you know, do whatever other conditions Ignite wanted, then it would be understandable that Ignite or that -- sorry -- Resort World didn't perform.

Q. We go next -- this will be Exhibit 30.

(Exhibit 30 was marked.)

BY MS. STEIN:

Q. This is CONSULTING 205 to 214. It's an email dated April 26, 2021, from Henry to Paul Holden copying you, "Subject: Resorts World Letter of Intent." And it's from Solomon Schwartz. It has a signature line underneath it even though it says it's from Henry.
Do you see that?

MR. PEARSON: Objection to the form.

THE WITNESS: Yes.

BY MS. STEIN:

Q. Okay. And it says:

190

"Attached is the LOI executed by Resorts World."

Q. Does that comport to your understanding that the LOI was executed by Resorts World on April 26, 2021?

A. It appears that way.

Q. Okay. And we can go down to starting on CONSULTING 207, it looks like there's a letter of intent dated April 26, 2021.

Do you see that?

A. Um-hum. Yes.

Q. Okay. And then if I go to CONSULTING 214 -- it's the last page -- it shows there's a signature by Scott Sibella.

A. Yes.

Q. But this is unsigned by Ignite; correct?

A. This particular document is unsigned; correct.

Q. And then going back to the first page, second line says:

"The following is the contact person at Resorts World so work can commence between the parties with respect to the in-room/minibar integration, grand opening activation, and on-property bar integration. I have been advised that Mr. Schwartz is not assigned to draft the definitive agreement."

191

Did I read those -- those two lines correctly?

A. Yes.

Q. Why at this time is Henry communicating on behalf of Consulting by AR versus yourself?

A. I think Henry was last in contact with Paul Bilzerian about the final changes that had to be made for Ignite to sign, and then I got Resort World to agree to those changes, and then they signed off, and Henry was the last person in touch with them. So I'm just going to assume that he was following information. And I -- I think he also told Paul that he would give him the contact information so they can start working on the integration once the LOI was signed. So the LOI was signed, and then he sent off that information.

Q. This will be Exhibit 31.

(Exhibit 31 was marked.)

BY MS. STEIN:

Q. And this is CONSULTING 191 to 192. It's an email from Solomon Schwartz to you and forward signature requested on Ignite International Ltd. letter of intent. And it says:

"Hi Alan, please forward to the Ignite team."

And then it's forwarding an email from Ryan Thomas that was sent to Scott Sibella. It's about a review and sign letter of intent.

192

Q. So is it true that, in fact, you were sent the letter of intent, and then you forwarded that to Henry to forward to Ignite?

A. I don't remember.

Q. Okay. Does this email help you to remember that?

A. I mean, I could have sent it to both. I just don't know. I could have sent it to Henry and sent it to Ignite or to David. I don't know if -- if I sent it to more than just to Henry.

Q. But the letter of intent was, in fact, signed by Ignite at some point; correct?

A. I believe so.

Q. Okay. And I'll go ahead; again, we'll just get this marked as Exhibit 32.

(Exhibit 32 was marked.)

BY MS. STEIN:

Q. This is IGNITE8 through 15. This is Letter of Intent dated April 26, 2021, between Resorts World Las Vegas LLC and Ignite International Ltd.

Did I read that correctly?

A. Yes.

Q. Okay. If I go to the last page, IGNITE15, we see, again, Mr. Sibella's signature, but underneath that under Ignite International Ltd., we see Mr. Schaefer's

193

signature as president and COO on 4/27/21; is that correct?

A. Yes.

Q. Do you know why the letter of intent was done with Ignite International?

A. No, I do not. And it says in parentheses Ignite -- no, I don't know why.

Q. Now, was the letter of intent we just looked at ever amended?

MR. PEARSON: Objection to the form.

THE WITNESS: I don't believe there was another LOI. The LOI and the final agreement -- the LOI led to the final agreement.

BY MS. STEIN:

Q. Let me go back. If I go back to Exhibit 32 and we go to the last page, IGNITE15 under Roman numeral XIII, Expiration of Proposal says:

"Time is of the essence. This LOI shall remain in full force until 30 days after the date of this LOI unless the parties mutually agree to extend in writing."

Did I read that correctly?

A. Yes.

Q. Okay. So this is dated, again, April 26, 2021. So if something didn't -- according to this, if -- that

 

194

would be May 26. So the question I have is does, in fact, then -- do you know if this agreement was extended in any way past May 26, 2021?

A. I assume it was.

Q. Did you assist or feel that was important on behalf of Ignite and as part of your role to make sure that was done?

A. I don't have any documents in front of me, but I remember reading something when I was preparing that Resort World gave another extension on this.

Q. Okay. I'm going to show you what I will mark Exhibit 33.

(Exhibit 33 was marked.)

BY MS. STEIN:

Q. This is RW1 to RW2, which means it was produced by Resorts World. And this is entitled "Amendment to Letter of Intent Dated April 26, 2021."

Have you ever seen this document before? And let me know, I can have you go -- scroll down for you.

A. I don't know if I did or didn't, but this may be what I just spoke about a minute ago. This is an extension document.

Q. Okay. And this is an unexecuted. Do you know if it was ever executed?

A. I don't know.

195

Q. This will be Exhibit 34.

(Exhibit 34 was marked.)

BY MS. STEIN:

Q. This is BELL56. It's an email from -- starts on top, an email from David Bell on April 27th, 2021, to you. The subject is Solomon Schwartz. And David answered:

"Hello Solomon. Nice to meet you. Look forward to working together."

And then there's an email underneath that on April 27th where it states Alan Richardson wrote:

"Solomon, not sure if you've been in touch with David Bell yet. He is a point man in the Ignite deal and a partner."

Did I read that correctly?

A. Yes.

Q. So is this the first time that you would have introduced David Bell to Solomon Schwartz?

A. I don't know.

Says: "Not sure if you've been in touch."

They may have already been.

Q. Okay. Now, this is the day after the letter of intent is signed. Had you --

A. You cut out. Start again, please.

Q. Sorry.

196

This was the day after the letter of intent was signed --

A. Okay.

Q. -- correct?

So prior to this time, had you arranged any member of Ignite to meet with Resorts World?

A. I have not.

Q. Why not?

A. Because I was getting all the negotiating done on their behalf for them.

Q. Okay. After the letter of intent was signed, did you continue to have a role to ensure the definitive agreements were executed?

A. Yes.

Q. Tell me about the thing that you did in your role to ensure the definitive agreements would be executed?

A. I continued to move the bar on behalf of Ignite for the continuous changes that were -- that were just never-ending, and anytime they needed something done after they were already in touch with them, they were still reaching out to me to assist them in getting those things done.

Q. Tell me what that included, though.

A. I would have to go through my notes because

197

there's been so many changes and so many requests that were -- that ultimately ended up in the final agreement from where we started and every -- every single one, 100 percent of those changes, were all Ignite request changes. So I don't remember the order, but we did discuss one of them earlier about the million-dollar order changed to a $500,000 order from guaranteed buyback to no guaranteed buyback. The requests kept coming in literally, you know, up until the last day I spoke to them.

Q. But let me ask maybe a different way. Sorry. It might be a bad question.

Did you have in-person meetings with Resorts World and Ignite, people from Ignite, from April 26, 2021, through July 2nd, 2021?

A. You -- you've asked me that, I think, already. I don't have a log, but I -- I don't know if I can answer in-person or not, but I never shut my phone off and stopped working for Ignite up until, you know, up until way after middle July and -- and I can't tell you as I sit here today which changes, which favors, I continued to do off the top of my head, but -- but they were ongoing throughout -- throughout the entire course of our communication.

Q. Did you have calls -- who did you -- do you

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

198

remember from Ignite who you were dealing with at this time?

A. John Schaefer and David Bell.

Q. Did you ever deal with Dan during this time?

A. I'd have to look at my notes at what time period that was, if we were still discussing these issues or not.

Q. Mark this Exhibit 35.

(Exhibit 35 was marked.)

BY MS. STEIN:

Q. This will be CONSULTING 543 to 546. This is text messages between yourself and John Schaefer as produced by you. And it states --

A. What was -- what was the date you just scrolled down? I'm sorry, 5 --

Q. 5/19. This is -- the one I'm asking about, though, is the one in the middle of the page in blue, 5/24/2021.

A. Yeah.

Q. Okay. It's from John Schaefer to you. Says:

"Hey Alan, according to the LOI, the deadline for definitive agreement is Wednesday. RW was supposed to draft it, but we are still waiting on them. Any help to get that ball rolling would be helpful as Wednesday is almost here.

199

Thanks."

And then you write back the next day, on 5/25:

"Sorry to text so late. Any updates on the extension letter?"

Did I read that correctly?

A. Yes.

Q. So between 5/24 and 5/25, did you contact Resorts World to ask them where the agreements were?

A. I assume that I did.

Q. But during this time, Ignite was not holding up the definitive agreements; correct?

A. On the date of 5/24 to 5/25, they were not holding it up; correct.

Q. Okay. And you would agree that Resorts World was supposed to draft the original definitive agreements per Mr. Solomon Schwartz's email; right?

A. Can you show me that email, please?

Q. I could go back to it, but I'm just asking you.

A. I don't know according to that email who was supposed to do what. I need to see it.

Q. Well, I'm going to ask you again, though, as the 30(b)(6) for Consulting by AR, were you, in fact -- who was supposed to draft the initial draft of the definitive agreement?

A. I don't know that I would know that answer off

200

the top of my head. I don't know if Resort World told them that they would do it or Ignite told Resort World that they would do it.

Q. Just a second. We'll go back.

This would be Exhibit 30 as marked. This is an email from your lawyer, Henry. Remember we looked at this email?

A. Yes.

Q. And it states:

"I've been advised that Mr. Schwartz is not assigned to draft the definitive agreement. Mr. Schwartz will be given your contact so the initial draft of the definitive agreement can be delivered to you when completed."

Does that help refresh your memory that Resorts World would be drafting the definitive agreement, not Ignite?

A. No, it does not.

Q. How does it not?

A. Well, it's Henry stating that his assumption -- his assumption is that the initial draft of the definitive agreement can be delivered to you when completed. So Henry's assuming, and maybe correctly, that the initial draft of the definitive agreement can be delivered to you when completed by Resort World. I

201

mean --

Q. You didn't expect Henry to be drafting the definitive agreements; is that correct?

A. That is correct.

Q. Okay. And you weren't drafting the definitive agreements; right?

A. I said it's either Resort World or Ignite. I just can't -- don't want to misstate who drafted the first version of it. I don't know.

Q. And going back to this Exhibit 35, Mr. Schaefer is asking -- is stating here that Resorts World was supposed to draft it.

Do you have any reason to doubt Mr. Schaefer texting on 5/24?

A. I have no reason to doubt it.

Q. And then, again, as we looked at CONSULTING 543, you said:

"Any updates on the extension letter?"

And Mr. Schaefer responds to you the same day:

"Yes, we sent it to them and Solomon responded with a formal email extending the deadline to June 9th (a week longer as they believe the holiday will delay things) and sent the letter to legal to review and get signed."

Did I read that correctly?

202

A. Yes.

Q. Then you questioned, you responded with a question:
    "The extension letter to legal?"
    Is that correct?

A. Yes.

Q. Okay. And then if we go further down, you question on 525 [sic]:
    "Okay. So we should be good. And he said hard
    copy should be this week?"
    You wrote that; correct?

A. Yes.

Q. And John answered you that:
    "He wouldn't commit to a hard copy this week.
    But appears to be good. I'll keep you posted."
    Correct?

A. Yes.

Q. And then you questioned:
    "But if he only extended seven days --" and
    then it looks like it's a typo. It says "snd"
    instead of "and." "-- no copy this week
    then...LOL. Gonna need another extension??"
    You did question this at this time; correct?

A. I questioned what -- exactly what I wrote there.

203

Q. Okay. So are you questioning that a week is not -- seven days is not enough time?

A. No, I'm not questioning the time frame. I'm questioning that if it's not done within the time frame, then they're "going to give another extension??"

Q. So you're asking if they're going to give another extension.

A. I mean, that's what exactly the words say.

Q. Did you at this time -- and this is May 25th -- reach out to Resorts World to ask them if they were going to give another extension?

A. I would have to keep reading more texts till I can answer you.

Q. Okay.

A. Right here, "Solomon extended it."
    There's the extension, isn't it?

Q. That's to June 9th; correct?

A. Correct. Is that not an extension?

Q. Okay. I'm just asking. It's up to you.

A. I mean, you're -- you're putting text messages one by one in front of me, and then you show me the next one, and right in there is the answer to the extension. You asked me if I reached out to them. There's the text message with me reaching out and their answer.

Q. Go to the next. This will be Exhibit 36.

204

(Exhibit 36 was marked.)

BY MS. STEIN:

Q. And this will be CONSULTING 551 to 555. Again, this is May 20th -- these are still text messages between yourself and John Schaefer. This is dated 5/26. And second email -- second text, sorry -- this is from John Schaefer to you and starting on the third sentence:
    "If you could just help us get a first draft of
    the definitive agreement to us today, that
    would be great so at least we can see what's in
    it or if they are changing things dramatically
    from the LOI."
    Did I read that correctly?

A. You did.

Q. Okay. And you responded:
    "I know 'they,'" in quotes, "were told to push
    contract to top of list. Not sure if today is
    possible. I will call now."
    Did I read that correctly?

A. Yeah.

Q. Did you, in fact, call on 5/26 Resorts World?

A. I assume I did based on my text message.

Q. And who would you have called at Resorts World on 5/26 regarding the definitive agreement?

A. Solomon Schwartz.

205

Q. Then if I keep going further, you actually answer John:
    "Obviously I'm extremely motivated and on top
    of it."
    What did you mean by that?

A. Maybe you can scroll up to the text message I was responding to, and I can answer.

Q. Sure. Go ahead. You can read it to yourself and let us know.

A. I'm on top of making sure that they get the contract out as soon as possible.

Q. And that's important to you; correct?

A. Yes.

Q. Actually I keep going. Sorry. Same exhibit. Hit the wrong button. Sorry I was scrolling down and hit the stop sharing.
    I'm going to scroll down, and I'm going to move now to 6/1/2021. John is texting you again:
    "Hey Alan. I hope you enjoyed the holiday
    weekend. We have yet to receive a draft of the
    definitive agreement and I know we only have a
    week left on the extension. Just wanted to
    give you a heads-up."
    Did I read that correctly?

A. Yes.

206

Q. Okay. And then he says:
"Also, I have a walk-through at RW with the retail team this Thursday at 3:30 if you wanted to join, or maybe I can connect with you that night. If not, I'll be out again in the coming weeks."
And you respond:
"Would love to join. And I already reached out this morning asking. Haven't heard back, but will be on top of it."
Does it help you remember more?
A. Help me remember more to what question?
Q. About what you did with regard to Resorts World and getting a draft of the definitive agreement.
A. Yeah, I'm calling or emailing to find out how it's coming along.
Q. Did you ever work with Ignite with regards to other contracts with regards to Resorts World beside what's in the letter agreement?
A. Yes.
Q. What other contracts did you assist on?
A. I helped them get a marketing deal with the massage company at Resort World.
Q. And what did that deal entail?
A. Basically they were going to market Ignite on

207

the massage therapist clothing and on the massage therapist cushions.
Q. And did that deal actually happen?
A. Yes.
Q. And did you get paid for doing that deal?
A. No, I did not.
Q. And do you know if Ignite was supposed to get paid under that agreement, or was it just a pure marketing?
A. If Ignite was supposed to get paid? From who?
Q. From the massage company.
A. Was Ignite supposed to get paid from the massage company? No, I don't believe so.
Q. Okay. That's what I was asking. Sorry.
MS. STEIN: Did I hear a weird sound? So sorry.
Did you say something, Jon? I didn't know if you -- I didn't -- couldn't hear you.
MR. PEARSON: I coughed.
MS. STEIN: Okay. I'm sorry. Are you okay?
MR. PEARSON: Yeah.
MS. STEIN: I thought you were objecting. So I was, like, okay, I want to make sure I wasn't crazy.
BY MS. STEIN:
Q. So the massage company was a marketing deal; is

208

that correct?
A. Yes, for Ignite.
Q. Okay. Was the massage company going to sell any Ignite products in the spa?
A. The massage company doesn't work with or for the spa.
Q. Okay. Was -- but does the massage company operate in Resorts World?
A. Yes.
Q. Where do -- do they operate in the spa?
A. No, they do not operate in the spa.
Q. They have their own area?
A. Correct.
Q. Okay. And in that area do they sell products?
A. They do not.
Q. Okay. So this was just shirts and cushions?
A. Can you ask the full question, please.
Q. Well, I'm just trying to understand, again, and I know that you said that. I'm just trying to understand under this massage contract, they were going to just brand shirts and cushions for the massage therapists and just have in the area?
A. Correct.
Q. Okay. And did you do any other agreements at Resorts World for any other Ignite products?

209

A. Not at Resort World.
Q. Okay. And so you said "not at Resort World." So another property?
A. It wasn't a property. It was another company.
Q. And what company is that?
A. Fat Tuesdays.
Q. And that's a bar, right, if I remember from my younger days?
A. I mean, it's a -- I don't know if it's considered a bar. It's sort of a walk-up, you know, like a walk-up -- maybe a walk-up bar, I guess.
Q. The big slushy drinks; right?
A. Exactly.
Q. Those were dangerous in the day, if I remember.
A. Yeah, if you can drink enough of that sweet stuff, I guess it could be.
Q. And did you -- were you successful in arranging a deal with Fat Tuesdays and Ignite?
A. No.
Q. And what kind of deal was that going to be?
A. It was going to be a deal where Ignite was going to launch or get a cocktail named after Dan using Ignite alcohol.
Q. And were you expecting to be paid if that deal was successful?

 

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC

Alan Richardson                                              Ignite Spirits, Inc. v. Consulting by AR, LLC

210

A.   No.

Q.   Any other deals at Resorts World or for Ignite besides the letter agreement, the massage, and Fat Tuesdays?

A.   At the end of the arguing days, I sent John Schaefer another company that was interested in potentially involving themselves in a deal with Ignite, and they were a, um -- they were a, uh, ice cream that is infused with alcohol. So I sent them the contact. I spoke to the person that owned the company. They were interested in -- in doing something potentially with Ignite. So I sent John Schaefer their information to reach out and see if he could put a deal together with them.

Q.   Okay. And -- okay. Hold on one second. Sorry. I think Dan was trying to show himself. There he is.

MS. STEIN:  Are we good, Jon?

MR. PEARSON:  We are. Thank you.

MS. STEIN:  Thanks, Dan. If you can just mute and you can go away. Thank you.

BY MS. STEIN:

Q.   Okay. You said something before -- and sorry about that -- about this company. You said it was, like, at the end. What did you mean by that?

211

A.   The ice cream company?

Q.   Yes.

A.   I mean after -- even after I stopped communicating with -- with Ignite, I still sent that deal to John Schaefer. So when I meant at the end, I meant after the communication broke down.

Q.   Why would you do that if you felt it was at the end of the relationship?

A.   Because that's what kind of guy I am.

Q.   Did you expect to be paid at all?

A.   No.

Q.   And actually, I'll just -- because I want to make sure I get the name right -- I will show you -- this will be marked Exhibit 37.

(Exhibit 37 was marked.)

BY MS. STEIN:

Q.   This is CONSULTING 485. It's an email from you on July 31st, 2021, to a dvonbrod dnafilms cc'ing John, and its subject is Booze Cream.

Is that what we're talking about?

A.   Yes.

Q.   And just to go down below, it's Deborah Von Brod from Booze Traveler; correct?

A.   I'm not sure who I spoke to or if ultimately somebody that I did speak to said reach out to Deborah.

212

I don't really remember.

Q.   Okay.

A.   It was very -- it was very brief because I was already, you know, obviously, not going to be able to orchestrate the deal.

Q.   Why wouldn't you be able to orchestrate that deal?

A.   Because I didn't think Dan would want me calling him and saying, "Hey, I have an idea to get involved in an ice cream deal."

Q.   Okay. You like John Schaefer; right?

A.   I mean, from the times that I spoke to him and talked to him, he seemed like a very nice person.

Q.   When was the last time you talked to John Schaefer?

A.   Sometime in late July, maybe, mid to late July.

Q.   Of 2021, obviously?

A.   Yes.

Q.   Sorry. I have to make sure where I am in the year. I forget. So --

A.   Well, it can't be '22; right?

Q.   Feels like it, though.

A.   Yeah.

Q.   Go ahead, and I'm going to mark this Exhibit 38.

213

(Exhibit 38 was marked.)

BY MS. STEIN:

Q.   And this will be BELL75 through 92. And this is an email to you from Paul Bilzerian dated June 11th -- excuse me -- 2021, "Subject: Resorts World," and it has an attachment: "Ignite International Ltd. - Strategic Marketing Alliance Agreement with RWLV dated June 7th, 2021." An important date; my dad's birthday.

And this says -- it's to you, and it says:

"We have now received a proposed Resorts World definitive agreement, a copy of which is attached."

Did I read that correctly?

A.   Yes.

Q.   Okay. And if I go down starting on BELL76, it has a document starting -- it says "Strategic Marketing Alliance Agreement"; correct?

A.   Yes.

Q.   And this is, obviously, not a signed document, just to show you. Looks like it's a draft.

Is this the first time, on June 11th, that you under- -- that you had seen the definitive agreement, or had you seen it prior?

A.   Can't recall.

Q.   Do you know if this agreement was sent to you

214

prior?

A.   Prior to Paul Bilzerian getting it?

Q.   Yes.

A.   I would have no way of knowing when Paul Bilzerian or who Paul Bilzerian got it from and I -- I don't remember when I saw it the first time or from who.

Q.   Okay.  Now, this is after June 9th; right?  This is June 11th; correct?

A.   Correct.

Q.   Okay.  And the second sentence says:
     "There are several provisions over which we
     intend to negotiate for revisions."
     Do you see that?

A.   I do.

Q.   Okay.  "However, some of the provisions affect
     Ignite's agreement with you."
     Did I read that correctly?

A.   You did.

Q.   Okay.  And then I'm going to ask you to read the next part of the paragraph, and let me know when you're done.

A.   How far do you want me to read?

Q.   The whole paragraph.

A.   Is there any more to scroll down?

Q.   No, I don't think there is, but I can show you

215

to make sure.  There you go.

A.   Okay.

Q.   Now, the last sentence states:
     "We would like your thoughts before we discuss
     our changes with RW."
     Did you respond to this email in any way?

A.   I think I had a conversation with Paul or David and discussed with them that -- I think it was with David.  I think David actually acknowledged, and I'm not positive, but -- that every single casino, in Nevada especially, has termination clauses with any vendor, and they're -- they're standard and had -- this had nothing to do with Ignite.  They're -- they're governed by Nevada Gaming that I don't think the hotel even cannot have that -- that wording in any contract with any vendor.

     And I don't think Mr. Bilzerian, Mr. Paul Bilzerian, knew about this at the time.  I remember having some conversation with him during the time of this email or after this email that, you know, his point is, you know, potentially logical that there's no clause in there that protects him in case he just gets thrown out and then at some point later learned that it's standard in every single casino in Nevada, and there's zero chance that they would take it out for -- you know,

216

for Tesla, for anybody.  It has to be in the agreement.

     And I assume that once he learned that it wasn't personal, that they were okay with it because ultimately they signed the deal with that in there.

Q.   Going next, this will be Exhibit 39.

     (Exhibit 39 was marked.)

BY MS. STEIN:

Q.   This is CONSULTING 299 to CONSULTING 300 as Bates stamps.  This is an email from John Schaefer on the top on June 12th to you regarding Resorts World:
     "Dear Alan, we will go back to RW with the
     changes and let you know how it goes."
     Did I read that correctly?

A.   Yes.

Q.   Now, I'm going to go down, again, to the bottom.  At 300 you'll see the same email we looked at in the previous exhibit on June 11th, and then John Schaefer sent you an email after that; correct?

A.   You are going way too fast for me to comprehend.

Q.   Okay.  So let me slow down.

     So at the bottom here, this is the email we just looked at with Paul.

A.   Okay.  Paul sends me an email on Friday, June 11th.

217

Q.   Okay.  And then if I go up a little bit -- I know it's hard because this is split screen.  This is just to show you on June 11th, later that night, John Schaefer wrote an email to you.

A.   June 11th.  Same day, June 11th also.

Q.   Okay.  Later in the day, much later.

A.   I mean, I understand there's some issues with time stamps because Paul is in a different time zone, and it's hard because the time stamps show their time zone.  So it's actually not necessarily -- it can be later on in the stamp, but it doesn't mean it's really later because there's, like, a five- or six-hour change between the two for -- I'm not -- just clarifying that.

Q.   Okay.  But then John writes to you here saying -- he was apologized getting to you so late, but he's also questioning the termination clause; right?

A.   I'd have to read it.  Sorry.  Hold still.

Q.   Go ahead.  Please read.

A.   Yes.

Q.   Okay.  And then you actually respond to him the next day, but actually the next really early morning depending on where we are:
     "I think it's best for you to discuss this with
     Solomon."
     Are you referring to the termination clause?

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

218

A. Maybe.
   Okay. I read it.
Q. Okay. So does that -- are you referring here to John's question on the termination clause --
A. Yes.
Q. -- about getting with Solomon?
A. Yes.
Q. But then you also ask at the last sentence:
   "Do you have the information on where and who will take the deposit of the shares?"
   Correct?
A. Yes.
Q. Okay. And John actually responds later on that same day or same morning that, again, he'll go back to Resorts World with the changes, and as for the share, he provided information to you; correct?
A. Yes.
Q. And it said that you -- that Alan can use Haywood Securities in the U.S.; right?
A. Yes.
Q. Did Consulting by AR -- I'm asking you as Consulting -- contact Haywood Securities to set up an account?
A. Yes.
Q. And I think we established earlier that there

219

was no account. Was Consulting by AR not successful in setting up an account with Haywood Securities?
A. Correct.
Q. And why not?
A. They won't allow an account setup until the stock has no restriction on it. They couldn't take stock with restriction, from my memory. So they said when the restriction is removed, to give them a call.
Q. Okay. Go next -- this will be Exhibit 40.
   (Exhibit 40 was marked.)
BY MS. STEIN:
Q. This is CONSULTING 594. And these are text messages from 6/21/2021, again, between you and Mr. Schaefer. At the bottom you questioned:
   "Did Ignite contract get sent back yet?"
   So you're following up here with regards to the status, right, of the definitive agreements with Resorts World?
A. Correct.
Q. And during this time, are you and/or Henry reviewing at all any draft agreements?
A. I don't know that we got any draft agreements.
Q. And, again, I just want to be -- the opening occurred on June 24th; correct?
A. Correct. That was pushed back. When we

220

originally did my letter agreement, it was going to be -- the talk of it was going to be July 4th, and the whole point of doing this deal, the entire intent of this deal, was that Ignite was going to be -- their, like -- the dig -- the big Dan hurrah was going to be at the opening.
   So when we first started this, we thought it was going to be July, and then as we got way closer, then the opening pool party/launch party, blah, blah, blah as we called it the whole day, got pushed back to June 24; correct.
Q. All right. Bear with me for one second.
   Okay. So then I'm going to go -- this will be Exhibit 41.
   (Exhibit 41 was marked.)
BY MS. STEIN:
Q. It's an email -- this is actually CONSULTING 471. It's an email from you dated June 28th, 2021, to John Schaefer regarding massage agreement. And you write:
   "Good morning, John. I hope you had a great weekend. I was told by Solomon today that they are still waiting on you guys to send back a signed contract and that you guys have had it all this time. Can you please tell me the

221

   status?"
   Are you referring to the massage agreement here or the Resorts World agreement?
A. The Resort World agreement.
Q. Okay. Then you go on to state:
   "Can you also send an addendum today extending my agreement deadline to July 15th if you aren't signing today with Resorts World. Thank you so much."
   Did I read that correctly?
A. Yes, you did.
Q. Okay. Why are you asking here on June 28th for an addendum to the letter agreement?
A. Because by June 28th, it was very clear that Dan, Paul, David, Ignite were playing games. They weren't -- they were trying to figure out every possible which way not to pay me, and I didn't want to be dealing with another excuse that Ignite would come up with in the event that the contract wasn't delivered prior and that they didn't perform prior and have to deal with another thing. Unfortunately, exactly what I was worried about is exactly what happened, and it's exactly why we're here today.
Q. At the time, did you understand that it was one or two agreements to the definitive agreement?

 

222

A.   It was, I think, from day one, always two agreements. There was a marketing agreement, and then there was a retail agreement. And the marketing agreement was long, long, long done, and the retail pop-up agreement they were waiting on -- according to John Schaefer and I think someone else told me that they were waiting on the location to be picked, that Paul wasn't happy with the location, and they couldn't finish the pop-up agreement until -- until they satisfied Ignite/Paul/David, whoever, the location of where the -- the pop-up retail kiosk, as they call it, I think, was going to be.

So early on in the documents -- I can't tell you at this moment where, but it always said that there -- there had to be a separate agreement for retail pop-up versus the -- the other agreement. I think it's called the marketing agreement or something like that.

Q.   Let me ask this question because I want to make sure I understand:

Did you ever personally deal with any of Resorts World attorneys who were part of the drafting process of these definitive agreements?

A.   Did I ever deal with them?

Q.   Personally, yeah.

A.   I don't believe I did.

223

Q.   Okay. So you wouldn't know their schedule with regards to reviewing documents or drafting personally; correct?

A.   Correct.

Q.   Go ahead, and we'll mark this Exhibit 42.

(Exhibit 42 was marked.)

BY MS. STEIN:

Q.   This is BELL36 to 38. This is an email forwarded by you to David Bell on June 30th, and you're forwarding an email that you sent to Paul Bilzerian on June 30th. And I'm going to read it:

"Good afternoon, Paul. I hope all is well. The party turned out to be a great time and I had -- and had a huge turnout. I've heard the agreement with Ignite has been finalized and agreed by both sides and some small redline is left with the retail agreement. Solomon thinks it's days away at most from finishing. Can I please receive an extension until this is signed off and completed by Ignite and Resorts World? Thank you, Alan."

Did I read that correctly?

A.   You did.

Q.   Why did you forward this email to David Bell?

A.   I think he -- I think he asked for it.

224

Q.   Did you have a discussion with David Bell after receiving Paul Bilzerian's email?

A.   I mean, I'm not sure what timing you're -- which email you're asking me if I received from Paul if I spoke to David afterward, but I was in contact with David as well, and I think David told me to reach out to Paul. So I reached out to Paul on David's request, and then I sent David back Paul's response.

Q.   Did you ever receive an extension to the letter agreement in writing?

A.   I did not.

Q.   This will be Exhibit 43.

(Exhibit 43 was marked.)

BY MS. STEIN:

Q.   This is CONSULTING 478 to 481. And on 7/1 you wrote to Paul Bilzerian:

"Dear Paul, thank you for your response. I spoke to David briefly, and he explained that you will be presenting me a new version of our agreement tomorrow. He basically said that compensation won't change, just a prorated payment if there's early termination due to RW cancelling. Is this what I'm meeting David tomorrow for?"

Did I read that correctly?

225

A.   You read it correctly.

Q.   So on July 1st, you were expecting to have a meeting with David Bell on July 2nd?

A.   So you're putting these --

Q.   I'm just asking a question about were you expecting a meeting?

A.   These text messages are out of context. Paul Bilzerian --

Q.   I'm asking --

A.   Paul Bilzerian told me this day or the day before that I will be meeting David the next day to resolve all the issues, and the meeting apparently would be that day with David per Paul's email prior to this.

Q.   Did you have a meeting with David Bell on July 2nd, 2021?

A.   I don't recall.

Q.   Did you have a meeting with David Bell anytime after July 1st, 2021?

A.   Yes.

Q.   How -- did you have more than one or just one?

A.   In person?

Q.   Yes.

A.   I think it was just one.

Q.   Was that in and around -- was it after this date of July 1st, 2021?



CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

---

**226**

A.   I believe it was, but I cannot tell you with certainty.

Q.   So if I go further down on this same page, you reference an email, and there's an email here on July 1st from Paul. Is that the email you're referring to? Take your time.

A.   "David Bell will meet with you tomorrow to finalize your deal so everyone can enter the July 4th weekend with hugs and smiles." Yes, that is the email.

Q.   And then we go to -- back later that day, and you are communicating with Paul, and you're asking him about meeting with David about compensation; correct?

A.   Correct. Not about compensation, about -- what it says, he said that the compensation won't change a prorated format that they want to -- they want to have a prorated format in case there's early termination. So the meeting is technically, according to what Paul said, about a prorated payment if early termination.

Q.   But at this point, you had asked for -- also for an extension; correct?

A.   Correct.

Q.   And you hadn't received that yet; right?

A.   Right.

Q.   And Paul is discussing a prorated payment. Did

---

**227**

you have any objection to a prorated payment at this time in July 1st?

A.   I didn't know anything about it. There's another email that I'm asking questions what it is, and that's when he responded and said "David will meet with you tomorrow to discuss it," and that's why I asked him, "Is that what he's going to be discussing with me tomorrow?" And Paul said, "I don't want to talk about it. Wait for David to get there, and he'll discuss it with you."

So Paul wouldn't -- would not share whatever he had on his mind with me. He sent David with the instructions, what they were going to be.

Q.   And we've been going for a little bit. Why don't we go ahead and take five minutes.

MS. STEIN:  That work?

MR. PEARSON:  Sounds good.

THE VIDEOGRAPHER:  The time is now 3:18 p.m. We are off the record.

(A recess was taken from 3:18 p.m. to 3:38 p.m.)

THE VIDEOGRAPHER:  The time is now 3:38 p.m. We are back on the record.

BY MS. STEIN:

Q.   Mr. Pearson [sic], besides your attorney, did

---

**228**

you speak with anyone during the break?

A.   Me?

Q.   Yes.

A.   Two phone calls.

Q.   Okay. To who?

A.   My mom and one of my friends out here.

Q.   Did you speak about this deposition at all?

A.   No, just that I'm still here.

Q.   Okay. I'm sorry. I meant to say Mr. Richardson. It's getting late in the day. I am not confusing you and your lawyer. I apologize.

A.   It is late.

Q.   I'm going to go ahead; we'll mark this Exhibit 44.

(Exhibit 44 was marked.)

BY MS. STEIN:

Q.   This is IGNITE51 to 68. This is Strategic Marketing Alliance Agreement between and Ignite International Ltd. and Resorts World Las Vegas LLC. And I'll just go through it and ask if you've seen this document before.

A.   I don't recall.

Q.   You mentioned earlier that there were to be two agreements with Resorts World. Were you aware that one of the agreements is a Strategic Marketing Alliance

---

**229**

Agreement?

A.   Yes.

Q.   Okay. Have you seen the Strategic Marketing Alliance Agreement before today?

A.   Yes.

Q.   When was the first time you saw the agreement?

A.   I don't remember. I think when -- maybe when it was signed, or I think Henry gave me a copy of it. I'm not exactly sure, but I'm pretty sure I saw it.

Q.   And then this agreement on Exhibit -- IGNITE61 shows the signatures by Scott Sibella and John Schaefer. From a Consulting by AR standpoint, did Consulting by AR have anything to do with the drafting of the Strategic Marketing Alliance Agreement?

A.   No.

Q.   Did Consulting by AR negotiate the terms of the Strategic Marketing Alliance Agreement?

A.   I think indirectly a lot of the terms came from the LOI, which I negotiated.

Q.   But after the LOI was executed, did you assist in negotiating the definitive agreements?

A.   I believe that all the changes that got done between the letter agreement, the LOI, and the final agreement were -- or some of them, at least, were through me.

---

230

Q.   Did you review the Strategic Marketing Alliance Agreement before Ignite International signed this agreement?  And I'm asking you as Consulting by AR.

A.   I don't recall.

Q.   So I'm asking -- so what would help you to recall, because, again, I'm asking you in your capacity as a 30(b)(6).

A.   I can call Henry up and ask him what date he got it and -- or I can look in my emails to see if I got a copy from -- from Ignite or Resort World or -- or Henry.  I mean, I just don't know.  I mean, I'm sorry.  There's literally 10,000 documents I went through.

Q.   So I guess my question, though, is but with regards to the agreement itself, did Consulting by AR, either through you or your attorney, Henry, make any modifications or changes or redlines to this Strategic Marketing Alliance Agreement before it was signed?

A.   To your question of redlines, I don't believe so.

Q.   Okay.  And just for the record, you'll see it has "Attention" under "Ignite" it has two names:  John Schaefer and my name, Kim Stein.  Is that the first time you heard my name or saw my name in this -- involved in this matter?

A.   I don't -- I don't recall when I first heard

231

your name.  And I see where you're talking about now.  I didn't see it before.  I was looking at the email addresses, and you're not there.

Q.   But just for the record, you had not dealt with me prior to this litigation; correct?

A.   Dealt with you?  Correct.

Q.   Go ahead, and I'm going to mark this Exhibit 45.

(Exhibit 45 was marked.)

BY MS. STEIN:

Q.   This is IGNITE16 through 50.  And this is Retail Pop-Up Space License Agreement between Ignite International and Resorts World.  And, again, I'm going to ask you if you've seen this document before.

A.   I just -- I can't tell you with certainty.  I saw some document with sketches of -- of the booth and of, like, the mall layout where they were going to be in the mall.  So I don't remember if it was part of this document or I saw it separately.

Q.   Okay.  So when you're talking about IGNITE33 --

A.   Like -- like some kind of sketch like that, like the mall sketch.

Q.   If I can rotate it so I can -- that's the property map and site plan.

Had you seen -- if you look at Exhibit B, which

232

is IGNITE36, it's a description of the licensed premises.

Have you seen this drawing before?

A.   I don't remember.  I saw some -- some booth designs and maybe that was one of the designs.  I don't really -- can't tell you with certainty.  I know there was different ideas or concepts of ideas for the booth.

Q.   Did you have any input in the booth -- the final booth design for the Ignite kiosk at Resorts World?

A.   No.  Or, I mean, I didn't have input to their opinion, maybe, but which one of the designs I liked best, maybe.  But, again, I'm not a hundred percent.  But as far as having an impact in the design, no, the ultimate design.

Q.   Now, similar questions to before, though.  You were -- again, you were aware there were two agreements for the Resorts World and one had to do with the retail space; correct?

A.   Yes.

Q.   Okay.  And kind of similar question, did you have anything to do with the drafting of this retail license agreement?

A.   No.

Q.   And, again, just as we sit here today, you

233

don't remember the first time you would have seen the retail agreement; is that correct?

A.   Correct.

Q.   Go ahead; this will be -- it's in two.  It's not combined, but I will combine it as one exhibit. This will be Exhibit 46.

(Exhibit 46 was marked.)

BY MS. STEIN:

Q.   This will be CONSULTING 482 and 483.  It's a text -- or an email between -- from you to Paul Bilzerian on July 5th, 2021.  Subject is "Screenshot," and you wrote:

"Sorry I was in the middle of writing you back prior to seeing you want emails.  So here is my last text.  I will await hearing back from you."

And then if we go to CONSULTING 483, and this is a very hard screenshot.  This was produced by your -- by your -- by you through your counsel.

Is this done on an iPhone?

A.   You are asking me if the screenshot was done on an iPhone?

Q.   Yes.

A.   I'm not sure what you're showing me.  It says

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                    Ignite Spirits, Inc. v. Consulting by AR, LLC

234

"Paul Bilzerian" on the top?

Q. Yeah, this is a screen- -- again, I'll show you the first page was -- it says it's a screenshot, and you said:

"Here is my last text."

This is what you wrote to Paul.

A. This that you're showing me here as my last text is not the same -- that's an email; right?

Q. No. You wrote an email saying "I was in the middle of writing you back --"

A. Right, that's what I just said. This is --

Q. "Here is my last" -- "So here is my last text," and there's an attachment of a screenshot and you -- this is what you produced. You produced this screenshot.

A. This screenshot that I produced looks like it's the shape of an iPhone.

Q. Okay.

A. So I'm guessing it came off of my iPhone, yes.

Q. Okay.

A. Oh, that's -- that's Signal.

Q. Okay. And what were you referring to in your email saying about his -- his -- that you said you were in the middle of writing him back prior to seeing he wants emails. So did he ask you not to use Signal?

235

A. No, he asked me to use Signal, not to use email.

Q. And I know it's hard to read, but if we look at this screenshot, you're blue and he is white; correct?

A. Can you, like, make it bigger, please?

Q. I will try. I don't know if it gets any better.

A. Yeah, it's -- oh, there you go. Moved off the screen.

Hold on. "Canadian Stock Exchange and -- Canadian Stock Exchange -- Ignite."

The white, I would assume, is Paul; correct.

Q. Okay. Do you still have Signal on your phone?

A. Yes.

Q. And do you have this text message where you could maybe produce it where it's clearer?

A. Ah, sure.

Q. Okay.

MS. STEIN: I'm just going to ask, Jon, if you can kind of get that and just kind of maybe correct this image.

MR. PEARSON: Yes. But I can tell you we've already produced this in one of our productions.

MS. STEIN: We couldn't find it otherwise attached to this email. So it's --

236

MR. PEARSON: Yeah, I can tell you and Ryan off the record where this is at in our production.

MS. STEIN: Okay. But I'd like to see it in this format. So maybe if we could just get another picture cleaner.

MR. PEARSON: You want it exactly like this?

MS. STEIN: Yeah, just a corrected image where we can actually see it. It shouldn't be fuzzy.

MR. PEARSON: We can try.

MS. STEIN: Okay.

BY MS. STEIN:

Q. Now, I know it's hard to read, Alan, and I will try, but the first line says:

"I am not the decision-maker, Alan, and have never said I was."

Had you ever heard Paul Bilzerian tell you he was not a decision-maker for Ignite?

A. Just here for the first time.

Q. Okay. What did you understand Paul Bilzerian's role to be with regards to Ignite?

A. That he was clearly the decision-maker.

Q. And what -- did he tell you that he was?

A. I mean, it was pretty obvious for the entire course of my interaction with him that he was the decision-maker. He actually -- he actually was the one

237

that told me that the only person authorized to talk to me was David Bell and that I'm not even allowed to talk to Dan Bilzerian anymore. He wrote that to me, and he told that to me.

Every single time that I had a question about this deal and I was with David Bell, he called Paul Bilzerian on the phone literally right in front of me and got the answers in a matter of seconds. Dan did the exact same thing when I went to Dan's house. He called his dad right in front of me and got the answers to my questions. And then I had lunch with John Schaefer, and John Schaefer couldn't have made it clearer that Paul Bilzerian runs the show; Paul Bilzerian is -- is the big, you know -- the big boss. And through all my experiences, I mean, every email, every text message I had with Paul, he made decisions.

Q. But I guess what I'm asking you, though, when he would tell you that, did you ever confirm that with Dan Bilzerian?

A. I just told you I was at Dan Bilzerian's house multiple times and Dan called -- literally called his dad right in front of me and asked him questions for answers, and there were other times that I would ask Dan something, and he said, "Let me -- let me talk to my dad, and I'll get back to you."

238

So I mean, it was pretty clear, pretty obvious, and the president of the company confirming the exact same thing, that, you know, that's what it was.

Q. But in July, as of July 5th, if you're having issues with Paul and Dan -- I'm sorry -- with Paul and David, why didn't you -- did you reach out to Dan regarding the letter agreement?

A. I mean, I did reach out to Dan somewhere along the way, and it's just -- you know, it's the shell game, to be honest with you -- talk to David. At Dan's deposition, he testified that he got -- he got tired of me; so he had to pass me off to David. And then David got tired of me; he had to pass him off to his dad. Then his dad got tired of me, and he passed me back off to David. And obviously, as we discussed today, David never passed me off to anybody. He dealt with me the entire time, including inviting me to go on a European vacation with him in late July.

And Paul Bilzerian, I'm not sure of the medical terminology, but one day, you know, is nice, the next day tells me never ever contact him again, tells me I need a psychiatrist and all these other things. And then one week later out of nowhere calls me -- and you read that email today, I believe -- and said -- oh, you didn't read that email today -- and said, "Please let's

239

forgive all harsh things I said to you and let's continue." And then a week later, the email you did read today, was that he heard the launch party was amazing, he wishes he could have been there. Maybe you didn't read that today. I'm sorry. That I did such a wonderful job, and he heard it went so well, and the last line literally was "I'm sure you had everything to do with making this happen."

So -- so after getting beaten up for three months, bounced around, and, you know, no matter what I did, it wasn't enough, I guess at some point there was no point in going back to Dan to -- to ask him to, you know, fix his father, which by that time, I guess, I concluded that he probably can't even fix his father because his father's, you know, the boss.

Q. But this email we're talking about, which is Exhibit 46, was on 7/5/21; correct?

A. The one where we can't really read very well?

Q. Yeah.

A. If you can show me the date again, but to answer your question -- 7/5 is the date of it, yes.

Q. This is after the deal with Resorts World is signed; correct?

A. Yes.

Q. Let me go ahead and mark this as Exhibit 47.

240

(Exhibit 47 was marked.)

BY MS. STEIN:

Q. This is DAN35 through 42, a text message conversation between -- and I represent to you between you and Dan on July 6.

Do you remember reaching out to Dan on July 6?

A. I mean, can you read me back the record? Didn't you just ask me a few minutes ago why didn't I reach out to Dan, and I said that I did at some point?

Q. Okay. And I'm asking you now, and based on what your answer was, do you remember reaching out to Dan on July 6?

A. I mean, I remember it now that you put it in front of me, but two minutes ago I told you I did; I just didn't remember at what point and when.

Q. Okay. So you did on July 6. Is this helping remind you when it was?

A. Yes.

Q. Okay.

A. Do you want me to read this?

Q. No.

Now, go ahead and mark this Exhibit 48.

(Exhibit 48 was marked.)

BY MS. STEIN:

Q. This will be CONSULTING 628 to 629. This is,

241

again, text messages between you and John Schaefer starting on July 20th, 2021, and you state:

"TY with a thumbs up as you understood it, they are honoring the original deal correct?"

And then John answers:

"I was just told they were satisfied and will do the deal with you. I wasn't involved in any of the deals so I don't know how the original deal is compared to any new deals you may have discussed. Sorry."

Why are you asking John if the -- they're honoring the original deal on July 20th, 2021?

A. Um -- excuse me -- at this point, there is literally -- as you're picking and choosing which text messages to show me, there's nonstop, ongoing communication back and forth as you showed July 4th or 5th or 3rd that David Bell was coming. Paul Bilzerian sent him with new marching orders of what the new proposal's going to be.

And then there were some -- some crazy story that they were afraid and that -- if you would show all the emails, you would know the answer -- they were afraid that I poisoned the well and that I -- David Bell told me, "I had to set a meeting up for John Schaefer to meet with Mr. Sibella" because Mr. Paul Bilzerian was



CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                         Ignite Spirits, Inc. v. Consulting by AR, LLC

242

very concerned that I poisoned the relationship, and he wanted to make sure that the relationship wasn't poisoned before they now went on to honor their deal.

Three days later, five days later, Mr. Paul [sic] Schaefer came to Resort World, and Mr. Paul Schaefer met with Mr. Sibella and Mr. Solomon Schwartz to figure out whether I poisoned or didn't poison the deal, and then Mr. Schaefer spoke to Mr. Bilzerian and Mr. Bell, I got messages from both of them, saying that Mr. Schaefer came back and told them that I had not poisoned the deal as Mr. Bilzerian had feared, and there's an email, which you didn't show me, that he said that he feared I poisoned it and how stupid can I be and how self-destructive I am and all these other psychological names that he called me, and they sent Mr. Schaefer on the investigative trail to figure out if that was true.

Then Mr. Schaefer came back and said that it wasn't true, and Mr. Schaefer reported back to David Bell and Paul. And then Mr. Schaefer, I assume doing his fiduciary responsibility as the president of the company, sent me an email that he spoke to Paul who -- this is more signs who runs the -- gave him the report that I didn't poison the well. And Mr. Paul Bilzerian then told him that now -- now they intend to honor my

243

deal.

So now we can pick up the text messages where you started to show me where it says -- where I'm asking Mr. Schaefer, "So now they are going to honor the original deal?" Because he just got done meeting with -- with Scott per Paul's concern about me poisoning the well and him reporting back to Paul that he didn't poison the well -- that I didn't poison the well. I'm sorry.

Q. Isn't it true, though, that you never had that meeting on July 2nd with David Bell?

A. I really don't recall. I know that -- I mean, let me think for a minute because, again, so many things.

I had a meeting with David Bell in his room. And it may not be July 2nd. I may have been confused. But I had a meeting with him. Obviously, as we discussed, they tried changing my deals so many times, and there were so many meetings. But I had a meeting with David Bell at Resort World in his room when he brought me back a proposed new set of terms, and then I had a question about it, and then he called Paul in front of me, and the answer was, no, they're not going to change the -- they're not going to change my -- my warrants -- not my warrants, but my options. They're

244

not going to change my options.

And -- and I may be confusing that as the July 2nd meeting. And as I'm thinking about it with more clarity now, I texted David Bell on July 2nd to meet with me, and you are 100 percent correct, it is clearer now, David Bell told me that we could talk briefly at the event. And I said, "David, that's not -- it's not going to be quiet."

And then he said, "You can come by the cabana. I invite you to the cabana, but I'm trying to have a relaxing day, and I don't have patience to deal with you today," and basically told me he wasn't going to meet with me. You are 100 percent accurate and -- and it came back to me now. Correct. Thank you.

Q. I'm confused, though. You said "at the event," but the event was June 24th; correct?

A. There was some event on July 2nd or it was a dinner party, and he said we can talk at that -- I'm not referring to the opening party.

Q. Okay. I just want to make sure I'm getting it right.

A. Yeah, "to the event," in quotes, whether it was dinner that night or it was a cocktail. There was something happening. I mean, I can grab the text, or I'm sure you have it, and he wrote to me, "We'll talk

245

about it at the --"

Q. Okay.

A. "-- dinner tonight."

And I said, "We can't talk there. It's too -- you know, there's no privacy."

And then he said, "Well, you can come by the cabana tomorrow or come by the cabana today, but I'm trying to have a relaxing day, and I don't want -- you know, I don't want to be bothered with you dealing with this right now."

And you're right, I never did go because he told me he didn't want to be bothered with it.

Q. Again, this is now July 20th, and we looked at emails earlier, June 30th and July 1st, where you're asking about extending the letter agreement; correct?

A. No, I didn't -- I didn't ask for it on July 3rd. I asked for it leading up to July 1st.

Q. So, again, going back to what we have marked as Exhibit 48, when you asked as you understand -- -stood it, "They're honoring the original deal contract [sic]?" you're asking that of John Schaefer; correct?

A. This particular text message you're showing me is from me to John Schaefer.

Q. And you're asking him, correct, if they're honoring the original deal?

246

A.   That is correct.

Q.   You're not telling him they're honoring the original deal, you're asking if they are; correct?

A.   There is a question mark at the end of it; correct.

Q.   And then after John answers you, you respond to him:

"We didn't discuss a new deal.  They said the old offer expired and had a new offer, which is not what is fair or ethical since they let my deal purposely expire."

Did you write that?

A.   Can you scroll up, please, to John's message in between?  Do you want to read that one to me?

Q.   We already did, sir.  You can read it to yourself, if you like.  I'm not going to read it again.

A.   You never read this.  This is John Schaefer to me now; right?

Q.   John Schaefer to you --

A.   You read the one above?

Q.   -- responding.  I read the one above.  But I'm not asking you -- my -- I have a question for you.  So you're welcome to look at that to help you answer the question, but can you please answer my question.

A.   Could I -- you told me to read it, and you said

247

you read it --

Q.   Go ahead.

A.   -- and you didn't read it.

Q.   Go ahead.

A.   Okay.  Go ahead.  I'm sorry.

Q.   So, again, did you write:

"We didn't discuss a new deal.  They said the old offer expired and had a new offer, which is not what is fair or ethical since they let my deal purposely expire."

Did you write that?

A.   I did.

Q.   What did you mean that "they let your deal purposely expire"?

A.   So this deal was done on June 24th when both parties performed.  The contract was then delivered to Ignite on June 30th, and they chose to sign the agreement in the wee hours of July 2nd.  So my interpretation is on -- based on all the bad faith that they did throughout this contract, that they had the contract on June 30th, and they waited -- clearly they waited for whatever reason, till the wee hours of July 2nd to sign it.  So that's what I meant when I said they let my deal purposely expire.

Q.   Except on June 30th, we looked at the email

248

earlier that you knew that the contracts could not be signed on time on June 30th; correct?

A.   Incorrect.

MR. PEARSON:  Objection to form.

BY MS. STEIN:

Q.   Okay.  Well, again, record's clear, but we'll go forward.

So what evidence that you have this belief that they purposely delayed, how do you know personally that the contracts were delivered by Resorts World to Ignite?

A.   There's a time stamp on it.

Q.   Did -- were they delivered -- were any contracts delivered to you?

A.   No.

Q.   Do you know who at Ignite they were delivered to?

A.   No, not off the top of my head.

Q.   Okay.  And do you know if both the strategic alliance agreement and the retail pop-up agreement were delivered at the same time?

A.   I -- I don't know.

Q.   Go ahead; we'll mark this Exhibit 49.

(Exhibit 49 was marked.)

BY MS. STEIN:

Q.   This is an email -- I'm sorry -- a letter

249

from -- sent by email to Henry Lichtenberger by Ignite dated July 30th, 2021.  This is IGNITE69 to 70.

Have you seen -- and I'll let you look at it. Read it to yourself, and then I'll ask you some questions.

A.   Can you not scroll so fast.

Q.   I'm sorry.

A.   Okay.  Go down, please.

Okay.  Can you just go back up to the top one more time?

So this is on July 30, 2021, from Paul -- is that Paul Holden?

Q.   That's correct.

A.   Paul Holden, okay.  I read it.

Q.   Have you seen this letter before?

A.   Yes.

Q.   And in the middle of the second paragraph, it references that you spoke to John Schaefer the night before, which would have been July 29th, 2021.

Do you remember having a discussion with Mr. Schaefer on July 29th, 2021?

A.   Vaguely.

Q.   And do you remember advising Mr. Schaefer that you were not willing to entertain any settlement offers and intended to file a lawsuit?

 

250

A.  I don't remember the exact wording, but it very well could have been that kind of conversation.

That letter also states that they made me substantial offers which I rejected, and that's not true.  I mean, as you just acknowledged, David Bell didn't even meet with me with Paul Bilzerian's latest marching orders.  So I don't know when they -- they offered me some substantial offers.

Q.  And I think I was able to find; so I'll go ahead and mark this Exhibit 50.

(Exhibit 50 was marked.)

BY MS. STEIN:

Q.  This is CONSULTING 3050 to 3067.  This is text messages as disclosed by you between Paul Bilzerian and yourself.  And, again, you said this is from Signal; is that correct?

A.  I can't see what you're looking at.

Q.  Oh, sorry.  Looks like --

A.  Much cleaner -- clearer than --

Q.  Yeah.

A.  -- the other one.

So the thing you're asking John for is going to be in here if it's cleaner.

Q.  That's what I was saying.  I had my assistant try to look for it as we were here.  So she found it.

251

Is this from Signal?

A.  Yes.

Q.  Okay.  And Sunday, July 4th, says:

"Happy Fourth of July.  Hope you're having a great day.  I have a few questions for you concerning your latest proposal.  Can we please schedule a five-minute talk today?"

And that's you, correct, in the blue?

A.  Yes.

Q.  Okay.  And then Paul answers back:

"Please talk to David."

A.  Yep.  This is what I referred to earlier when Paul wouldn't even give me an offer or nothing.  He said, "Talk to David," and that's -- I don't want to go on.

Q.  Okay.  And then you say:

"Good morning.  I tried to meet with David yesterday, but he told me there is nothing to talk about.  Your new offer was not negotiable and that he was busy enjoying his day and didn't want to be aggravated."

A.  Oh, perfect.  Exactly what I told you.

Q.  Okay.  And then this is the one that's just cleaner just for the record:

"I am not the decision-maker, Alan, and have

252

never said I was."

So that was from the other exhibit that we looked at that's part of Exhibit 46.  But this is CONSULTING 3051.  I just want to make sure I show that.  Okay?

Okay.  After Mr. Lichtenberger received that letter on July 30th, you then engaged Holland & Hart and Mr. Pearson; correct?

A.  I mean, at some point.  I don't know the time frame or the date, but yes.

Q.  Okay.  Well, I'll just make it easier.  I just want to get a date.  This will be Exhibit 51.

(Exhibit 51 was marked.)

BY MS. STEIN:

Q.  This is IGNITE71.  This is a letter dated August 2nd, 2021, to Paul Holden.

A.  Yes.

Q.  Okay.  And it's -- just for the record, this just says:

"I have received a copy of your letter dated July 30th."

So this is when you would have retained Mr. Pearson; correct?

A.  Yes.

Q.  Now, you're aware that you were actually sued

253

in this case first; correct?

A.  Yes.

Q.  Okay.  And then you -- then a counterclaim was filed on Consulting by AR's behalf; correct?

(The court reporter interrupts for clarification of the record.)

MS. STEIN:  Sorry.

BY MS. STEIN:

Q.  I said and a counterclaim was then filed on Consulting by AR's behalf; is that correct?

A.  Yeah.

Q.  Okay.  Did you review the counterclaims before they were filed?

A.  I imagine I did.

Q.  I'm going to go ahead, and I'm going to pull that up.  This will be Exhibit 52.

(Exhibit 52 was marked.)

BY MS. STEIN:

Q.  This is Consulting by AR LLC's Answer, Affirmative Defenses, and Counterclaims.  And I'll just go to a date.  It's not the filed version because this is the unredacted version.  So we will mark this confidential under the protective order.

But this certifies it's signed September 1st, 2021.  Did you have a chance to review this document

 

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC
Alan Richardson                                              Ignite Spirits, Inc. v. Consulting by AR, LLC

254

before it was filed on September 1st, 2021?
A. Yes.
Q. Did you make any changes to any drafts of this counterclaim before it was filed?
A. I don't recall.
Q. Let me go to where it starts, which is page 7. This is where the counterclaims start.
    Do you see that?
A. Um-hum. Yes.
Q. Now, under A.1., it states:
    "Counterclaim plaintiff company," which is
    Consulting by AR, is a Florida limited
    liability company. Alan Richardson is the
    company's sole member and manager. Richardson
    permanently resides in Miami-Dade County,
    Florida."
    That statement's true as we sit here today.
A. Yes.
Q. Next states that:
    "Counterclaim defendant Ignite Spirits is a
    for-profit Wyoming corporation headquartered in
    Los Angeles County, California."
    Did I read that correctly?
A. Yes.
Q. What was your basis to believe that Ignite

255

Spirits is headquartered in Los Angeles, California?
A. You'll have to ask my -- my lawyer.
Q. Okay. So you had no independent basis of that information?
A. You -- you have to ask my lawyer.
Q. Okay. Go to paragraph 15, which is on page 9. It says:
    "Given this lack of presence, in or about
    January 2021, the company's managing member,
    Richardson, approached Dan Bilzerian."
    Do you see that?
A. Yes.
Q. And, again, just to make sure, the entity, Consulting by AR, was not formed until March 3rd, 2021; correct?
A. Correct.
Q. I'm going to go to page 13, paragraph 22 of the counterclaim, states:



256

Q. Did I read that correctly?
A. Yes.
Q.
A.
Q. Consulting by AR is how the company is defined, yes.
A. That it was never modified?
Q. Correct.
A. I believe so.
Q. Now, I want to ask you if I go to the end of this counterclaim -- so I'm going to go to the right page -- on "Relief Requested." And that's on page 34 of the document and the exhibit. And under B, can you explain to me -- you're seeking here specific performance for certain stock and stock options or monetary damages; is that correct?
A. Yes.
Q. How do you expect -- and then, again, this is -- Consulting by AR is the counterclaimant, not you personally; correct?
A. Yes.
Q. How do you expect Consulting by AR to -- if it was successful, to be able to take possession of the stock without a brokerage account?

257

    MR. PEARSON: Objection to form.
    THE WITNESS:

BY MS. STEIN:
Q. Okay. And then also here you're asking for -- an alternative of monetary damages, but Consulting by AR does not have a bank account; correct?
A. I mean, it takes 30 seconds to open up a bank account.
Q. But as of today, you don't have a bank account; correct?
A. Consulting by AR never got paid; so there's no reason to have a bank account.
Q. But Consulting by AR has never had a bank account; correct?
A. Correct.
Q. Consulting by AR does not have an operating

258

agreement; correct?

A. Didn't we go over this already?

Q. Just asking a question.

A. I'm just asking if we went over this.

Q. And I -- again, it's my chance to ask questions, not yours. So I'm just asking you to answer my question.

A. Ask your question, again, please.

Q. And, again, Consulting by AR does not have an operating agreement; correct?

A. And, again, you're correct.

Q. Okay. If we can go ahead and take five minutes, I might be done. I always think the lawyers say that, but I just want to go through and make sure I didn't miss anything. Okay?

A. I'm going to go get a hot tea.

THE VIDEOGRAPHER: The time is now 4:25 p.m. We are off the record.

(A recess was taken from 4:25 p.m. to 4:36 p.m.)

THE VIDEOGRAPHER: The time is now 4:36 p.m. We are back on the record.

MS. STEIN: So I'm going to go ahead and pass the witness and just make a couple reservations to have the witness fill in some documents and then just reserve

259

my rights based on if certain documents come up to be able to re-question. But at this time I will pass the witness.

MR. ELLIS: On behalf of Ignite International and Ignite International Brands, no questions at this time subject to the same reservations Ms. Stein just made.

MR. PEARSON: And this is Jon Pearson on behalf of Consulting by AR and Mr. Richardson. We understand that you guys make your reservation, and we just want to make it clear we don't concede that you would have that ability. But we can deal with that on another day.

(The court reporter interrupts for clarification of the record.)

MR. PEARSON: Sorry. My voice is going out. We don't concede that they have the ability to re-question him, but we can deal with that on a later date.

THE VIDEOGRAPHER: This concludes the deposition of Alan Richardson, 30(b)(6) for Consulting by AR LLC. The time is now 4:37 p.m. We are off the record.

THE COURT REPORTER: Could I get counsels' transcript orders on the record, please, whether you like hard copy or electronic. I think you all have

260

ordered before in this case. Just same orders?

MR. PEARSON: For my firm, yes, please. And, obviously, Mr. Richardson will want a chance to review and sign.

MR. ELLIS: Right now I don't think I need one at this time.

THE VIDEOGRAPHER: Video, anyone?

MR. PEARSON: Not at this time for me.

MR. ELLIS: Same.

MS. STEIN: And we will need one, yes.

(Deposition concluded at 4:38 p.m.)

261

CERTIFICATE OF WITNESS

PAGE    LINE    CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

* * * * *

I, ALAN RICHARDSON, witness herein, do hereby certify and declare under penalty of perjury the within and foregoing transcription to be my deposition in said action; that I have read, corrected, and do hereby affix my signature to said deposition.

_____    _____

ALAN RICHARDSON
Witness                          Date

CONTAINS CONFIDENTIAL INFORMATION - 30(b)(6) for Consulting by AR, LLC

Alan Richardson

*Ignite Spirits, Inc. v. Consulting by AR, LLC*

262

REPORTER'S CERTIFICATE

STATE OF NEVADA          )
                         ) ss
COUNTY OF WASHOE         )

I, Dawn Bratcher Gustin, a duly certified court reporter licensed in and for the State of Nevada, do hereby certify:

That I reported the taking of the deposition of the witness, ALAN RICHARDSON, at the time and place aforesaid;

That prior to being examined, the witness was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That I thereafter transcribed my shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true, and accurate record of the proceedings to the best of my ability.

I further certify that (1) I am not a relative, employee, or independent contractor of counsel of any of the parties; nor a relative, employee, or independent contractor of the parties involved in said action; nor a person financially interested in the action; nor do I have any other relationship with any of the parties or with counsel of any of the parties involved in the action that may reasonably cause my impartiality to be questioned; and (2) that transcript review pursuant to FRCP 30(e) was requested.

IN WITNESS WHEREOF, I have hereunto set my hand in the County of Washoe, State of Nevada, this 26th day of May 2022.

_____
Dawn Bratcher Gustin, CCR 253, RPR, CRR

